# EXHIBIT C

# [PUBLICLY AVAILABLE REDACTED VERSION]

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

JASON WILLIAMS,

      Plaintiff,

vs.

AT&T MOBILITY LLC,

      Defendant.

Case No. 5:19-cv-00475-BO

---

**DEFENDANT AT&T MOBILITY LLC'S APPENDIX OF EXHIBITS TO
LOCAL CIVIL RULE 56.1 SEPARATE STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR
FOR PARTIAL SUMMARY JUDGMENT IN THE ALTERNATIVE AND IN
SUPPORT OF DEFENDANT'S MOTIONS IN LIMINE 1 AND 2**

Defendant AT&T Mobility LLC ("AT&T") submits this Appendix of Exhibits pursuant to

Local Civil Rule 56.1 and AT&T's Statement of Undisputed Material Facts, in Support of AT&T's

Motion for Summary Judgment or for Partial Summary Judgment in the Alternative, and in support

of AT&T's Motions *In Limine* Nos. 1 and 2 filed concurrently:

| Ex. No. | Description |
|---|---|
| 1 | Excerpts of Deposition of Jason Williams, taken on February 23, 2022 |
| 2 | Plaintiff's Supplemental Responses to AT&T's Second Set of Interrogatories |
| 3 | PART 1: AT&T Wireless Customer Agreement in effect March 2018–Nov. 2018 (ATT-WIL-05974)<br>PART 2: AT&T Wireless Customer Agreement in effect Nov. 2018–Feb. 2019 (ATT-WIL-01498) |
| 4 | Excerpts of Deposition of AT&T Mobility LLC Pursuant to Fed. R. Civ. Proc. 30 (b)(6) (Valerie Scheder), taken on November 30, 2021 |
| 5 | Excerpts of Deposition of AT&T Mobility LLC Pursuant to Fed. R. Civ. Proc. 30 (b)(6) (Ray Hill), taken on November 17, 2021 |
| 6 | Plaintiff Jason Williams' Signed Electronic Acknowledgement for AT&T Mobility Wireless Customer Agreement (ATT-WIL-01564) |
| 7 | Copy of Delaware Department of State, Division of Corporations webpage with entity details for Apollo Kids Mining, LLC |

Respectfully submitted on this 30th day of March 2022.

/s/   Joseph S. Dowdy

Joseph S. Dowdy (N.C. State Bar No. 31941)
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: (919) 420-1700
Facsimile: (919) 510-6120
Email: jdowdy@kilpatricktownsend.com

Michael Breslin (GA State Bar No. 142551)
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree St. NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile (404) 815-6555
Email: mbreslin@kilpatricktownsend.com

Nancy L. Stagg (CA State Bar No. 157034)
KILPATRICK TOWNSEND & STOCKTON LLP
12255 El Camino Real, Suite 250
San Diego, CA  92130
Telephone: (858) 350-6156
Facsimile: (858) 350-6111
Email:  nstagg@kilpatricktownsend.com

*Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on date set out below, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

SHUMAKER LOOP & KENDRICK LLP
Terence S. Reynolds
treynolds@shumaker.com
Lucas D. Garber
lgarber@shumaker.com
101 South Tyron Street
Suite 2200
Charlotte, North Carolina 28280

*Counsel for Plaintiff Jason Williams*

WITHERS BERGMAN LLP
Joseph Gallo
Joseph.gallo@withersworldwide.com
Christopher LaVigne
christopher.lavigne@withersworldwide.com
Martin J. Auerbach
Martin.auerbach@withersworldwide.com
430 Park Avenue, 10th Floor
New York, New York 10022-3505

*Counsel for Plaintiff Jason Williams*

This the 30th day of March, 2022.

/s/ Joseph Dowdy
Joseph S. Dowdy

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

Case No. 5:19-cv-00475-BO

- - - - - - - - - - - - - - -X

JASON WILLIAMS,               :

       Plaintiff,      :

v.                      :

AT&T MOBILITY, LLC,     :

       Defendant.      :

- - - - - - - - - - - - - - -X

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Videoconference Video Deposition of

JASON A. WILLIAMS

(Taken by Defendant)

Charlotte, North Carolina

February 23, 2022

Reported by:    Andrea Nobrega

                  Court Reporter

                  Notary Public

1    APPEARANCE OF COUNSEL:

2    By Videoconference for the Plaintiff:

3      CHRISTOPHER LAVIGNE, Esq.

4      JOSEPH GALLO, Esq.

5      Withers Bergman LLP

6      430 Park Avenue, 10th Floor

7      New York, New York  10022-3505

8      (212) 848-9800

9      Christopher.lavigne@withersworldwide.com

10     Joseph.gallo@withersworldwide.com

11

12   For the Defendant:

13     NANCY L. STAGG, Esq.

14     Kilpatrick Townsend & Stockton LLC

15     12255 El Camino Real, Suite 250

16     San Diego, California  92130

17     (858) 350-6156

18     Nstagg@kilpatricktownsend.com

19

20   Also Present: DILLON TYNDALL, Videographer

21              NIKI OKCU, Esq.

22     Videoconference Video deposition of JASON A.
     WILLIAMS, taken by the Defendant, at Charlotte,
23   North Carolina, on the 23rd day of February 2022
     at 9:43 a.m., before Andrea L. Nobrega, Notary
24   Public and Court reporter.

25

1                   CONTENTS

2    THE WITNESS: JASON A. WILLIAMS        EXAMINATION

3    BY MS. STAGG:                                    5

4                 INDEX OF EXHIBITS

5    For the Defendant                            Page

6    EXHIBIT 1  Williams Deposition Notice        78

7    EXHIBIT 2  Document Bates Labeled JW_0040

8               - 41                              144

9    EXHIBIT 3  Document Bates Labeled

10              JW_0089_CONFIDENTIAL.xlsx         270

11   EXHIBIT 4  Document Bates Labeled

12              GEMINI_0009                       284

13   EXHIBIT 5  Corrected Complaint              290

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   So I'm trying to understand based

2  on the employment narrative that you gave,

3  which of those companies relate to your

4  Crypto mining activities, and then we'll

5  drill down into them?

6       But I'm trying to understand from

7  your employment narrative which ones

8  relate to this case.  You can answer.

9       MR. LAVIGNE:  Same objection.

10      THE WITNESS:  I'm sorry, Chris,

11  your microphone broke up.  I thought you

12  said you had an objection.

13      MR. LAVIGNE:  I said same

14  objection.  You can go ahead and answer.

15      THE WITNESS:  Okay.  At present,

16  PRTI is in the business of mining

17  Cryptocurrency.

18      BY MS. STAGG:

19    Q.   Related to the claims that you're

20  making in this lawsuit, which -- was it

21  you personally or another company that was

22  involved in Crypto mining?

23    A.   I owned a company, but I was the

24  only owner of called Apollo Kids Mining.

25    Q.   So PRTI's Crypto mining activities

1    jobs that I hold, being a CEO of PRTI,

2    fund-raising, you know, processing the

3    amount of material we were doing, having a

4    constant and persistent attack, SIM swap

5    attack like I was facing, was highly

6    disruptive.

7         It was terrifying actually to wake

8    up in other countries, not have access to

9    your cell phone, lose -- lose your email,

10   see -- see transactions being made in your

11   traditional bank accounts.

12        All of these things were difficult

13   to manage on top of trying to take care of

14   my activities as an executive, as a

15   husband, as a father, all that.  It was

16   very difficult.

17   **Q.   Okay, so that the affects that you**

18   **are claiming from the SIM swap relate to**

19   **your personal response to what occurred**

20   **versus an actual affect on the Crypto**

21   **mining activities of PRTI?**

22        MR. GALLO:  Objection, misstate

23   the testimony.  Sorry, I realize that

24   Chris has been objecting, but with his

25   connection issues, I'm just going to jump

1    in for a bit.  I apologize for any

2    confusion.

3              MS. STAGG:  Okay, all right.

4              MR. GALLO:  Jason, you can answer.

5              THE WITNESS:  Yeah, the SIM swap

6    attacks affected me in totality in

7    everything I was doing, but most

8    specifically Apollo Kids Mining.

9              BY MS. STAGG:

10   Q.    That's what I'm trying to get at.

11   We are going to talk about all the other

12   issues, Mr. Williams, and give you an

13   opportunity to talk about your claims.

14             What I'm trying to understand is,

15   so I can focus on it, is I mean from --

16   this is my opinion, that most of your

17   claims in this case -- and I'm not

18   asking you a question -- relate to Crypto

19   mining.

20             So I'm going to ask you a lot of

21   questions about Crypto mining.  You may

22   disagree, your attorneys may disagree, but

23   as I said earlier, this is my opportunity

24   to ask you some questions, okay.

25             So we'll try to clarify.  Was

1    ahead and answer.

2           THE WITNESS:  So, you know, I had

3    seven or eight SIM swaps.  I lost control

4    of my email.

5           My middle daughter was threatened

6    to be kidnapped by these -- these people

7    who had possession of my personal

8    information.

9           My bank accounts were being

10   accessed.  My personal email was being

11   accessed.  All my identification I believe

12   was accessed and used to reorient my

13   accounts.

14          Yeah, things like that, and on top

15   of trying to run my businesses and

16   maintain my own stability, it was a lot.

17          BY MS. STAGG:

18   **Q.   Have you ever been told by the**

19   **police who was responsible for the threats**

20   **to your family and the threats to conduct**

21   **SWAT attacks?**

22   A.   No, I haven't been told

23   specifically who was involved with the

24   threats against me.

25   **Q.   How about generally?**

1      A.    That's interesting.  Yes, there
2  have been some assumptions made by the FBI
3  at times that it could be this person, it
4  could be that person, but I don't think
5  there was anything definitive.
6      **Q.    So at this point the FBI hasn't**
7  **given you any indication that they are**
8  **investigating any specific person or**
9  **persons in connection with these threats?**
10     A.    No.  I was contacted by a group --
11  I don't know if it's called FAST or -- it
12  was out of California.
13          They were investigating SIM swap
14  attacks, and I believe it was out of a
15  division of the FBI.  They reached out to
16  me.
17     **Q.    Are you referring to REACT?**
18     A.    Thank you, yes, it's called REACT.
19     **Q.    Sure.  So has REACT ever told you**
20  **any specific individuals that they were**
21  **looking at in connection with these --**
22  **either the SIM swaps or the other types of**
23  **attacks?  And we'll go through all of**
24  **that.**
25     A.    REACT only reached out to me

1   because they identified me as a target of

2   SIM swaps.  I didn't reach out to them.

3        They reached out to me.  They knew

4   I was being SIM swapped and they wanted to

5   get my story, and then I don't know what

6   happened after that.

7      **Q.  How about other law enforcement**

8   **agencies, have you had any communications**

9   **with them regarding this activity,**

10  **including the SIM swaps, the SWAT attacks**

11  **and the attacks on your email and**

12  **financial accounts?**

13     A.  Yes.

14     **Q.  Okay.  Who have you been in**

15  **contact with?**

16     A.  Specifically the night or the

17  afternoon that I was threatened by text

18  message, that if I didn't respond or do

19  something, that my daughter would go

20  missing.  I called the police.  I was

21  terrified.

22        The police showed up at my house.

23  They did not -- it was such a wild claim

24  that I made, I think it was difficult for

25  the officer to fully contextualize

1    in Raleigh?

2        A.    That was local law enforcement in

3    Raleigh, and then the FBI, I think they

4    are based out of Charlotte.

5              There is a Dark Web Division that

6    I was dealing with out of Charlotte.  That

7    is the Dark Web Division of the FBI.

8        **Q.    Okay.  And have they ever told you**

9    **that they have been able to identify**

10   **anyone who has been involved in any of**

11   **these threats or threatened attacks?**

12       A.    Yeah, that's where that when I

13   said they have alluded to knowing of

14   people and things, the FBI has, but they

15   would not provide me with specifics.

16             The FBI was in communication with

17   me because they recognized that I was one

18   of the largest miners in North America at

19   that time.

20             This is a very small community, a

21   very difficult thing to do, a very

22   unpopular thing, you know, so nuanced, but

23   that's when the FBI and I started our

24   relationship.

25             It had nothing to do with SIM

1  swaps.  It had to do with the facts that I

2  was mining.

3      Q.   Okay, so did that proceed some of

4  the SIM swap attacks that we are going to

5  talk about?

6      A.   Did -- my relationship with the

7  FBI preceded the SIM swap attacks, that's

8  what I'm saying.

9           They recognized me as one of North

10 America's largest Cryptocurrency miners

11 for some reason and wanted to interview me

12 and talk with me.

13     Q.   When was that initially, if you

14 recall?

15     A.   It would be late 2018.  I don't

16 recall specifically, but maybe late 2018.

17     Q.   All right.  But sometime prior to

18 the first SIM swap in this case?

19     A.   Yes, I believe so.

20     Q.   Okay.  But in connection with the

21 SIM swaps, has the FBI ever, you know,

22 involved you in any investigation or

23 prosecution of someone related to any of

24 the -- either the SIM swaps or the

25 threatened SWAT attacks or the other hacks

1    discussion with the FBI was -- you know,

2    where in time of the SIM swaps did that

3    occur?  You said it occurred after the

4    first one.

5        A.    No, it was when I was talking to

6    them about Molly and her being kidnapped,

7    it was very close proximity after that, I

8    believe.

9        Q.    So let me ask you this.  What is

10   your belief or understanding as to how

11   this terrible threat to kidnap your

12   daughter relates to AT&T and your claims

13   in this case?

14       A.    Well, I was under persistent SIM

15   swaps.  They were text messaging me.  They

16   were contacting me.  It wasn't -- there

17   was no interruption of the kind of chaos

18   and intensity of this.

19            So, you know, it was these were

20   sequential, consistent.  I would lose my

21   phone.  I would be texted.  I would be

22   contacted.  I would get notifications that

23   someone is trying to do something with my

24   account at AT&T.

25            It was just this constant like

1    unrelenting wave of this activity.  So in

2    that wave of activity was a text message

3    at 6:44 p.m. that if you don't do X, Y, Z,

4    we are going to kidnap your daughter.

5          It was just me handling the AT&T

6    SIM swap.  I don't know if you have ever

7    called AT&T or had to be on the phone with

8    an AT&T representative to handle any

9    problem with your account, but these

10   things take hours and they are confusing

11   and then the phone drops or the

12   representative may not be engaged or

13   believe me or want to deal with it, but it

14   is -- it is an absolute time suck.

15          Throw on top of it you are worried

16   about your safety and your family's

17   safety.  It's terrifying.  I hate to keep

18   using the same word, but it is very scary.

19   **Q.    Did you call AT&T in connection**

20   **with the kidnapping threat on your**

21   **daughter?**

22   A.    No, but I did share that

23   information in the AT&T store, I believe,

24   at one time when I was handling a SIM

25   swap, that this is the level of problem

1      I wasn't being loud, or I wasn't

2 being disruptive.  That's not in my

3 nature.  I was simply being matter of fact

4 that I need you guys to take this

5 seriously.

6      I have been a customer for, gosh,

7 15, 16, 17 years at AT&T.  Why can't we

8 get this right.  I have done my job.

9      I pay you guys.  You know, 18

10 years I have been a customer.  Stop doing

11 this, you know, because this is the

12 result, someone wants to kidnap my

13 daughter.

**14    Q.  I'm trying to understand how you**

**15 believe the SIM swaps were related to the**

**16 kidnapping of your daughter?**

17    A.  Well, I will say it again.  This

18 was a persistent attack that went over

19 time.  It wasn't some asymmetric thing

20 where five months later someone said, you

21 know, X, Y, Z.

22      This was all happening all at once

23 at the same time, and I barely would get

24 some semblance of control over my phone

25 before it would happen again.

1          Even as of today, I have never
2     gotten access to certain accounts back.
3     So that is directly related to the SIM
4     swaps.  That's how it happened.  That's
5     when it happened.  It hasn't happened
6     since.
7          Q.   So I know -- we'll jump to the end
8     there.
9               You terminated your relationship
10    with AT&T in about February of 2019,
11    correct?
12         A.   I believe so.
13         Q.   And you went to Verizon?
14         A.   Yes.
15         Q.   And are you still with Verizon?
16         A.   Yes.
17         Q.   And using the same wireless number
18    that you used at AT&T?
19         A.   Yes.
20         Q.   You ported that number over to
21    Verizon?
22         A.   Yes.
23         Q.   And have you experienced any SIM
24    swap or SIM attack of any kind since you
25    moved to Verizon?

1    then reestablish security, change
2    passwords, etc., and then I'm running a
3    business.
4          I'm just back from vacation.  I
5    have all of these other complexities that
6    I have laid out to you.  So my life wasn't
7    consisting of dealing with AT&T and SIM
8    swaps.
9          I had other things going on.
10   Yeah, in those two or three week time
11   period, it was running my business and
12   resolving the issues around my phone.
13   **Q.    Okay.  Does it sound correct that**
14   **you obtained a new SIM card or your SIM**
15   **card was restored on November 6, 2018**
16   **after the --**
17         MR. LAVIGNE:  Objection, form.
18         THE WITNESS:  No, that does not
19   sound correct.
20         BY MS. STAGG:
21   **Q.    So you think many days went by**
22   **that you didn't have your AT&T wireless**
23   **service?**
24   A.    I don't recall specifically, but I
25   would expect it was sometime after the 6th

1    that I reestablished my cell phone.

2        Q.    And between that date, whenever

3    that date was, and the 28th, in connection

4    with the AT&T SIM swap, what else did you

5    do that we haven't talked about here so

6    far today?

7        A.    Yeah, I would have expected that I

8    went into the store to -- sorry, Chris,

9    did you --

10           MR. LAVIGNE:  Yeah, objection,

11    vague.  Just give me a second.  Not a

12    problem.  Go ahead, Jason.

13           THE WITNESS:  I'm stating that

14    once I returned from Jamaica on the 6th or

15    thereafter, I then had to go to the store

16    and physically get a new SIM card for the

17    phone.

18           So I don't know when exactly that

19    happened, but I would have expected it to

20    happen very soon.

21           Like having a phone is paramount

22    to me.  It's literally my lifeline to

23    business and commerce.  It's how I run a

24    lot of my business.

25           BY MS. STAGG:

1      Q.    All right.   So -- but you don't
2   remember what date you were able to get
3   your AT&T service restored after that
4   initial SIM swap?
5      A.    I don't know, but we could
6   probably get that information from AT&T.
7   I'm sure they have it in their records
8   that when I went into the store and if
9   they produced the SIM card, what SIM card
10  it was, who is the person who helped me
11  reestablish it.   I'm sure it's all in
12  there.
13     Q.    Yeah, I'm asking you for your
14  recollection.   That's what I'm trying to
15  get at today.   So you don't really
16  remember?
17     A.    It was sometime after the 6th and
18  before the 28th.
19     Q.    All right.   So on the 28th you
20  have two entries there.   You have the DOX
21  attack we just talked about, which you
22  don't know whether that was a SIM swap or
23  not, is that correct?
24          MR. LAVIGNE:   Objection, asked and
25  answered.

1    stuff that I placed here for you to read,

2    that there was some SIM swapper in a store

3    and I believe that store was either in

4    Michigan or up in the northeast.

5          I can't recall exactly where and

6    they produced a license, and that license

7    was scanned into a computer.

8          So that's why when you asked me

9    earlier, does AT&T have a copy of my

10   license.  I'm pretty sure they do because

11   that's their standard operating procedure

12   to change a SIM card is to scan in a

13   license.

14   Q.   Okay.  Did you -- do you know if

15   you actually lost use of your phone on

16   November 30th?

17   A.   I believe I was SIM swapped.

18   Yeah, I was SIM swapped.  I was SIM

19   swapped, went into the store, and on

20   November 30th got a new SIM card.

21          Again, AT&T records should show if

22   I went into a store and got a new SIM

23   card.

24   Q.   Yeah, so what I'm trying to

25   understand is it looks to me like on the

1   showed up and asked me to step outside.

2       Q.   Okay.  And why do you think AT&T

3   called the Raleigh Police Department?

4       A.   I'm sure when someone is saying

5   that they are a victim of crimes and there

6   is potential kidnapping and harm, it was

7   probably scary for them as it is for me,

8   and maybe they were trying to help me.

9          Maybe they were trying to protect

10  themselves.  It's a frightening thing to

11  hear someone say the things that I was

12  saying.  Imagine living it.

13      Q.   Okay.  Do you recall who those

14  employees were that were at the store?

15      A.   No, but they were employees on

16  December 5, 2018.  So you can probably go

17  and get the records and find out who they

18  were.

19      Q.   Had you ever met them before?

20      A.   I don't recall who they are or

21  their names or anything about them.  They

22  are not friends or associates of mine in

23  any way, so I can't recall who they are.

24      Q.   Okay.  In your prior

25  communications at AT&T stores, did you --

1    checking to make sure because we discussed

2    that earlier.  Okay, thank you.  Sorry

3    about that.  Hope your air conditioning is

4    working fine.

5             So now it said -- what I want to

6    understand on December 5, 2018, you are

7    saying you suffered another SIM swap.  You

8    went to the store and the police were

9    called.  We discussed the situation.

10            Was your SIM swap resolved at the

11   store on that date on December 5th?

12       A.   Would you go back to the other

13   page, please?

14       Q.   The second page.

15       A.   No, this is it.  I believe so.

16   They issued a new SIM card.

17       Q.   Okay.  So while you were at the

18   store, the employees at that AT&T retail

19   store were able to reverse the SIM swap

20   and give you back access to your account

21   again?

22       A.   It appears that, because they

23   issued a new SIM card.

24       Q.   Okay.  You don't remember one way

25   or another?

1      A.   It says they issued a new SIM

2   card, and typically when they issued the

3   new SIM card, it means that they have

4   swapped it back to me.

5      Q.   **So now we are looking at your**

6   **entries on Exhibit No. 2 on the second**

7   **page, JW 0041, and it says, you know,**

8   **about first entry on the left-hand side**

9   **hacked accounts and then it lists Gmail,**

10   **HitBTC, Coinbase, Gemini account, Slush**

11   **Pool, mine in Virginia.  Do you see that?**

12      A.   Yes.

13      Q.   **So is this the list of the various**

14   **accounts that had activity where the**

15   **hackers took control of it other than your**

16   **AT&T phone?**

17          MR. LAVIGNE:  Objection, vague,

18   compound, asked and answered.

19          BY MS. STAGG:

20      Q.   **What was your purpose in listing**

21   **those?**

22      A.   It was an attempt to try to -- it

23   was an attempt to try to list the affected

24   accounts.  I can't say that that's them in

25   totality.  It's just what I listed at that

1     Q.    Okay.  Were you doing that in your

2     individual in your name, Jason Williams?

3     A.    Yes.

4     Q.    We look at the last line there

5     under that entry, it says total impact

6     approximately 1.5 million dollars.  Do you

7     see that?

8     A.    Yes.

9     Q.    How did you calculate that amount?

10    A.    It was an estimation of the Asics

11    and some of the -- yeah, I think it was

12    estimation of the Asics and the CAPX

13    associated with Apollo Kids Mining.

14          Again, it was just a notation or a

15    record.  I don't know exactly what it

16    intended by the statement, but it's there.

17    It's just a note.

18    Q.    Do you remember that you looked at

19    any documents to come up with that amount?

20    A.    No.  I recall the $2,880 times 500

21    comes up to some number, plus 70,000, plus

22    some number, gets me close to 1.5 million.

23    It's hard for me to quantify or know

24    exactly what was lost in Coinbase and

25    HitBTC because as you can see, I didn't

1      Q.    And then you believe that at that

2    point in time that that hacker or hackers

3    also were able to access your Gemini

4    account?

5      A.    Well, I noted that the --

6            MR. LAVIGNE:  Objection, asked and

7    answered.

8            THE WITNESS:  I noted that the

9    account was compromised in some way, and

10   that record has been turned over to you.

11           I don't know to what extent it is

12   now.  You are talking about such an

13   intense frequent -- intense frequency of

14   SIM swap.

15           I hope it's impressing upon you

16   how exhausting this process may be of

17   going some place, your phone is SIM

18   swapped, then I'm coming into a store and

19   I'm dealing with the recovery of this.

20   Then I'm troubleshooting all the damage

21   associated with it.

22           Then the next day I'm SIM swapped

23   again, and I'm going through the recovery

24   of all of that, going into the store

25   again.

1              You know, my life doesn't revolve

2    around AT&T and going to the North Hills

3    store and then repairing the damage

4    associated with SIM swaps.

5              So over this time period, again,

6    taking it all in totality, it's absolute

7    chaos, like absolute chaos.

8              To quantify the amount of money

9    and time, lost opportunity, it's nearly

10   impossible for me.  And this period of

11   time was very, very frustrating.

12             BY MS. STAGG:

13        Q.   Why is that?

14        A.   Because of the frequency that it

15   was happening, literally almost back to

16   back.  It's like what's going on?  What's

17   going on at AT&T?

18        Q.   Would you -- sure.  So between

19   December 5th and February 4th, you didn't

20   have any SIM swap incidents, correct?

21        A.   I would have to look at the record

22   again.  I'm not -- right now I can't

23   recall the exact dates of when the SIM

24   swaps occurred.

25        Q.   Okay.  You think you -- let me

1  answered.

2          BY MS. STAGG:

3      Q.   And did you restore the Slush Pool

4  account after February 6th?

5      A.   Yes, I believe so.  I believe that

6  there was -- I believe I created a new

7  Slush Pool account.  I didn't restore that

8  one.  I created a new Slush Pool account.

9      Q.   Okay.  Any other SIM card changes

10  that you recall after February 6, 2019?

11      A.   I don't recall anything at this

12  time.

13      Q.   Do you remember when you ported

14  your service to Verizon from AT&T?

15      A.   I don't recall exactly, but it was

16  around -- I think it was around that time.

17  I don't recall exactly.

18      Q.   Okay.  All right, we can take down

19  Exhibit No. 2.  Let me ask you a series of

20  some questions to kind of clear up some of

21  the records here.

22          Did you store a backup of your

23  phone's memory in any account?

24      A.   No, not that I know of.

25      Q.   Let's talk about the mining

1    business since that seems to -- at least

2    from a financial standpoint some of the

3    area that you are claiming in this case.

4    The mining operation that was connected to

5    the Slush Pool account, was that being

6    done in your name, Jason Williams, or were

7    you doing it through another entity?

8          MR. LAVIGNE:  Objection, compound,

9    vague, speculation, argumentative.

10          BY MS. STAGG:

11    Q.    Your mining operations that were

12    connected to the Slush Pool accounts that

13    we talked about today, were all done under

14    Apollo Kids Mining, is that correct?

15    A.    Yes.

16    Q.    So all of the Crypto mining

17    operations that you are alleging were

18    affected by AT&T SIM swaps were actually

19    being conducted by an LLC that you set up

20    named Apollo Kids Mining, is that correct?

21          MR. LAVIGNE:  Objection,

22    mischaracterizes previous testimony.

23          MS. STAGG:  You can answer.

24          THE WITNESS:  Yeah, I believe so.

25    I set up an LLC called Apollo Kids Mining,

1    and that's where -- that's where that

2    business was done.

3           It's a single member LLC.  I owned

4    it.  It's a single member LLC.

5           BY MS. STAGG:

6     **Q.   All right, but it was the LLC that**

7    **owned the Crypto mining rigs, is that**

8    **correct, the 500?**

9     A.    That's an accounting question.

10   I'm not an accountant, but I set up an LLC

11   called Apollo Kids Mining, and that's

12   where -- that's where the -- that's where

13   I did the business of mining.

14    **Q.   Okay.  And that's a Delaware LLC?**

15    A.    I believe so.

16    **Q.   All right.  And is it still**

17   **operational today?**

18    A.    Yes.

19    **Q.   And Apollo Kids Mining incurred**

20   **all the expenses in connection with Crypto**

21   **mining, correct?**

22    A.    Most of them, but some of them I

23   bore personally.

24    **Q.   Okay.  Which ones were those?**

25    A.    I don't know.  I would have to --

1   I think I turned over my -- you have all

2   of my financials.  So they are all there.

3   I have shown my financials.  My accountant

4   turned all that stuff over, tax returns,

5   etc.

6   **Q.   Okay.  But what expenses do you**

7   **believe that you personally incurred**

8   **versus the LLC in connection with all of**

9   **the Crypto mining that Apollo Kids Mining**

10  **was doing?**

11          MR. LAVIGNE:  Objection, asked and

12  answered.

13          MS. STAGG:  You can answer.

14          THE WITNESS:  Yeah, so when I

15  purchased the 1.4 million or so

16  Cryptocurrency miners, I took a loan

17  against my -- like I have a stock account.

18          So I was just trying to be

19  efficient in regards to capital

20  allocation.  So I took a loan, bought

21  those rigs and that was my own like trust.

22  So it wasn't the -- a business.  It was my

23  trust.

24          So, yeah, so I was personally --

25  somewhat personally funding Apollo Kids

1    Mining.  It's a single member LLC that I

2    own, and limited liability companies pass

3    through to mid-member managers anyway.  So

4    my money, my business.

5          BY MS. STAGG:

6    **Q.   Okay.  But actually it was your**

7    **trust that took the loan out against the**

8    **stock account?**

9          MR. LAVIGNE:  Objection, asked and

10   answered.

11         THE WITNESS:  Yeah, I believe my

12   stock portfolio account is domiciled in my

13   trust, which I'm the sole trustee.

14         BY MS. STAGG:

15   **Q.   And so the trust borrowed the**

16   **money to purchase the rigs for Apollo Kids**

17   **Mining, LLC?**

18   A.   I as the trustee borrowed the

19   money and allocated it to a business that

20   I owned 100 percent and then I paid that

21   money back 100 percent.

22   **Q.   Okay.**

23   A.   Again, I'm not an accountant, so

24   anything I was doing, my accountants have

25   all that information and my bankers.  So

1  you know --

2      Q.   Okay.  So you --

3      A.   It's all --

4      Q.   You would defer to the records on

5  how the ownership of the Crypto mining

6  rigs is handled?

7          MR. LAVIGNE:  Objection,

8  mischaracterizes testimony, asked and

9  answered.

10         BY MS. STAGG:

11     Q.   In any event, when the rewards

12  were paid out by Slush Pool to your Gemini

13  account, those were paid out to Apollo

14  Kids Mining, LLC, correct?

15     A.   No.  They are paid out to a

16  wallet.  That wallet was controlled by

17  Apollo Kids Mining, but paid out to a

18  wallet.

19     Q.   All right.  So they are paid out

20  to a wallet, but the wallet is controlled

21  by Apollo Kids Mining, LLC, correct?

22     A.   Which is me.

23     Q.   Okay, but Apollo Kids Mining, LLC

24  was the entity that you controlled that

25  was doing the mining, correct?

1　　　　　MR. LAVIGNE:  Objection, asked and

2　answered, cumulative, mischaracterizes

3　testimony.

4　　　　　MS. STAGG:  You can answer.

5　　　　　THE WITNESS:  Yeah, I'm super

6　confused.  I'm the single member manager

7　of an LLC.  That LLC I believe -- again,

8　my accountants handle this stuff, is

9　the -- is the company that benefited from

10　the depreciation of those rigs, I believe.

11　　　　　That depreciation, though, is

12　passed through to me as the single member.

13　　　　　So in aggregate, I own Apollo Kids

14　Mining.  I'm the trustee.  The mines were

15　purchased by me as the member and the tax

16　benefit, losses, income earned, gained,

17　lost, it all goes back to me, and any

18　accounting of that is handled by my

19　accountants.

20　　　　　BY MS. STAGG:

21　　**Q.　Now, although your Cryptocurrency**

22　**and your Gemini accounts were hacked after**

23　**the SIM swaps, ultimately the hackers were**

24　**not able to steal any currency from your**

25　**Coinbase account, is that correct?**

1     A.   No.

2     **Q.   Okay.   What Cryptocurrency was**

3   **taken out of your Coinbase account?**

4     A.   2.5 Bitcoin and then some amount

5   to which I don't know they purchased with

6   funds.   Either they liquidated assets in

7   the account.   There was stable coins in

8   the account.

9       There were transfers out of my

10   First Citizens account, which they

11   purchased more Bitcoin and they

12   transferred that out of the account.

13       I'm not quite sure of all the

14   numbers.

15     **Q.   All right.   The First Citizens**

16   **account, any transfers that came out of**

17   **that account you were reimbursed, correct?**

18     A.   Yes.   I contacted First Citizens'

19   fraud department and those were I believe

20   FDIC insured.

21     **Q.   So through the FDIC insured**

22   **accounts you were made whole, is that**

23   **correct?**

24     A.   To the best of my knowledge, and I

25   don't know if it's FDIC that does it, but

1   those were FDIC insured accounts.

2        But I went through the process to

3   claim the fraud and First Citizens, they

4   returned that money.

5        MR. LAVIGNE:  Objection, vague and

6   ambiguous to the question.  Objection,

7   vague and ambiguous, argumentative,

8   mischaracterizes testimony.

9        BY MS. STAGG:

10    Q.   **And that was about $6,500?**

11    A.   I don't recall the exact amount,

12   but I have given you all of that

13   information on a spreadsheet.

14        I think there were five or six --

15   five or six, maybe more attempts at

16   withdrawals from my account.  Two or three

17   were effective.  The rest of them were

18   stopped or somehow delayed.

19        I don't know exactly how we were

20   able to delay them.  But eventually I had

21   withdrawn all of the money out of that

22   account because I wasn't able to get

23   Coinbase because I didn't have access to

24   it to stop any of the activity.

25        The only way I could stop it was

1    opportunity to ask you.  What are your

2    claims on behalf of PRTI in this lawsuit?

3              MR. LAVIGNE:  Objection,

4    mischaracterizes testimony.

5              MS. STAGG:  You can answer.

6              THE WITNESS:  Yeah, I think we

7    have outlined, you know, all of our -- all

8    of my claims in the documents that we

9    presented, and I think that's the answer.

10              BY MS. STAGG:

11        Q.    I don't know what that answer is,

12    Mr. Williams.

13              What are you claiming against AT&T

14    with regard to PRTI?

15              MR. LAVIGNE:  Objection,

16    mischaracterizes testimony and asked and

17    answered, calls for a legal conclusion.

18              THE WITNESS:  Yeah, as much as my

19    daughter being kidnapped is a result of

20    these SIM swaps, you know, that affected

21    me.

22              Maintaining all of my businesses

23    and my capacity to be the best I can be

24    during this chaotic event, this persistent

25    event, the loss of control of multiple

1   systems all at once, it affected me

2   negatively.

3           I cannot quantify to you exactly

4   what that is, but it is something real and

5   it has down range of effects that I'm

6   still dealing with today.

7           I have been hesitant to disclose

8   them, but I'm dealing with them today.

9           BY MS. STAGG:

10      Q.   **And what are those?**

11      A.   You know, affects to my daughters'

12   emotional state, and my own personal

13   relationships with my family.

14      Q.   **So you're making a claim in this**

15   **lawsuit for your affects to your daughters**

16   **and your personal relationship with your**

17   **family?**

18          MR. LAVIGNE:  Objection,

19   mischaracterizes testimony, calls for a

20   legal conclusion.

21          MS. STAGG:  You can answer.

22          THE WITNESS:  I think what I'm

23   saying to you is a threatening a 15 year

24   old to be kidnapped and having police with

25   guns in your house and your father trying

1    to project himself as some type of

2    vigilante who can defend himself with

3    weapons, who is tired, exhausted from

4    this, and it's affected me.

5            It's affected my relationships.

6    It's affected my daughter.  It's affected

7    me and my wife.  I am making that claim.

8            How do I quantify that?  I don't

9    know.  Do I think you are liable, yes.

10   Yes, 100 percent.

11           Do I think that these SIM swaps

12   have taken a toll on me, and have affected

13   my businesses negatively, yes.

14           How do I quantify that?  I don't

15   know.  I'm leaving that up to these

16   attorneys.  That's why I persisted.

17   That's why I'm sitting here today and

18   that's why I'm willing to go to trial with

19   this.  You have offered settlement.  I

20   will not take it.

21           BY MS. STAGG:

22      **Q.   So you think that AT&T is 100**

23   **percent liable for all of the threats, DOX**

24   **attacks and SIM swaps?**

25           MR. LAVIGNE:  Objection,

1    mischaracterizes testimony, calls for a

2    legal conclusion.

3            MS. STAGG:  You can answer, Mr.

4    Williams.

5            THE WITNESS:  Yeah, I can only say

6    that the persistent incompetence and

7    errors and from my understanding, inside

8    employees making decisions that I don't

9    think are in my best interest, affected me

10   negatively.

11           So for that, yes, you are

12   responsible, like 100 percent responsible

13   for those events.  And the events that

14   come from it, yes, you are responsible.

15           BY MS. STAGG:

16   **Q.    Okay.  So do you feel that the**

17   **individuals who have targeted you have any**

18   **responsibility for any of the actions that**

19   **have occurred that you described today in**

20   **your testimony?**

21           MR. LAVIGNE:  Objection, asked and

22   answered, mischaracterizes testimony, also

23   calls for a legal conclusion.

24           This has been disputed and argued

25   in front of the court and decided already.

1          MS. STAGG:  You can answer, Mr.

2    Williams.

3          THE WITNESS:  Yeah, I think there

4    is a whole host of people that are

5    responsible.

6          The persistent attack vector has

7    been the SIM swaps through AT&T.  I have

8    done everything that you said for me to

9    do.

10         I have tried my very best to

11    manage this as best as I can.  I am the

12    customer.  I have been a customer for 15,

13    20 years, however long it is.

14         Every time I went into the store,

15    if you told me stand on my right leg, I

16    did it.  If you told me hold my nose, I

17    did that.  If you told me stand on my leg

18    and hold my nose, I did.

19         I did what you said, and I would

20    walk out of the store and you see what

21    happens days later, same day, whatever.

22         No matter where I am in the world,

23    I'm not safe, and yeah, it's a big deal.

24    It's a big deal.  I don't know if you ever

25    had someone threaten your life, threaten

1    to kidnap your kids, ever seen a kid have

2    to deal with that.  It's a big deal.  It's

3    a big deal to me.

4           BY MS. STAGG:

5      Q.   Have you kept any other notes

6    other than the ones you produced?  Like,

7    for example, do you keep a diary of any of

8    the things that are going on with you

9    emotionally?

10     A.   No.

11     Q.   Have you seen any healthcare

12   provider about any of these emotional

13   issues that you have been dealing with

14   with your family?

15     A.   No.  My daughter has.

16     Q.   Okay.  Your daughter is not a

17   party to this lawsuit.  Are you making

18   claims on her behalf?

19          MR. LAVIGNE:  Objection, calls for

20   a legal conclusion, and he has already

21   explained what he meant.

22          BY MS. STAGG:

23     Q.   Well, what I'm trying to get at

24   is, if he is making claims on behalf of

25   his daughter in some capacity, then I'm

1    going to ask him a lot of questions.

2            If he is not making any claims on

3    behalf on his daughter's behalf in this

4    lawsuit, then I don't have to ask those

5    questions.

6            MR. LAVIGNE:  I think you have

7    answered your own question in your

8    question.  You noted that the daughter is

9    not a party of the lawsuit.

10           BY MS. STAGG:

11       Q.   Well, Mr. Williams, are you

12   seeking to recover for what you just

13   described with your daughter's emotional

14   state in this lawsuit?

15           MR. LAVIGNE:  Same objection.

16           MS. STAGG:  You can answer.

17           THE WITNESS:  Yeah, I don't know

18   what any of that means.  I'm just saying

19   that because AT&T persistently allowed for

20   my phone to be SIM swapped, these hackers

21   threatened to kidnap my daughter.

22           I'm not Liam Nesson.  I don't go

23   out and fight crime.  This happened, and

24   I'm stating I got damages.  I don't know

25   what that means.  I'm just telling you

1    that's what happened, and it's bothered

2    me.

3              BY MS. STAGG:

4        **Q.   Have you gone and gotten any**

5    **counseling from a psychologist, a licensed**

6    **clinical social worker, a psychiatrist,**

7    **anyone else in connection with the**

8    **incidents that you attribute to AT&T?**

9              MR. LAVIGNE:  Objection, asked and

10   answered.

11             THE WITNESS:  No, I haven't, no.

12             BY MS. STAGG:

13       **Q.   Okay.  And you haven't kept a**

14   **diary?**

15       A.   I don't understand the question.

16   It's not something like -- I don't keep a

17   diary.  I never have.  I have been through

18   a lot in my life, very traumatic things.

19   I don't keep a diary.

20             I'm sorry if that's something that

21   people do.  I just don't.

22       **Q.   Okay.  I'm just asking what**

23   **information you have to support your**

24   **claims --**

25       A.   I workout.  I workout.  I go to

1    the gym.  I try to do it that way.

2            MR. LAVIGNE:  Objection to the

3    previous question, asks for a legal

4    conclusion and argumentative.

5            BY MS. STAGG:

6        **Q.   All right.  Have you talked to any**

7    **healthcare providers about your mental**

8    **state?**

9            MR. LAVIGNE:  Asked and answered.

10           MS. STAGG:  You can answer.

11           THE WITNESS:  No.  I don't go to

12    the doctor.

13           BY MS. STAGG:

14       **Q.   All right, going back to the**

15    **mining operation of Apollo Kids Mining,**

16    **did you ever try to sell the rigs?**

17       A.   I think I ran all types of

18    different scenarios with the palletized

19    rigs that were in possession with JP, but

20    I never really got anywhere.

21           It was confusing, and yeah -- and

22    again they trade all over the place.  In

23    terms of your initial question, if I pay

24    $2,880 somewhat for each rig, as the price

25    of Bitcoin decreases, they decrease.  The

1   the hackers told me in text messages while

2   I was an AT&T customer.

3          They told me that if I didn't

4   respond, they would sell my information on

5   the Dark Web, that they would bring hell

6   to my life.

7          Like you have read all the text

8   messages, that they would attempt to

9   kidnap my daughter.  I can only tell you

10  what they told me.

11         I didn't say it.  They said it.

12  They said it with my phone, my AT&T phone,

13  as a result of AT&T operators, AT&T

14  employees, AT&T third-party vendors, I

15  don't know.

16         Those are the ones who are

17  facilitating the SIM swaps, the changing

18  of my passwords, the changing of my four

19  digit PIN, the changing of my notes in my

20  file.  I didn't do that.  AT&T employees

21  did that.

22         I mean did an AT&T employee delete

23  the file that had instructions to not

24  change my SIM card, unless I was at the

25  north Raleigh store?  Had to.  Had to be

1    wife.  It's when I lived in Fayetteville,
2    North Carolina.
3        Q.   And you don't have any reason to
4    believe that had anything to do with
5    what's gone on now?  You don't have a
6    stalker who is stalking you for years?
7        A.   No.
8        Q.   All right.  And you weren't home
9    during that incident?
10       A.   I wasn't.  My wife was.  That's
11   why it was so concerning, and when you
12   brought this up, it triggered my memory of
13   it.
14       Q.   Okay, thank you.  Now, I asked you
15   some questions before about Apollo Kids
16   Mining, LLC.  Apollo Kids Mining, LLC
17   never had an AT&T account, correct?
18       A.   No.  Just I was the AT&T account.
19       Q.   So Jason A. Williams is the AT&T
20   customer, correct?
21       A.   I believe that's the name that's
22   there, yeah.
23       Q.   It's not held in a business
24   account?
25       A.   No, I don't believe so.  I think

1    it's my name.

2        Q.   Did you ever have any

3    communications with anyone at AT&T where

4    you told AT&T that Apollo Kids Mining,

5    LLC's mining rigs were dependent on AT&T's

6    security on the phone?

7            MR. LAVIGNE:  Objection, vague.

8            MS. STAGG:  You can answer.

9            THE WITNESS:  I don't believe I

10   had any discussion with anyone like that.

11           BY MS. STAGG:

12       Q.   Now, in connection with your Slush

13   Pool account, at some point in time you

14   locked out the payouts on the Slush Pool

15   account, is that correct?  Or maybe I used

16   the wrong word.

17           I should say locked the payout

18   account on the Slush Pool account,

19   correct?

20       A.   Well, I learned of that technique

21   only after I was SIM swapped and the

22   hackers locked me out of the Slush Pool

23   account.

24           So I didn't know that you can put

25   a wallet address in Slush Pool and then

1    this case.

2        A.    Okay.

3        Q.    But if you haven't seen it before,

4    that's fine.  Does the date of February 9,

5    2019 give you any recollection that that's

6    when you locked your wallet?

7        A.    No, I -- no, I have no idea.

8        Q.    All right.

9        A.    Yeah, I have no idea.

10        Q.    All right, that's fine.  Now, why

11    didn't you change your -- I'm sorry, let

12    me ask it this way.  Why didn't you

13    terminate your AT&T service after the

14    first SIM swap?

15        A.    I had been a customer for ten plus

16    years.  I just tried to get it fixed.  I

17    had no idea that I was going to be

18    terrorized in the way I was from the

19    extent of time that I was terrorized.

20            I had no -- I'd heard of SIM

21    swaps, but I didn't understand the extent

22    to which I was going to be -- that I was

23    going to be -- you know, that this was

24    going to happen.

25            So I guess that's where I was.  In

1          So if you can see here, Mr.

2     Williams, that's document number two that

3     was filed in your lawsuit against AT&T

4     Mobility on October 25, 2019.  Do you see

5     that?

6        A.   Yes.

7        Q.   Did you have a chance to review

8     the complaint before it was filed in this

9     case?

10       A.   Yes.

11       Q.   And did you -- with the document

12    that was filed, did you believe everything

13    was true and accurate at the time?

14       A.   Yes.  To the best of my knowledge.

15    Yes.

16       Q.   Okay.  All right.  If we could

17    scroll down to -- I'm going to start

18    around paragraph 32, at the top of page

19    ten.

20          Paragraph 32 of the complaint says

21    that since February 2018 Mr. Williams has

22    invested over $2,000,000 in his

23    Cryptocurrency mining operation, the bulk

24    of which was spent on servers powerful

25    enough to compute the cryptographic Hash

1    required to successfully mine.  Do you see

2    that?

3        A.    Yes.

4        Q.    Okay.  And so again that is

5    referring to the Cryptocurrency mining

6    operation that was conducted by Apollo

7    Kids Mining, LLC, correct?

8        A.    Yes.

9        Q.    Paragraph 34, if we could look at

10   that.  You can actually see it there.  It

11   talks about your Cryptocurrency mining

12   efforts.

13           Mr. Williams' efforts were

14   successful.  By November 2018, Mr.

15   Williams was successfully mining between 7

16   and 12 Bitcoins per month.  Each Bitcoin

17   was worth approximately $6,381 since the

18   beginning of November, 2018, putting Mr.

19   Williams' accumulated Bitcoin holdings at

20   approximately $450,000.

21           I'm specifically asking you about

22   the accumulated Bitcoin holding at

23   approximately $450,000.  What does that

24   include, if you know?

25       A.    It was some number times 638 --

1   6,381 to total 450,000.  Some number of

2   Bitcoin times 6,381 equals 450,000.

3       **Q.   Yes.  So the accumulated Bitcoin**

4   **holding, though, is that just for mining**

5   **or does that include also your personal**

6   **Cryptocurrency transactions, if you know?**

7       A.   I believe that was for mining.

8       **Q.   Just for the mining operation?**

9            MR. LAVIGNE:  Asked and answered.

10           MS. STAGG:  You can answer.

11           THE WITNESS:  I believe it was

12   from the mining, to the best of my

13   knowledge.

14           BY MS. STAGG:

15      **Q.   And that was for the mining that**

16   **was done by Apollo Kids Mining, LLC?**

17           MR. LAVIGNE:  Same objection.

18           BY MS. STAGG:

19      **Q.   Is that correct?**

20      A.   I believe this mining reward that

21   is being noted in paragraph 34 was as a

22   result of my mine by Apollo Kids, and it's

23   some number by Bitcoins times the

24   approximate value at that time of $6,381.

25      **Q.   Okay.  It's not including -- I'm**

1    sorry.

2           It's not including, for example,

3    PRTI's mining operations?

4      A.    PRTI doesn't mine Bitcoin.

5      Q.    Got it.  And it doesn't include

6    your own personal Bitcoin holdings outside

7    of Apollo Kids Mining?

8      A.    No.  This number represents the

9    mining of Bitcoin.

10     Q.    Okay, thank you.  Now, paragraph

11   35 talked about Mr. Williams'

12   sophisticated and successful and

13   Cryptocurrency mining operation and the

14   significant investment made to set up that

15   operation were destroyed by AT&T's failure

16   to protect Mr. Williams' wireless AT&T

17   account and the data contained therein.

18          Did you ever hire an IT or data

19   security professional to advise you on

20   security for Apollo Kids Mining, LLC's

21   mining operations?

22          MR. LAVIGNE:  Objection, vague and

23   compound.

24          MS. STAGG:  You can answer.

25          THE WITNESS:  I hired the IT folks

1            CERTIFICATE OF REPORTER

2

3    STATE OF NORTH CAROLINA}

4    COUNTY OF MECKLENBURG  }

5        I, Andrea L. Nobrega, the officer before

6    whom the foregoing deposition was taken, do

7    hereby certify that the witness whose testimony

8    appears in the foregoing deposition was NOT duly

9    sworn by me; that the testimony of said witness

10    was taken by me to the best of my ability and

11    thereafter reduced to typewriting under my

12    direction; that I am neither counsel for, related

13    to, nor employed by any of the parties to the

14    action in which this deposition was taken, and

15    further that I am not a relative or employee of

16    any attorney or counsel employed by the parties

17    thereto, nor financially or otherwise interested

18    in the outcome of the action.

19

20          ANDREA L. NOBREGA

21          Court Reporter and Notary

22          Public in and for North

23          Carolina.

24

25    My Commission expires: 11-25-26

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

-------------------------------------------------------- X

JASON WILLIAMS,                                          :

                      Plaintiff,          :

                vs.                    :

AT&T MOBILITY LLC,                                       :

                   Defendant.         :

-------------------------------------------------------- X

Case No. 5:19-cv-00475-BO

**PLAINTIFF JASON WILLIAMS'
FIRST SUPPLEMENTAL
RESPONSES AND OBJECTIONS
TO DEFENDANT'S SECOND SET
OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33 and the Local Rules of the Eastern District of North Carolina 26.1 and 33.1, Plaintiff Jason Williams ("Plaintiff" or "Williams"), by his attorneys, Withers Bergman LLP, for his first supplemental responses and objections to Defendant AT&T Mobility LLC's ("Defendant" or "AT&T") Second Set of Interrogatories (the "Second Interrogatories" and each an "Interrogatory"), dated July 14, 2021, states as follows:

<u>**ENUMERATED OBJECTIONS**</u>

Plaintiff objects to the individual interrogatories (each an "Interrogatory") as follows:

1.      Plaintiff objects to the Interrogatory on the grounds that it is overly broad, calls for disclosure of information not relevant to the claims or defenses of any party, seeks documents and information not relevant to the subject matter of this action, and in that it is not reasonably calculated to lead to the discovery of admissible evidence.

2.      Plaintiff objects to the Interrogatory on the ground that it is unduly burdensome.

3.      Plaintiff objects to the Interrogatory on the grounds that it is redundant and duplicative of other requests.

4.      Plaintiff objects to the Interrogatory on the grounds that it is argumentative,

factually unfounded, and/or based on factual premises that are false, inaccurate, or not conceded, or based on recitations of events that did not occur, or the occurrence of which is, or may be, disputed. Plaintiff has no obligation to correct all the factual errors, inaccuracies, and false premises stated or embedded in the Interrogatory. In responding to the Interrogatory, Plaintiff does not concede the validity or accuracy of any factual assertion or premise stated, or embedded, in any instruction, definition, or individual interrogatory.

5. Plaintiff objects to the Interrogatory on the grounds that it seeks information not in Plaintiff's possession, custody or control, or to the extent that it seeks to impose discovery obligations on non-parties.

6. Plaintiff objects to the Interrogatory on the grounds that it calls for the disclosure of information that represents or contains confidential, proprietary, and/or personal information.

7. Plaintiff objects to the Interrogatory on the grounds that it seeks information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege or immunity. Plaintiff hereby claims all such privileges, immunities, and protections to the extent implicated by each interrogatory. Any disclosure of information subject to any claim of privilege, immunity, or protection is inadvertent, and without waiver of Plaintiff's rights to recall and retrieve such inadvertently disclosed information.

8. Plaintiff objects to the Interrogatory and the Second Interrogatories' Instruction and Definitions to the extent they purport to impose obligations contrary to, different from, or in addition to those set forth in the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Eastern District of North Carolina, or the Individual Practice Rules of Judge Terrence W. Boyle, and other applicable rules and laws.

## TERMS AND CONDITIONS

Plaintiff provides supplemental responses to the Second Interrogatories subject to the foregoing Enumerated Objections, the specific objections stated below, and the following terms and conditions:

1.      Inadvertent production of any information that is confidential, privileged, was prepared in anticipation of litigation or for trial or is otherwise protected from discovery, shall not constitute a waiver of any privilege or of any ground for objection to discovery with respect to such information, document or any other document or information, or the subject matter thereof or the information contained therein, or of the right of Plaintiff to object to the use of any such document or information.

2.      That Plaintiff has responded or objected to the Second Interrogatories, or to any part thereof, is not intended to be, nor should it be deemed, an admission that he accepts or admits the existence of any alleged fact or documents described or assumed, or any allegations or statements set forth, assumed or implied, by any individual interrogatory, or that such response or objection constitutes admissible evidence.  In responding to the Second Interrogatories, Plaintiff neither waives nor intends to waive, but expressly reserves, every part of every objection to the Second Interrogatories and reserves any and all objections as to authenticity, relevance, competency, materiality and/or admissibility at trial or any hearing of any information produced, set forth, identified, or referred to herein.

3.      The following responses are made solely for the purpose of this action.  Each response is subject to all objections as to competence, relevance, privilege, materiality, admissibility, and any and all other objections and grounds that would require the exclusion of any statement or document made available herewith as if any request were asked of, or if any statements contained herein were made by, or if any documents made available herewith were

offered by, a witness present and testifying in court, all of which objections are reserved and may be interposed at the time of any hearing or trial in this action.

4. The following responses and any documents made available pursuant thereto are based on facts known to Plaintiff at the time of responding to the Second Interrogatories and a review of files reasonably expected to contain responsive documents or information. Plaintiff reserves the right to amend and/or supplement these responses and any documents made available in the event new or different information or documents are discovered.

5. Unless otherwise defined herein, all capitalized terms in the specific responses below as defined in the same way as in Plaintiff's First Interrogatories to Defendant.

## SPECIFIC RESPONSES AND OBJECTIONS

The foregoing Enumerated Objections and the foregoing Terms and Conditions apply to the specific interrogatories and are incorporated in the specific responses and objections set forth below. In response to certain individual interrogatories, Williams may restate one or more of its objections for clarity or emphasis. The lack of such specific references and/or the provision of specific responses and objections stated below, however, are not intended as, and shall not be deemed to be, a waiver, either in whole or in part, of any of the foregoing Enumerated Objections or Terms and Conditions, and subject to and without waiving them, Williams further responds and objects to each specific interrogatory as follows:

**Interrogatory No. 1:**
Regarding the Gemini wallet address 1A8DnCGBTWBD8DTSdHKMkLcdoaoMXUZRBw ("Wallet 1A8D"), Identify the owner(s) of Wallet 1A8D and each person who to your knowledge during March 2018 to November 2018 (inclusive) accessed Wallet 1A8D or the Gemini exchange account associated with Wallet 1A8D; state whether Wallet 1A8D is where Slush Pool payouts from Plaintiff's mining operation referenced in the Complaint [Doc 2] were deposited, and the date range(s) those deposits took place (e.g., March 17, 2018 to November 4, 2018, or some other period(s)); and state when and why Plaintiff ceased using Wallet 1A8D to receive Slush Pool payouts.

4

**Response to Interrogatory No. 1:**

Plaintiff objects to Interrogatory No. 1 on the grounds set forth in Enumerated Objections 1, 2, 3, 4, 5, 6, and 8. Plaintiff further objects to Interrogatory No. 1 on the grounds it is improperly compound. Subject to, limited by and without waiving his Enumerated Objections and the Terms and Conditions, Plaintiff states as follows:

Mr. Williams was the only rightful owner of Wallet 1A8D during this time period. After Mr. Williams was the victim of the First SIM Swap Attack (as defined in his Complaint), it possible that some other individual or entity used Wallet 1A8D without his permission. Mr. Williams did receive deposits in connection with his cryptocurrency mining operation into Wallet 1A8D. Mr. Williams does not recall the exact date range during which he used Wallet 1A8D to receive deposits in connection with his cryptocurrency mining operation, but he believes that it was the first wallet he used receive deposits in connection with his cryptocurrency mining operation. Mr. Williams also recalls that he stopped using Wallet 1A8D to receive deposits in connection with his cryptocurrency mining operation shortly after the First SIM Swap Attack (on or about November 5, 2018), because he wanted to attempt to resume his cryptocurrency mining operation after the First SIM Swap Attack, but he was concerned about the security of Wallet 1A8D after the First SIM Swap Attack.

**Supplemental Response to Interrogatory No. 1:**

Plaintiff incorporates herein his previous response and objections. Mr. Williams was the only rightful owner of Wallet 1A8D during this time period. After Mr. Williams was the victim of the First SIM Swap Attack (as defined in his Complaint), it possible that some other individual or entity used Wallet 1A8D without his permission. Mr. Williams does not have specific knowledge of any such instance of unauthorized use.

5

Mr. Williams did receive deposits in connection with his cryptocurrency mining operation into Wallet 1A8D. Mr. Williams has reviewed records from his Gemini account, which he is producing to Defendant on the same date as these supplemental responses. Those records reflect that Mr. Williams received Slush Pool payouts from his mining operation into Wallet 1A8D from March 17, 2018 to November 5, 2018. Those records also reflect Mr. Williams stopped using Wallet 1A8D to receive Slush Pool payouts from his mining operation after November 5, 2018. Mr. Williams stopped using Wallet 1A8D to receive Slush Pool payouts from his mining operation because he wanted to attempt to resume his cryptocurrency mining operation after the First SIM Swap Attack, but he was concerned about the security of Wallet 1A8D after the First SIM Swap Attack.

**Interrogatory No. 2:**

Provide the following information regarding the Gemini wallet address 1F1UMqM7ngeosQNtmwcoXCFxfmArUmGwcL identified on JW_0021 & JW_0040 ("Wallet 1F1U"):

a. Identify the owner(s) of Wallet 1F1U and each person who to your knowledge during November 2018 to May 2019 (inclusive) accessed Wallet 1F1U or the Gemini exchange account associated with Wallet 1F1U, and state the most recent date You or anyone on Your behalf accessed Wallet 1F1U or its associated Gemini account and Identify the person who did so;

b. State the date range(s) that Wallet 1F1U received payouts from Plaintiff's mining operation referenced in the Complaint, and whether Wallet 1F1U is where the Slush Pool payouts from Plaintiff's mining operation referenced in the Complaint were deposited after Plaintiff "reconfigure[d] all his mining rigs" (Compl. ¶ 43) following the November 5, 2018 unauthorized SIM swap; and provide an explanation of the reasons, and state any facts or circumstances supporting those reasons, why Wallet 1F1U received 76 deposits from Slush Pool during February 6, 2019 to May 14, 2019 – including whether any of those deposits resulted from or have any connection to Plaintiff's mining operation or any of Plaintiff's mining rigs referenced in the Complaint;

c. State the reasons for the March 7th, 11th, 12th, and 14th 2019 deposits into Wallet 1F1U from Binance and Poloniex, the identity of the person(s) who initiated those deposits, and the identity of the owner(s) of those Binance and Poloniex accounts;

d. Explain the disposition of the 46.067 bitcoin that was deposited into Wallet 1F1U during November 9, 2018 through May 14, 2019, including the persons or entities to whom those bitcoin were transferred from Wallet 1F1U and the reasons for the transfers.

6

**Response to Interrogatory No. 2:**

Plaintiff objects to Interrogatory No. 2 on the grounds set forth in Enumerated Objections 1, 2, 3, 4, 5, 6, and 8.  Plaintiff further objects Interrogatory No. 2 on the grounds that it seeks sensitive financial information about himself and third parties that has no relevance to any of the claims or defenses in this lawsuit, and on the grounds it is improperly compound.  Subject to, limited by and without waiving his Enumerated Objections, further objections, and the Terms and Conditions, Plaintiff states as follows:

Mr. Williams was the only rightful owner of Wallet 1F1U during this time period and is not aware of anyone else using Wallet 1F1U.  Mr. Williams did receive deposits in connection with his cryptocurrency mining operation into Wallet 1F1U after the First SIM Swap Attack.  Mr. Williams does not recall the exact date range during which he used Wallet 1F1U to receive deposits in connection with his cryptocurrency mining operation, but he believes that he began using it to receive deposits in connection with his cryptocurrency mining operation after the First SIM Swap Attack (on or about November 5, 2018), because he wanted to attempt to resume his cryptocurrency mining operation after the First SIM Swap Attack, but he was concerned about the security of Wallet 1A8D after the First SIM Swap Attack.  Mr. Williams objects to parts c. and d. of this Interrogatory on the grounds that they seek sensitive financial information that has no relevance to any of the claims or defenses in this lawsuit.  Notwithstanding his objections, Mr. Williams believes that he is the owner of the Binance and Poloniex accounts referred to in part c. of this Interrogatory, and that the transactions referred to in part c. of this Interrogatory have no connection to his cryptocurrency mining operation.  Notwithstanding his objections, Mr. Williams believes that he is still in possession of the Bitcoin referred to part d. of this Interrogatory, and that such Bitcoin is not currently being stored in Wallet 1F1U.

7

**Supplemental Response to Interrogatory No. 2:**

Plaintiff incorporates herein his previous response and objections. Mr. Williams was the only rightful owner of Wallet 1F1U during this time period. Mr. Williams was the only rightful owner of Wallet 1F1U during this time period and is not aware of anyone else using Wallet 1F1U. Mr. Williams still uses and has access to the Gemini account associated with Wallet 1F1U, and last accessed that Gemini account on November 5, 2021.

Mr. Williams did receive deposits in connection with his cryptocurrency mining operation into Wallet 1F1U. Mr. Williams has reviewed records from his Gemini account, which he is producing to Defendant on the same date as these supplemental responses. Those records reflect that Mr. Williams received Slush Pool payouts from his mining operation into Wallet 1F1U from November 9, 2018 to May 14, 2019. Mr. Williams continued his mining operation after the last of the seven SIM Swaps in the Complaint and used this wallet to receive Slush Pool payouts from his mining operation until May 14, 2019, but eventually shut down his mining operation because he believed he could no longer operate it securely.

Mr. Williams objects to parts c. and d. of this Interrogatory on the grounds that they seek sensitive financial information that has no relevance to any of the claims or defenses in this lawsuit. Notwithstanding his objections, Mr. Williams does not recall the circumstances of the deposits referred to in part c. of this Interrogatory. At the times of those deposits, Mr. Williams did possess both Binance and Poloniex accounts, although he no longer has access to the Poloniex account. Mr. Williams thinks it is possible that those deposits came from his Binance and Poloniex accounts, but he is unable to confirm that at this time. Mr. Williams can confirm that neither his Binance nor Poloniex accounts had anything to do with his mining operation, and that therefore the deposits are not proceeds from his mining operation.

Notwithstanding his objections, Mr. Williams is still in possession of the Bitcoin referred to part d. of this Interrogatory, and such Bitcoin is not currently being stored in Wallet 1F1U. Mr. Williams stores the Bitcoin he earned from his mining operation in a cold wallet.

**Interrogatory No. 3:**
Excluding Wallet 1A8D and Wallet 1F1U, provide the address of any wallet which at any time during March 2018 to the present received any payout or deposit from a Slush Pool account owned by Plaintiff or that resulted from any use or operation of Plaintiff's mining rigs referenced in the Complaint, and the dates of such payouts or deposits.

**Response to Interrogatory No. 3:**

Plaintiff objects to Interrogatory No. 3 on the grounds set forth in Enumerated Objections 1, 3, 4, 6, and 8. Plaintiff further objects to Interrogatory No. 3 on the grounds it is improperly compound. Subject to, limited by and without waiving his Enumerated Objections and the Terms and Conditions, Plaintiff states as follows:

Mr. Williams believes he did not receive deposits in connection with his cryptocurrency mining operation into any wallet besides Wallet 1A8D and Wallet 1F1U.

**Interrogatory No. 4:**
Regarding the handwritten note and screenshot depicted in JW_0021, Identify the author of the note and the person who took the screenshot; separately state for the note and screenshot the date and reason(s) why each was created; Identify each person to whom the note or screenshot was sent and state when and why it was sent; and identify the owner of the ApolloKidsMining "account" referenced in the note, the platform or service where the account was maintained, the date range(s) the account was used, and the purpose(s) of the account.

**Response to Interrogatory No. 4:**

Plaintiff objects to Interrogatory No. 4 on the grounds set forth in Enumerated Objections 1, 2, 3, 4, 5, 6, 7, and 8. Plaintiff further objects to Interrogatory No. 4 on the grounds it is improperly compound. Subject to, limited by and without waiving his Enumerated Objections, further objections, and the Terms and Conditions, Plaintiff states as follows:

Mr. Williams was the author of the note captured in the screenshot with Bates number JW_0021, and that he took that screenshot. Mr. Williams does not recall exactly why he wrote

the note or took the screenshot, and to whom the screenshot was sent (other than to his attorneys in connection with this lawsuit). Mr. Williams believes that he may have written this note in connection with an attempt to recover access to the wallet identified in the screenshot. The wallet identified in the screenshot was used to receive deposits in connection with his cryptocurrency mining operation. Mr. Williams is the sole owner of ApolloKidsMining.

**Supplemental Response to Interrogatory No. 4:**

Plaintiff incorporates herein his previous response and objections. Mr. Williams was the author of the note captured in the screenshot with Bates number JW_0021, and that he took that screenshot. Mr. Williams and his counsel have not located any version of this screenshot in Mr. Williams' jwilliams@prtitech.com email account ("PRTI Email Account"). The note appears to be dated January 5, 2019, and the screenshot appears to be dated February 5. Mr. Williams believes "February 5" means February 5, 2019. Mr. Williams has no reason to believe the apparent dates of the note and screenshot are inaccurate.

To the best of Mr. Williams' recollection, he wrote this note and took this screenshot in response to a request from Slush Pool in connection with an attempt to regain access to his account. Mr. Williams recalls that Slush Pool asked for his signature as part of the account recovery process, and he took this screenshot and sent it to Slush Pool in response to that request. After sending the screenshot to Slush Pool, Mr. Williams recalls that Slush Pool actually wanted a digital signature, as opposed to a picture of a handwritten signature.

Mr. Williams previously created a Slush Pool account named ApolloKidsMining10. Mr. Williams believes that the "ApolloKidsMining 10" in the note and screenshot is that Slush Pool account. As set forth in Chris LaVigne's September 25, 2021 letter to Michael Breslin, Mr. Williams believes that he used the ApolloKidsMining10 Slush Pool account from approximately June 2017 to February 2019, but is unable to confirm that because he cannot access this Slush

Pool account or his Gmail associated with this account, and has not received any records from Slush Pool that would verify this information. The purpose of the ApolloKidsMining10 Slush Pool account was to receive rewards from Mr. Williams' cryptocurrency mining operation.

**Interrogatory No. 5:**
Identify each contract or agreement you entered into with Anexio, including without limitation any contract related to the proposal shown on JW_0066-70 (collectively, the "Anexio Agreements") and, for each, identify by date and amount each payment made pursuant to that Anexio Agreement and state the dates it commenced and was terminated, who terminated it, and the reason(s) for the termination.

**Response to Interrogatory No. 5:**

Plaintiff objects to Interrogatory No. 5 on the grounds set forth in Enumerated Objections 1, 2, 3, 4, 5, 6, and 8. Plaintiff further objects to Interrogatory No. 5 on the grounds it is improperly compound. Subject to, limited by and without waiving his Enumerated Objections, further objections, and the Terms and Conditions, Plaintiff states as follows:

Mr. Williams is not aware of any agreement between himself and Anexio beyond the one reflected in the documents referred to in this Interrogatory. Mr. Williams does not recall any specific dates or amounts of any payments he made to Anexio, but does recall that he made payments to Anexio, and believes that those payments would have been consistent with the terms of the agreement reflected in the documents referred to in this Interrogatory. Mr. Williams terminated the agreement with Anexio because he decided that he could no longer securely mine Bitcoin. Mr. Williams does not recall when he terminated his agreement with Anexio, but believes it would have been in or around the time he wound down his mining operation in May 2019.

**Supplemental Response to Interrogatory No. 5:**

Plaintiff incorporates herein his previous response and objections. Mr. Williams has only entered into one agreement with Anexio in his individual capacity: the one reflected in the

documents referred to in this Interrogatory, regarding Anexio's provision of electricity for Mr. Williams' cryptocurrency mining operation (the "Anexio Agreement").

Entities that Mr. Williams is affiliated with may have entered into agreements with Anexio that were entirely unrelated to Anexio's provision of electricity for Mr. Williams' cryptocurrency mining operation.

In connection with the Anexio Agreement, Mr. Williams made payments to Anexio pursuant to invoices he received from Anexio. Mr. Williams and his counsel have searched Mr. Williams's PRTI Email Account, and have located invoices, communications, and other documents related to Mr. Williams, which he is producing to Defendant on the same date as these supplemental responses. Based on those records, including the spreadsheet that can be found at Bates number JW_2752, Mr. Williams appears to have made the following payments to Anexio:

| Payment Date | Inv No. | Amount (USD) |
|---|---|---|
| 04/02/2018 | 4203 | 3,340.80 |
| 04/17/2018 | 4203 | 12,258.41 |
| 05/01/2018 | 4203 | 76,392.96 |
| 05/ 9778101/2018 | 4203 | 64,282.00 |
| 06/14/2018 | 4340 | 80,871.67 |
| 07/09/2018 | 4320 | 81,538.71 |
| 08/16/2018 | 4493 | 45,500.00 |
| 09/14/2018 | 4493-A | 45,500.00 |
| 10/12/2018 | 4563 | 45,500.00 |
| 11/16/2018 | 4789 | 45,500.00 |
| 12/18/2018 | 4892 | 45,500.00 |
| 01/29/2019 | 5151 | 45,500.00 |
| 03/07/2019 | 5152 | 34,000.00 |
| 05/06/2019 | 5248 | 34,000.00 |

In addition, the records in Mr. Williams's PRTI Email Account, including the email chain that can be found at Bates number JW_2864-75, indicate that he made additional payments to

Anexio in the amounts of 10,967.70 USD and 34,000.00 USD on or about July 26, 2019 and August 19, 2019, respectively.

Mr. Williams is also attempting to obtain records from First Citizens bank regarding his payments to Anexio, and will supplement his production (and this response if necessary) if and when he obtains those records.

The records in Mr. Williams's PRTI Email Account indicate that Mr. Williams commenced the Anexio Agreement on March 1, 2018. A version of the Anexio Agreement with Mr. Williams' signature can be found at Bates number JW_0194-96. The records in Mr. Williams's PRTI Email Account, including the email chain that can be found at Bates number JW_2771-81, indicate that Mr. Williams terminated the Anexio Agreement on or about May 10, 2019, which is the last date Anexio charged Mr. Williams for providing electricity for Mr. Williams' cryptocurrency mining operation.

After review of his PRTI Email Account records, Mr. Williams recalls he terminated the Anexio Agreement because Anexio shut down the particular facility in Virginia that housed and powered his mining rigs. Mr. Williams could have decided to relocate his mining rigs to another data center. Additionally, at the time, Mr. Williams was the CEO and Chairman of Product Recovery Technologies International, Inc. ("PRTI"), which runs a first-of-its-kind cryptocurrency mining operation powered by the decomposition of old tires. Mr. Williams could have, at minimal personal cost, immediately transferred his mining rigs from the Anexio Virginia data center to the PRTI facility, where PRTI employees could have reestablished his mining rigs with minimal downtime. Mr. Williams chose not to because, in light of the repeated SIM swaps he suffered and the repeated hacks of his BTC mining rigs enabled by those SIM swaps, he was concerned that associating these rigs with the PRTI facility would compromise the security of PRTI's operations, which, to this day, remain secure and have not been hacked.

13

Instead, Mr. Williams directed a business associate to retrieve the mining rigs from Anexio. Mr. Williams provided at least $100,000.00 to that business associate in funding for an experimental shipping container mining rig facility project. Mr. Williams provided the funding for this project, which he expected to be paid back, with the hopes that he could replicate this type of facility for use in connection with PRTI's business. The records in Mr. Williams's PRTI Email Account indicate that the business associate commingled Mr. Williams's rigs with other ASIC Antminer S9 rigs in configuring the experimental facility. Mr. Williams eventually recovered his $100,000.00 investment, but ultimately this project was shut down. To Mr. Williams' knowledge, his rigs remain unused, commingled, in disrepair, and in possession of the business associate.

**Interrogatory No. 6:**

Regarding the tax returns Plaintiff produced (JW_0071-75), explain the basis for and method of calculating the 2018 reported mining income of $902,760 (JW_0072), 2019 reported mining income of $49,110 (JW_0075), $36,500 claimed mortgage interest (JW_0072), and $999 hardware and $275 tech support expenses (JW_0073). Further, if the 2018 income figure was not based upon all of the approximately 80.25 total bitcoin deposits from Slush Pool during 2018 (66.9 BTC into Wallet 1A8D and 13.35 BTC into Wallet 1F1U), or the 2019 income figure was not based upon all of the approximately 32.72 bitcoin deposited into Wallet 1F1U from Slush Pool during 2019, state the reasons why.

**Response to Interrogatory No. 6:**

Plaintiff objects to Interrogatory No. 6 on the grounds set forth in Enumerated Objections 1, 2, 3, 4, 5, 6, and 8. Plaintiff further objects to Interrogatory No. 6 on the grounds it is improperly compound. Subject to, limited by and without waiving his Enumerated Objections, further objections, and the Terms and Conditions Plaintiff states as follows:

The tax returns referred to in this Interrogatory were prepared by Mr. Williams' accountants. Mr. Williams is not an accountant or tax professional. Mr. Williams does not recall how the items from his tax returns referred to in this Interrogatory were calculated. Mr. Williams believes that the income items referred to in this Interrogatory were entirely based on

the amount of Bitcoin he mined during the relevant tax periods. Mr. Williams does not recall the basis for the mortgage interest, hardware, and tech support items from his tax returns referred to in this Interrogatory.

**Supplemental Response to Interrogatory No. 6:**

Plaintiff incorporates herein his previous response and objections. The tax returns referred to in this Interrogatory were prepared by Mr. Williams' accountants. Mr. Williams is not an accountant or tax professional. Mr. Williams does not recall how the items from his tax returns referred to in this Interrogatory were calculated. Mr. Williams and his counsel have searched Mr. Williams's PRTI Email Account, and have located communications and other documents related to the portions of the tax returns at issue in this interrogatory, which he is producing to Defendant on the same date as these supplemental responses. Mr. Williams has also obtained from his accountants their records related to the portions of the tax returns at issue in this interrogatory, and has previously produced those records.

Dated: November 12, 2021
      New York, New York

                            WITHERS BERGMAN LLP

By: _____
                            Christopher LaVigne
                            Joseph Gallo
                            430 Park Avenue
                            New York, New York 10022
                            (212) 848-9800
                            Christopher.LaVigne@withersworldwide.com
                            Joseph.Gallo@withersworldwide.com

                            *Attorneys for Plaintiff Jason Williams*

TO:    Joseph S. Dowdy (N.C. State Bar No. 31941)
        Kilpatrick Townsend & Stockton LLP
        4208 Six Forks Road, Suite 1400
        Raleigh, NC 27609

Telephone: (919) 420-1700
Facsimile: (919) 510-6120
jdowdy@kilpatricktownsend.com

Michael Breslin
1100 Peachtree St. NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile (404) 815-6555
mbreslin@kilpatricktownsend.com

*Attorneys for Defendant AT&T Mobility LLC*

## <u>VERIFICATION</u>

I, Jason Williams, have read the foregoing Supplemental Responses and Objections to Defendant's Second Set of Interrogatories. I verify under penalty of perjury that the foregoing responses are true and correct to the best of my knowledge, information, and belief.



_____
Jason Williams

Dated: November 12, 2021

# EXHIBIT 3

# PART 1 OF 2

# Wireless Customer Agreement

**FMS TC T 0318 6242 E**

V03122018

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 77 of 246

ATT-WIL-05974



**WIRELESS CUSTOMER AGREEMENT**
**TABLE OF CONTENTS**

**1.0   TERM COMMITMENT, CHARGES, BILLING AND PAYMENT**

    **1.1     What Is The Term Of My Service? How Can I Fulfill My Service Commitment? What are My Rights to Cancel Service and Terminate My Agreement?**
    **1.2     What are AT&T's Rights to Cancel My Service(s) and Terminate My Agreement?**
    **1.3     Can AT&T Change My Terms And Rates?**
    **1.4     How Will I Receive My Bill? What Charges Am I Responsible For?  How Much Time Do I Have To Dispute My Bill?**
    **1.5     How Does AT&T Calculate My Bill?**
    **1.6     Are Advance Payments And/Or Deposits Required?**
    **1.7     What if I fail to pay my AT&T Bill when it is due?**
    **1.8     What Happens If My Check Bounces?**
    **1.9     Are There Business or Government Benefits?**
    **1.10    Who Can Access My Account and for What Purpose?**
    **1.11    How will AT&T communicate with me about my Service?**

**2.0   HOW DO I RESOLVE DISPUTES WITH AT&T?**

    **2.1     Dispute Resolution By Binding Arbitration**
    **2.2     Arbitration Agreement**
    **2.3     Puerto Rico Customers**

**3.0   TERMS RELATING TO YOUR DEVICE AND CONTENT**

    **3.1     Your Device**
    **3.2     Where and How Does AT&T Service Work?**
    **3.3     What Information, Content, And Applications Are Provided By Third Parties?**
    **3.4     How Can I Get Mobile Content?**
    **3.5     Am I Responsible If Someone Makes A Purchase With My Device?**
    **3.6     Does AT&T Collect Location-Based Network Performance Information From My Device?  Can I Use Location-Based Services With My Device?**
    **3.7     What If My Device Is Lost Or Stolen?**

**4.0   TERMS RELATING TO THE USE AND LIMITATIONS OF SERVICE**

    **4.1     What Are The Limitations On Service And Liability?**
    **4.2     How Can I Use My AT&T Service?**
    **4.3     Who Is Responsible For Security?**
    **4.4     How Can I Use the Software?**
    **4.5     How Can I Use Another Carrier's Network (Off-Net Usage)?**
        **4.5.1   Voice**
        **4.5.2   Data**
        **4.5.3   Messaging**
        **4.5.4   Notice**

    **4.6     How Do I Get Service Outside AT&T's Wireless Network (Roaming)?**
        **4.6.1   International Services**
            **4.6.1.1 International Long Distance**
            **4.6.1.2 International Long Distance Text, Picture & Video Messaging**
            **4.6.1.3 International Roaming**
            **4.6.1.4 International Data**
            **4.6.1.5 Data Global Add-Ons and Global Messaging Plans/Packages**
            **4.6.1.6 Data Connect Global/North America Plans**

V03122018

ATT-WIL-05975

4.6.1.7 Cruise Ship Roaming
4.6.1.8 International Miscellaneous

**5.0   WHAT VOICE SERVICES DOES AT&T OFFER?**

5.1   What Are The General Terms That Apply To All AT&T Voice Rate Plans?
5.2   Voicemail
5.3   Voicemail-To-Text (VMTT)
5.4   Unlimited Voice Services
5.5   Caller ID
5.6   Rollover® Minutes
5.7   Mobile To Mobile Minutes
5.8   FamilyTalk® Plan
5.9   A-List®
5.10  AT&T Viva Mexico$^{SM}$ ("Mexico Plan") & AT&T Nation®/FamilyTalk® With Canada ("Canada Plan")
5.11  AT&T Unity$^{SM}$ And AT&T Unity$^{SM}$-FamilyTalk® Plans Requirements
        5.11.1 Eligibility Requirements
        5.11.2 AT&T Unity$^{SM}$ Minutes
5.12  VoiceDial Services
5.13  AT&T Messaging Unlimited with Mobile to Any Mobile Calling Feature

**6.0   WHAT DATA AND MESSAGING SERVICES DOES AT&T OFFER?**

6.1   What Are The General Terms That Apply To All Data And Messaging Plans?
6.2   What Are The Intended Uses Of AT&T's Wireless Data Service?
6.3   What Are The Voice And Data Plan Requirements?
6.4   How Does AT&T Calculate My Data Usage/Billing?
6.5   Text Messaging And Picture/Video Messaging
6.6   Unlimited Messaging
6.7   Mobile Email
6.8   Mobile Video
6.9   AT&T Wi-Fi Services
6.10  DataConnect Plans
        6.10.1 What Are the General Terms that Apply to All DataConnect Plans?
        6.10.2 Data Global Add-On/DataConnect Global Plans/DataConnect North America Plans
6.11  AT&T DataPlus$^{SM}$/AT&T DataPro$^{SM}$ Plans
        6.11.1 AT&T Data Plans With Tethering
        6.11.2 Blackberry® Personal
        6.11.3 Blackberry® Connect; Blackberry Enterprise; Blackberry International
6.12  GOOD Plan
6.13  Microsoft® Direct Push
6.14  AT&T Mobile Share Plans (with Unlimited Talk and Text)
6.15  AT&T Mobile Share – Data Plans (for Data-Only Devices)

**7.0   AT&T WIRELESS HOME SERVICES**

7.1   AT&T Wireless Home Phone Service
7.2   AT&T Wireless Internet Service

**8.0   ARE THERE OTHER TERMS AND CONDITIONS THAT APPLY TO FEATURES AND APPLICATIONS?**

**9.0   WHAT IS AT&T ROADSIDE ASSISTANCE & OPTIONAL AT&T MOBILE INSURANCE?**

V03122018

ATT-WIL-05976

**9.1**      **AT&T Roadside Assistance**

**9.2**      **Optional AT&T Mobile Insurance, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack**

**10.0**    **WHAT OTHER TERMS AND CONDITIONS APPLY TO MY WIRELESS SERVICE?**

**10.1**      **Intellectual Property**

**10.2**      **Severability**

**10.3**      **Assignment; Governing Law; English Language**

         **10.3.1**    **Assignment**

         **10.3.2**    **Governing Law**

         **10.3.3**    **English Language**

**10.4**      **Lifeline Services**

**10.5**      **Trial Services**

**10.6**      **NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)**

**11.0**    **WHAT TERMS APPLY ONLY TO SPECIFIC STATES?**

**11.1**      **California: What If There Are Unauthorized Charges Billed To My Device?**

**11.2**      **Connecticut: Questions About Your Service**

**11.3**      **Puerto Rico**

V03122018

ATT-WIL-05977

**WIRELESS CUSTOMER AGREEMENT ("Agreement")**

"AT&T" or "we," "us," or "our" refers to AT&T Mobility LLC, acting on behalf of its affiliates doing business as AT&T or other brands owned by AT&T. "You" or "your" refers to the person or entity that is the customer of record.

**PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION, INCLUDING OUR USE OF YOUR LOCATION INFORMATION (SEE SECTION 3.6). THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.**

This Agreement, including the AT&T Privacy Policy Located at att.com/privacy, Customer Service Summary, and terms of service for wireless products, features, applications, and services (including content and other AT&T services included with your wireless service) ("Services") not otherwise described herein that are posted on applicable AT&T websites or devices, and any documents expressly referred to herein or therein, make up the complete agreement between you and AT&T and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement.

AT&T's wireless network may provide broadband access to the Internet. For more information about how AT&T helps transmit information to points on the Internet and how we manage our network, please see the Broadband Information page which can be found at: www.att.com/broadbandinfo.

**1.0 TERM COMMITMENT, CHARGES, BILLING AND PAYMENT**

**1.1 What Is The Term Of My Service? How Can I Fulfill My Service Commitment? What are My Rights to Cancel Service and Terminate My Agreement?**

AT&T wireless Service(s) may be used with: (a) a mobile device that contains a SIM that is assigned to your account ("Device") and/or, (b) a device that is designed and purchased for use exclusively on AT&T's network ("Equipment").

**Term of Service.**

Your Agreement begins on the day we activate your Service(s) and continues through the Term of Service, typically a 12 month or 24 month period ("Service Commitment"), specified on your Customer Service Summary. At the end of your service commitment, this Agreement will automatically continue on a month-to-month basis. If your Agreement has no Service Commitment, it is a month-to-month Agreement.

**Device Activation.**

V03122018

ATT-WIL-05978

If You purchased a device that was shipped to You, You agree to activate the device within seven (7) days of the shipment date. If Your device is not activated by You, we may activate the device for You within a month of shipping and Your monthly recurring charges, and any applicable Service Commitment, will begin.

**Fulfillment of Service Commitment.**

You have received certain benefits from us in exchange for your Service Commitment, which may include, but are not limited to, a subsidized wireless device. There are two alternative ways to fulfill your Service Commitment. You can pay for the Services described in your Customer Service Summary for the term of your Service Commitment, or you can terminate your Agreement prior to the end of your Service Commitment and pay an Early Termination Fee ("ETF"). The Early Termination Fee is not a penalty, but rather is an alternative means for you to perform your obligations under the Agreement that partially compensates us for the fact that the Service Commitment on which your rate plan is based was not completed.

**Your Termination Rights.**

Within the first 14 days after service activation, you may terminate your Agreement for any reason and not be required to pay an ETF. If you terminate within three (3) days of accepting the Agreement, AT&T will refund your activation fee, if any. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement, and you agree to return to AT&T any Equipment you purchased from AT&T in connection with your Service Commitment. If you fail to return this Equipment, you will be charged the difference between the amount you paid AT&T for the Equipment and the amount you would have been charged for the Equipment had you not agreed to a Service Commitment. AT&T also may charge you a restocking fee for any returned Equipment. Some dealers may impose additional fees.

After the first 14 days, you may terminate your Agreement for any reason. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement along with the applicable ETF. The Early Termination Fee is either: (a) $325 or (b) $150. The ETF reduces each full month of your Service Commitment that you complete. To determine whether your Equipment has a $325 Early Termination Fee or a $150 Early Termination Fee, and the amount of reduction, check att.com/equipmentETF.

After your Service Commitment ends and you are on a month-to-month Agreement, you may terminate your Agreement at any time with 30 days notice without incurring an ETF. If you sign a new Agreement before the end of the term of your existing Agreement and terminate that new Agreement within 14 days as allowed above, you agree that you will be bound by the terms and conditions of your existing Agreement including fulfillment of any remaining Service Commitment thereunder.

**1.2 <u>What are AT&T's Rights to Cancel My Service(s) and Terminate My Agreement?</u>**

AT&T may interrupt, suspend or cancel your Services and terminate your Agreement without advance notice for any reason including, but not limited to, the following:

V03122018

ATT-WIL-05979

- Any conduct that we believe violates this Agreement or AT&T's Acceptable Use Policy;

- Any conduct that involves the use of abusive, derogatory, insulting, threatening, vulgar or similarly unreasonable language or behavior directed at any of our employees or representatives whether it be in person, over the phone, or in writing;

- Any abusive use of our network or Services;

- You use your Device/Equipment and/or our Services for an unlawful or fraudulent purpose;

- You use your Device/Equipment and/or our Services in any way that: (a) is harmful to, interferes with, or negatively affects our network, other customers, or the network of any other provider, (b) is harmful to, interferes with, or negatively affects our Services or operations, (c) infringes intellectual property rights of AT&T or others, (d) results in the publication of threatening, offensive or illegal material, or (e) generates spam or other abusive messaging or calling, a security risk, or a violation of privacy;

- You resell our Services either alone or as part of any other good or service;

- You fail to make all required payments when due;

- Your credit has deteriorated and/or we believe that there is a risk of non-payment;

- You refuse to pay any required advance payment or deposit;

- We discover that you are underage;

- You provide inaccurate or misleading credit information; or

- You modify your device from its manufacturer's specifications.

AT&T's rights under this Section 1.2 are in addition to any specific rights that we reserve in other provisions of this Agreement to interrupt, suspend, modify, or cancel your Services and terminate your Agreement.

After your Service Commitment ends and you are on a month-to-month Agreement, AT&T may terminate your Agreement at any time with 30 days notice.

**1.3 Can AT&T Change My Terms And Rates?**

We may change any terms, conditions, rates, fees, expenses, or charges regarding your Services at any time. We will provide you with notice of material changes (other than changes to governmental fees, proportional charges for governmental mandates, roaming rates or administrative charges) either in your monthly bill or separately. You understand and agree that State and Federal Universal Service Fees and other governmentally imposed fees, whether or not assessed directly upon you, may be increased based upon the government's or our calculations.

IF WE INCREASE THE PRICE OF ANY OF THE SERVICES TO WHICH YOU SUBSCRIBE, BEYOND THE LIMITS SET FORTH IN YOUR CUSTOMER SERVICE SUMMARY, OR IF WE MATERIALLY DECREASE THE GEOGRAPHICAL AREA IN WHICH YOUR AIRTIME RATE APPLIES (OTHER THAN A TEMPORARY DECREASE FOR REPAIRS OR MAINTENANCE), WE'LL DISCLOSE THE CHANGE AT LEAST ONE BILLING CYCLE IN ADVANCE (EITHER THROUGH A NOTICE WITH YOUR BILL, A

V03122018

ATT-WIL-05980

TEXT MESSAGE TO YOUR DEVICE, OR OTHERWISE), AND YOU MAY TERMINATE THIS
AGREEMENT WITHOUT PAYING AN EARLY TERMINATION FEE OR RETURNING OR PAYING FOR
ANY PROMOTIONAL ITEMS, PROVIDED YOUR NOTICE OF TERMINATION IS DELIVERED TO US
WITHIN THIRTY (30) DAYS AFTER THE FIRST BILL REFLECTING THE CHANGE.

If you lose your eligibility for a particular rate plan, we may change your rate plan to one for which you
qualify.

**1.4 How Will I Receive My Bill? What Charges Am I Responsible For? How Much Time Do I Have
To Dispute My Bill?**

You will receive an electronic (paperless) bill at AT&T's online account management site unless you tell
us you want a paper bill. You will be given the option to choose electronic billing or paper billing when you
purchase service. Each month we will send you an email notice when your electronic bill is available
online. This will be sent to your official email address on file with AT&T. You are required to keep your
email address current and to notify us immediately of any change in your email address. You always have
the option of switching back to a paper bill by changing your billing preferences at AT&T's online account
management site. You will not receive a paper bill in the mail unless you expressly request one.

You are responsible for paying all charges for or resulting from Services provided under this Agreement,
including any activation fee that may apply to each voice or data line. You will receive monthly bills that
are due in full.

IF YOU DISPUTE ANY CHARGES ON YOUR BILL, YOU MUST NOTIFY US IN WRITING AT AT&T
BILL DISPUTE, 1025 LENOX PARK, ATLANTA, GA 30319 WITHIN 100 DAYS OF THE DATE OF THE
BILL OR YOU'LL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL AND TO PARTICIPATE IN ANY
LEGAL ACTION RAISING SUCH DISPUTE.

Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative,
and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll,
collect call and directory assistance charges; restoral and reactivation charges; any other charges or calls
billed to your phone number; and applicable taxes and governmental fees, whether assessed directly
upon you or upon AT&T.

To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to
collect, you're required to provide us with your residential or business street address. If you don't provide
us with such address, or if it falls outside our licensed Services area, we may reasonably designate a
PPU within the licensed Services area for you. You must live and have a mailing address within AT&T's
owned network coverage area.

**Auto Bill Pay:** If you enroll your account for automatic bill payments ("Auto Bill Pay"), you authorized
AT&T to charge your debit/credit card or bank account automatically to pay your monthly statements, as
well as any unpaid balances and fees if your AT&T service is disconnected. To cancel your authorization
for Auto Bill Pay, you must call 1-800-288-2020.  You should also contact your card issuer or financial

V03122018

ATT-WIL-05981

institution to advise that you have cancelled your enrollment.   You will lose any promotional credits associated with your account if you opt out from Auto Bill Pay.

**1.5** <u>**How Does AT&T Calculate My Bill?**</u>

Usage and monthly fees will be billed as specified in your customer service summary or rate plan information online. If the Equipment you order is shipped to you, your Services may be activated before you take delivery of the Equipment so that you can use it promptly upon receipt. Thus, you may be charged for Services while your Equipment is still in transit. If, upon receiving your first bill, you have been charged for Services while your Equipment was in transit, you may contact Customer Care 1-800-331-0500 to request a credit. Except as provided below, monthly Services and certain other charges are billed one month in advance, and there is no proration of such charges if Service is terminated on other than the last day of your billing cycle. Monthly Service and certain other charges are billed in arrears if you're a former customer of AT&T Wireless and maintain uninterrupted Service on select AT&T rate plans, however, if you elect to receive your bills for your Services combined with your wireline phone bill (where available) you will be billed in advance as provided above. You agree to pay for all services used with your Device.

AIRTIME AND OTHER MEASURED USAGE ("CHARGEABLE TIME") IS BILLED IN FULL-MINUTE INCREMENTS, AND ACTUAL AIRTIME AND USAGE ARE ROUNDED UP TO THE NEXT FULL-MINUTE INCREMENT AT THE END OF EACH CALL FOR BILLING PURPOSES. AT&T CHARGES A FULL MINUTE OF AIRTIME USAGE FOR EVERY FRACTION OF THE LAST MINUTE OF AIRTIME USED ON EACH WIRELESS CALL. UNLESS OTHERWISE PROVIDED IN YOUR PLAN, MINUTES WILL BE DEPLETED ACCORDING TO USAGE IN THE FOLLOWING ORDER: NIGHT AND WEEKEND MINUTES, MOBILE TO MOBILE MINUTES, ANYTIME MINUTES AND ROLLOVER, EXCEPT THAT MINUTES THAT ARE PART OF BOTH A LIMITED PACKAGE AND AN UNLIMITED PACKAGE WILL NOT BE DEPLETED FROM THE LIMITED PACKAGE. Chargeable Time begins for outgoing calls when you press SEND (or similar key) and for incoming calls when a signal connection from the caller is established with our facilities. Chargeable Time ends after you press END (or similar key), but not until your wireless telephone's signal of call disconnect is received by our facilities and the call disconnect signal has been confirmed.

All outgoing calls for which we receive answer supervision or which have at least 30 seconds of Chargeable Time, including ring time, shall incur a minimum of one minute airtime charge. Answer supervision is generally received when a call is answered; however, answer supervision may also be generated by voicemail systems, private branch exchanges, and interexchange switching equipment. Chargeable Time may include time for us to recognize that only one party has disconnected from the call, time to clear the channels in use, and ring time. Chargeable Time may also occur from other uses of our facilities, including by way of example, voicemail deposits and retrievals, and call transfers. Calls that begin in one rate period and end in another rate period may be billed in their entirety at the rates for the period in which the call began.

DATA TRANSPORT OR USAGE IS CALCULATED IN FULL-KILOBYTE INCREMENTS, AND ACTUAL TRANSPORT OR USAGE IS ROUNDED UP TO THE NEXT FULL-KILOBYTE INCREMENT AT THE END OF EACH DATA SESSION FOR BILLING PURPOSES. AT&T CALCULATES A FULL KILOBYTE

V03122018

ATT-WIL-05982

OF DATA TRANSPORT/USAGE FOR EVERY FRACTION OF THE LAST KILOBYTE OF DATA TRANSPORT/USAGE USED ON EACH DATA SESSION. TRANSPORT OR USAGE IS BILLED EITHER BY THE KILOBYTE ("KB") OR MEGABYTE ("MB"). IF BILLED BY MB, THE FULL KBs CALCULATED FOR EACH DATA SESSION DURING THE BILLING PERIOD ARE TOTALED AND ROUNDED UP TO NEXT FULL MB INCREMENT TO DETERMINE BILLING. IF BILLED BY KB, THE FULL KBs CALCULATED FOR EACH DATA SESSION DURING THE BILLING PERIOD ARE TOTALED TO DETERMINE BILLING. NETWORK OVERHEAD, SOFTWARE UPDATE REQUESTS, EMAIL NOTIFICATIONS, AND RESEND REQUESTS CAUSED BY NETWORK ERRORS CAN INCREASE MEASURED KILOBYTES. DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, AS DISCUSSED IN MORE DETAIL IN SECTION 6.4.

If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, megabytes or messages), unless otherwise specifically provided as a part of such rate plan, any unused allotment of Services from one billing cycle will not carry over to any other billing cycle. We may bill you in a format as we determine from time to time. Additional charges may apply for additional copies of your bill, or for detailed information about your usage of Services.

**Delayed Billing:** Billing of usage for calls, messages, data or other Services (such as usage when roaming on other carriers' networks, including internationally) may occasionally be delayed. Such usage charges may appear in a later billing cycle, will be deducted from Anytime monthly minutes or other Services allotments for the month when the usage is actually billed, and may result in additional charges for that month. Those minutes will be applied against your Anytime monthly minutes in the month in which the calls appear on your bill. You also remain responsible for paying your monthly Service fee if your Service is suspended for nonpayment. We may require payment by money order, cashier's check, or a similarly secure form of payment at our discretion.

**1.6 Are Advance Payments And/Or Deposits Required?**

We may require you to make deposits or advance payments for Services, which we may offset against any unpaid balance on your account. Interest won't be paid on advance payments or deposits unless required by law. We may require additional advance payments or deposits if we determine that the initial payment was inadequate. Based on your creditworthiness as we determine it, we may establish a credit limit and restrict Services or features. If your account balance goes beyond the limit we set for you, we may immediately interrupt or suspend Services until your balance is brought below the limit. Any charges you incur in excess of your limit become immediately due. If you have more than one account with us, you must keep all accounts in good standing to maintain Services. If one account is past due or over its limit, all accounts in your name are subject to interruption or termination and all other available collection remedies.

**1.7 What if I fail to pay my AT&T Bill when it is due?**

You agree that for each bill not paid in full by the due date, AT&T may charge and you will pay a late payment fee of $5.75. Restrictive endorsements are void.

V03122018

ATT-WIL-05983

You expressly authorize, and specifically consent to allowing, AT&T and/or its outside collection agencies, outside counsel, or other agents to contact you in connection with any and all matters relating to unpaid past due charges billed by AT&T to you. You agree that, for attempts to collect unpaid past due charges, such contact may be made to any mailing address, telephone number, cellular phone number, e-mail address, or any other electronic address that you have provided, or may in the future provide, to AT&T. You agree and acknowledge that any e-mail address or any other electronic address that you provide to AT&T is your private address and is not accessible to unauthorized third parties. For attempts to collect unpaid charges, you agree that in addition to individual persons attempting to communicate directly with you, any type of contact described above may be made using, among other methods, pre-recorded or artificial voice messages delivered by an automatic telephone dialing system, pre-set e-mail messages delivered by an automatic e-mailing system, or any other pre-set electronic messages delivered by any other automatic electronic messaging system.

**1.8 What Happens If My Check Bounces?**

We'll charge you up to $30 (depending on applicable law) for any check or other instrument (including credit card charge backs) returned unpaid for any reason.

**1.9 Are There Business or Government Benefits?**

You may receive or be eligible for certain discounts, credits, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement"). All such Benefits are provided to you solely as a result of the corresponding Business Agreement, and may be modified or terminated without notice. You may also be eligible for certain additional rate plans and/or other Services. Please see http://www.att.com/iru-additional-terms for such Services and the associated additional terms, which are hereby incorporated by reference.

If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your account information with it or its authorized agents. If you use Service(s) and/or receive certain Benefits tied to a Business Agreement with us, but you're liable for your own charges, then you authorize us to share enough account information with it or its authorized agents to verify your continuing eligibility for those Services or Benefits.

You may receive Benefits because of your agreement to have the charges for your Services, billed ("Joint Billing") by a wireline company affiliated with AT&T ("Affiliate") or because you subscribe to certain services provided by an Affiliate. If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.

**1.10 Who Can Access My Account and for What Purpose?**

You may add an Authorized/Approved User to Your account. Doing so authorizes Us to provide the Authorized/Approved User with information about, and access to, Your account. Authorized/Approved Users include:

V03122018

ATT-WIL-05984

(a) A person authorized by You to act on Your behalf with respect to Your account when the person is in a retail store;

(b) A person who calls into customer service and provides sufficient account information; and

(c) A person who registers for secondary access to Your account in AT&T's online account management system, provides sufficient account information, and has access to a device that is billed to Your account.

Authorized/Approved Users can view Your account and payment information, make changes to the plans under Your account, purchase devices including via financing agreements, add new lines of service, and perform other account functions. You are responsible for all changes made or actions taken by Authorized/Approved Users.

By taking these actions as Your agent, Authorized/Approved Users authorize Us to perform a credit check on You, share Your credit information between Us and our Affiliates, and obtain a credit report on You from a consumer reporting agency.

You may remove an Authorized/Approved User at any time by contacting Us. The removal will take effect after we have a reasonable opportunity to process the request. If You remove an Authorized/Approved User, we recommend that You reset your account passcode and online credentials.

You consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you. In any event, we reserve the right to contact you by any means regarding customer service-related notifications, or other such information.

**1.11 How will AT&T communicate with me about my Service?**

As your wireless carrier, we will need to communicate with you about your Service on occasion. We and our authorized agents may contact you by: bill message, text message, email, phone call, postal mail, in-app notification, push notification, or by other reasonable means, to advise you about your Service or other matters we believe may be of interest to you. **We and our authorized agents may use any one or a combination of these methods of communication to convey important notices (for example, changes to this Agreement, to your Service, legal notices, etc.). You expressly consent on behalf of all the wireless lines on your account to all such methods of communication regarding your Service, whether active or inactive.**

Email and text messages to your AT&T device are two of the primary methods that we use to contact you. The email address you provide at the time of ordering or Service activation is the email address we will use to communicate with you. You can update your email address through myAT&T, using the myAT&T app, or by calling Customer Care at 800.331.0500. **Notices from us to you are considered immediately delivered when we send them to your email address or by text message to your AT&T device.**

V03122018

ATT-WIL-05985

Bill messages and inserts are another key way we share information with you. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. **Please do not overlook the important messages section of your bill.**

## 2.0 HOW DO I RESOLVE DISPUTES WITH AT&T?

### 2.1 Dispute Resolution By Binding Arbitration

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.**

Summary:

Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1-800-331-0500. **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.** For any non-frivolous claim that does not exceed $75,000, AT&T will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), AT&T will pay you more than the amount of the arbitrator's award and will pay your attorney (if any) twice his or her reasonable attorneys' fees if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute.

### 2.2 Arbitration Agreement

1. AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

   - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;

   - claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);

   - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

   - claims that may arise after the termination of this Agreement.

V03122018

ATT-WIL-05986

References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an individual action in small claims court. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

2. A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to AT&T should be addressed to: Office for Dispute Resolution, AT&T, 1025 Lenox Park Blvd., Atlanta, GA 30319 ("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If AT&T and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or AT&T may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by AT&T or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you and AT&T is entitled. You may download or copy a form Notice and a form to initiate arbitration at att.com/arbitration-forms.

3. After AT&T receives notice at the Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000. (The filing fee currently is $200 for claims under $10,000 but is subject to change by the arbitration provider. If you are unable to pay this fee, AT&T will pay it directly upon receiving a written request at the Notice Address.) The arbitration will be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. The AAA Rules are available online at adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.) The arbitrator is bound by the terms of this Agreement. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision are for the court to decide. Unless AT&T and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as otherwise provided for herein, AT&T will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that

V03122018

ATT-WIL-05987

either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse AT&T for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek more than $75,000 in damages, the payment of these fees will be governed by the AAA rules.

4. If, after finding in your favor in any respect on the merits of your claim, the arbitrator issues you an award that is greater than the value of AT&T's last written settlement offer made before an arbitrator was selected, then AT&T will:

- pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater; and

- pay your attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably accrues for investigating, preparing, and pursuing your claim in arbitration ("the attorney premium").

If AT&T did not make a written offer to settle the dispute before an arbitrator was selected, you and your attorney will be entitled to receive the alternative payment and the attorney premium, respectively, if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment and the attorney premium at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits.

5. The right to attorneys' fees and expenses discussed in paragraph (4) supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this provision does not preclude the arbitrator from awarding you that amount. However, you may not recover duplicative awards of attorneys' fees or costs. Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award.

6. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

7. Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address) during your Service Commitment, you may reject any such change by sending us written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

V03122018

ATT-WIL-05988

**2.3 Puerto Rico Customers**

For Puerto Rico customers, references to "small claims court" in sections 2.1 and 2.2 should be understood to mean the Puerto Rico Telecommunications Regulatory Board.

**3.0 TERMS RELATING TO YOUR DEVICE AND CONTENT**

**3.1 Your Device**

Your Device must be compatible with, and not interfere with, our Services and must comply with all applicable laws, rules, and regulations. We may periodically program your Device remotely with system settings for roaming service, to direct your Device to use network services most appropriate for your typical usage, and other features that cannot be changed manually. Some device manufacturers will no longer pre-load certain applications into the device memory. As a result, AT&T may remotely pre-load certain applications to your device at activation and periodically update those applications. You can delete any application that AT&T remotely pre-loads on your device.

You agree that you won't make any modifications to your Equipment or its programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems.

If you bought a Device from AT&T, it may have been programmed with a SIM lock which will prevent it from operating with other compatible wireless telephone carriers' services. If you wish to use this Device with the service of another wireless telephone carrier, you must enter a numeric Unlock Code to unlock the phone. AT&T will provide the Unlock Code upon request, provided that you meet certain criteria including, but not limited to the following: (a) you have paid for your Device in full; (b) your account has been active for at least sixty days and is in good standing (i.e. it has no past due amount or unpaid balance owed AT&T); (c) you have fulfilled your Service Commitment by expiration of any contractual term, upgrading to a new Device under AT&T's standard or early upgrade policies, or payment of any applicable ETF; (d) your Device has not been reported lost or stolen; and (e) AT&T has the Unlock Code or can reasonably obtain it from the manufacturer. AT&T will unlock a maximum of five phones per account, per year. For Devices sold with a Prepaid Plan, AT&T will provide you with the Unlock Code upon request if you provide a detailed receipt or other proof of purchase of the phone and AT&T has the Unlock Code or can reasonably obtain it from the manufacturer. For further details on eligibility requirements and for assistance on obtaining the Unlock Code for your handset, please call 1-800-331-0500 or visit an AT&T company store.

You are solely responsible for complying with U.S. Export Control laws and regulations and the import laws and regulations of foreign countries when traveling internationally with your Device.

**3.2 Where and How Does AT&T Service Work?**

AT&T does not guarantee availability of wireless network. Services may be subject to certain Device and compatibility/limitations including memory, storage, network availability, coverage, accessibility and data

V03122018

ATT-WIL-05989

conversion limitations. Services (including without limitation, eligibility requirements, plans, pricing, features and/or service areas) are subject to change without notice.

When outside AT&T's coverage area, access will be limited to information and applications previously downloaded to or resident on your device. Coverage areas vary between AT&T network technologies. See coverage map(s), available at store or from your sales representative, for details or the coverage map at www.att.com/coverageviewer.

Actual network speeds depend upon device characteristics, network, network availability and coverage levels, tasks, file characteristics, applications and other factors. Performance may be impacted by transmission limitations, terrain, in-building/in-vehicle use and capacity constraints.

**3.3 What Information, Content, And Applications Are Provided By Third Parties?**

Certain information, applications, or other content is provided by independently owned and operated content providers or service providers who are subject to change at any time without notice.

AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.

Third-party content or service providers may impose additional charges. Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services. It is your responsibility to read the rules or service agreements of each content provider or service provider.

Any information you involuntarily or voluntarily provide to third parties is governed by their policies or terms. The accuracy, appropriateness, content, completeness, timeliness, usefulness, security, safety, merchantability, fitness for a particular purpose, transmission or correct sequencing of any application, information or downloaded data is not guaranteed or warranted by AT&T or any content providers or other third party. Delays or omissions may occur. Neither AT&T nor its content providers, service providers or other third parties shall be liable to you for any loss or injury arising out of or caused, in whole or in part, by your use of any information, application or content, or any information, application, or other content acquired through the Service.

You acknowledge that every business or personal decision, to some degree or another, represents an assumption of risk, and that neither AT&T nor its content and service providers or suppliers, in providing information, applications or other content or services, or access to information, applications, or other content underwrites, can underwrite, or assumes your risk in any manner whatsoever.

**3.4 How Can I Get Mobile Content?**

You understand that Devices can be used to acquire or purchase goods, content, and services (including subscription plans) like ring tones, graphics, games, applications and news alerts from AT&T or other companies ("Content"). You understand that you are responsible for all authorized charges associated

V03122018

ATT-WIL-05990

with such Content from any Device assigned to your account, that these charges will appear on your bill (including charges on behalf of other companies), and that such purchases can be restricted by using parental controls available from an AT&T salesperson, or by calling AT&T. Any person using any Device assigned to your account to order Content on your account may be deemed to have corresponding authority to consent to the use or disclosure of your account information, including customer proprietary network information (CPNI), to facilitate the processing or provisioning of and/or billing for such Content. CPNI is information that relates to the quantity, technical configuration, type, destination, location and amount of use of a telecommunications service, and you have the right, and AT&T has the duty under federal law, to protect the confidentiality of CPNI. You have the right to withhold authorization of this disclosure and use of your CPNI without affecting the provision of any service(s) to which you currently subscribe from AT&T.

You are responsible for reviewing your monthly bills to ensure that all charges for Content are accurate.

Additionally, you have full-time access to your Content purchase transaction history on our website. You may contest and seek refunds for unauthorized purchases and purchases with which you are not satisfied. AT&T reserves the right to restrict Content purchases or terminate the account of anyone who seeks refunds on improper grounds or otherwise abuses this Service.

Actual Content may vary based on the Device capabilities. Content may be delivered in multiple messages. Content charges are incurred at the stated one-time download rate or subscription rate, plus a per kilobyte or per megabyte default pay per use charge for the Content transport when delivered, unless you have a data plan and such charges appear separately on your bill. You will be charged each time you download Content. Data Service charges apply.

**3.5 Am I Responsible If Someone Makes A Purchase With My Device?**

Except as otherwise provided in this Agreement, if your Device is used by others to make Content purchases, you are responsible for all such purchases. If this occurs, you are giving those other users your authority to:

1. make Content purchases from those Devices, and to incur charges for those Content purchases that will appear on your bill;

2. give consent required for that Content, including the consent to use that user's location information to deliver customized information to that user's Device; or

3. make any representation required for that content, including a representation of the user's age, if requested.

Usage by others can be restricted by use of parental controls or similar features. Visit att.com/smartlimits to learn more.

**3.6 Does AT&T Collect Location-Based Network Performance Information From My Device? Can I Use Location-Based Services With My Device?**

V03122018

ATT-WIL-05991

AT&T collects information about the approximate location of your Device in relation to our cell towers and the Global Positioning System (GPS). We use that information, as well as other usage and performance information also obtained from our network and your Device, to provide you with wireless voice and data services, and to maintain and improve our network and the quality of your wireless experience. We may also use location information to create aggregate data from which your personally identifiable information has been removed or obscured. Such aggregate data may be used for a variety of purposes such as scientific and marketing research and services such as vehicle traffic volume monitoring. It is your responsibility to notify users on your account that we may collect and use location information from Devices.

Your Device is also capable of using optional Content at your request or the request of a user on your account, offered by AT&T or third parties that make use of a Device's location information ("Location-Based Services"). Please review the terms and conditions and the associated privacy policy for each Location-Based Service to learn how the location information will be used and protected. For more information on Location-Based Services, please visit att.com/privacy.

Our directory assistance service (411) may use the location of a Device to deliver relevant customized 411 information based upon the user's request for a listing or other 411 service. By using this directory assistance service, the user is consenting to our use of that user's location information for such purpose. This location information may be disclosed to a third party to perform the directory assistance service and for no other purpose. Such location information will be retained only as long as is necessary to provide the relevant customized 411 information and will be discarded after such use. Please see our privacy policy at att.com/privacy for additional details.

**3.7 <u>What If My Device Is Lost Or Stolen?</u>**

If your wireless Device is lost or stolen, you must contact us immediately to report the Device lost or stolen. You're not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Once you report to us that the Device is lost or stolen, you will not be responsible for subsequent charges incurred by that Device.

You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. You may be asked to provide information and you may submit information to support your claim. We will advise you of the result of our investigation within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to, your monthly fee. We both have a duty to act in good faith in a reasonable and responsible manner including in connection with the loss or theft of your Device. (California Customers see Section 11.1 "California: What if there are Unauthorized Charges Billed to My Device?" below.)

**4.0 TERMS RELATING TO THE USE AND LIMITATIONS OF SERVICE**

V03122018

ATT-WIL-05992

**4.1** <u>**What Are The Limitations On Service And Liability?**</u>

Unless prohibited by law, the following limitations of liability apply. Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers. We may block access to certain categories of numbers (e.g., 976, 900, and international destinations) at our sole discretion.

Additional hardware, software, subscription, credit or debit card, Internet access from your compatible PC and/or special network connection may be required and you are solely responsible for arranging for or obtaining all such requirements. Some solutions may require third party products and/or services, which are subject to any applicable third party terms and conditions and may require separate purchase from and/or agreement with the third party provider. AT&T is not responsible for any consequential damages caused in any way by the preceding hardware, software or other items/requirements for which you are responsible.

Not all plans or Services are available for purchase or use in all sales channels, in all areas or with all devices. AT&T is not responsible for loss or disclosure of any sensitive information you transmit. AT&T's wireless services are not equivalent to wireline Internet. AT&T is not responsible for nonproprietary services or their effects on devices.

We may, but do not have the obligation to, refuse to transmit any information through the Services and may screen and delete information prior to delivery of that information to you. There are gaps in service within the Services areas shown on coverage maps, which, by their nature, are only approximations of actual coverage.

WE DO NOT GUARANTEE YOU UNINTERRUPTED SERVICE OR COVERAGE. WE CANNOT ASSURE YOU THAT IF YOU PLACE A 911 CALL YOU WILL BE FOUND. AIRTIME AND OTHER SERVICE CHARGES APPLY TO ALL CALLS, INCLUDING INVOLUNTARILY TERMINATED CALLS. AT&T MAKES NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, ACCURACY, SECURITY, OR PERFORMANCE REGARDING ANY SERVICES, SOFTWARE OR GOODS, AND IN NO EVENT SHALL AT&T BE LIABLE, WHETHER OR NOT DUE TO ITS OWN NEGLIGENCE, for any:

    a. act or omission of a third party;

    b. mistakes, omissions, interruptions, errors, failures to transmit, delays, or defects in the Services or Software provided by or through us;

    c. damage or injury caused by the use of Services, Software, or Device, including use in a vehicle;

    d. claims against you by third parties;

    e. damage or injury caused by a suspension or termination of Services or Software by AT&T; or

V03122018

ATT-WIL-05993

f. damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service.

Notwithstanding the foregoing, if your Service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly Service fee for the time period your Service was unavailable, not to exceed the monthly Service fee. Our liability to you for Service failures is limited solely to the credit set forth above.

Unless prohibited by law, AT&T isn't liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, Services, Software, or Devices provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injuries.

To the full extent allowed by law, you hereby release, indemnify, and hold AT&T and its officers, directors, employees and agents harmless from and against any and all claims of any person or entity for damages of any nature arising in any way from or relating to, directly or indirectly, service provided by AT&T or any person's use thereof (including, but not limited to, vehicular damage and personal injury), INCLUDING CLAIMS ARISING IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF AT&T, or any violation by you of this Agreement. This obligation shall survive termination of your Service with AT&T. AT&T is not liable to you for changes in operation, equipment, or technology that cause your Device or Software to be rendered obsolete or require modification.

SOME STATES, INCLUDING THE STATE OF KANSAS, DON'T ALLOW DISCLAIMERS OF IMPLIED WARRANTIES OR LIMITS ON REMEDIES FOR BREACH. THEREFORE, THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THIS AGREEMENT GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

**4.2 How Can I Use My AT&T Service?**

All use of AT&T's wireless network and Services is governed by AT&T's Acceptable Use Policy, which can be found at att.com/AcceptableUsePolicy, as determined solely by AT&T. AT&T can revise its Acceptable Use Policy at any time without notice by updating this posting.

**4.3 Who Is Responsible For Security?**

AT&T DOES NOT GUARANTEE SECURITY. Data encryption is available with some, but not all, Services sold by AT&T. If you use your Device to access company email or information, it is your responsibility to ensure your use complies with your company's internal IT and security procedures.

**4.4 How Can I Use the Software?**

The software, interfaces, documentation, data, and content provided for your Equipment as may be updated, downloaded, or replaced by feature enhancements, software updates, system restore software or data generated or provided subsequently by AT&T (hereinafter "Software") is licensed, not sold, to you by AT&T and/or its licensors/suppliers for use only on your Equipment. Your use of the Software shall

V03122018

ATT-WIL-05994

comply with its intended purposes as determined by us, all applicable laws, and AT&T's Acceptable Use Policy at att.com/AcceptableUsePolicy.

You are not permitted to use the Software in any manner not authorized by this License. You may not (and you agree not to enable others to) copy, decompile, reverse engineer, disassemble, reproduce, attempt to derive the source code of, decrypt, modify, defeat protective mechanisms, combine with other software, or create derivative works of the Software or any portion thereof. You may not rent, lease, lend, sell, redistribute, transfer or sublicense the Software or any portion thereof. You agree the Software contains proprietary content and information owned by AT&T and/or its licensors/suppliers.

AT&T and its licensors/suppliers reserve the right to change, suspend, terminate, remove, impose limits on the use or access to, or disable access to, the Software at any time without notice and will have no liability for doing so. You acknowledge AT&T's Software licensors/suppliers are intended third party beneficiaries of this license, including the indemnification, limitation of liability, disclaimer of warranty provisions found in this Agreement.

**4.5 How Can I Use Another Carrier's Network (Off-Net Usage)?**

**4.5.1 Voice**

If your use of minutes (including unlimited Services) on other carrier networks ("off-net voice usage") during any two consecutive months exceed your off-net voice usage allowance, AT&T may, at its option, terminate your Services, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net voice usage. Your off-net voice usage allowance is equal to the lesser of 750 minutes or 40% of the Anytime Minutes included with your plan.

**4.5.2 Data**

If you use Data Services on other carriers' wireless networks ("off-net data usage") your data usage may be reduced to 2G speeds.  In addition, if your off-net data usage during any month exceeds your off-net data usage allowance, AT&T may at its option terminate your access to Data Services, deny your continued use of other carriers' coverage, further reduce your off-net data usage speed, or change your plan to one imposing usage charges for off-net data usage. Your off-net data usage allowance is equal to the lesser of 100 megabytes or 20% of the kilobytes included with your plan. You may be required to use a Device programmed with AT&T's preferred roaming database.

**4.5.3 Messaging**

If you use messaging services (including unlimited Services) on other carrier networks ("off-net messaging usage") during any two consecutive months exceed your off-net messaging usage allowance, AT&T may, at its option, terminate your messaging service, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net messaging usage. Your off-net messaging usage allowance is equal to the lesser of 3,000 messages or 50% of the messages included with your plan.

V03122018

ATT-WIL-05995

**4.5.4 Notice**

If you exceed your allowances stated above and AT&T determines to suspend or terminate your access, deny your usage of other carrier's coverage, or change your plan to a different plan, AT&T will provide notice and you may terminate this Agreement.

**4.6  How Do I Get Service Outside AT&T's Wireless Network (Roaming)?**

Services originated or received while outside your plan's included coverage area are subject to roaming charges. Domestic roaming charges for wireless data or voice Services may be charged with some plans when outside AT&T's wireless network. International roaming rates apply for any voice, messaging or data usage incurred outside the U.S., Puerto Rico and U.S. Virgin Islands. Use of Services when roaming is dependent upon roaming carrier's support of applicable network technology and functionality. Display on your device may not indicate whether you will incur roaming charges. Check with roaming carriers individually for support and coverage details.

**4.6.1 International Services**

Certain eligibility restrictions apply which may be based on service tenure, payment history and/or credit. Rates are subject to change. For countries, rates and additional details, see att.com/global.

**4.6.1.1 International Long Distance:**

International rates apply for calls made and messages sent from the U.S., Puerto Rico and U.S.V.I. to another country. Calling or messaging to some countries may not be available. Calls to wireless numbers and numbers for special services, such as Premium Rated Services, may cost more than calls to wireline numbers. If a customer calls an overseas wireline number and the call is forwarded to a wireless number, the customer will be charged for a call terminated to a wireless number. International Long Distance calling rates are charged per minute and apply throughout the same footprint in which the customer's airtime package minutes apply.

**4.6.1.2 International Long Distance Text, Picture & Video Messaging:**

Additional charges apply for premium messages and content. Messages over 300 KBs are billed an additional 50¢/message. For a complete list of countries, please visit att.com/text2world.

**4.6.1.3 International Roaming:**

Compatible Device required. Your plan may include the capability to make and receive calls and texts and use data while roaming internationally. AT&T, in its sole discretion, may block your ability to use your Device while roaming internationally until eligibility criteria are met. International roaming rates, which vary by country, apply for all calls placed or received while outside the United States, Puerto Rico and U.S.V.I. Please consult att.com/global or call 611 from your mobile device or 800-331-0500 for a list of currently available countries and carriers. All countries may not be available for roaming. All carriers within available countries may not be available on certain plans or packages. Availability, quality of coverage and services while roaming are not guaranteed. When roaming internationally, you will be charged

V03122018

ATT-WIL-05996

international roaming airtime rates including when incoming calls are routed to voicemail, even if no message is left. Substantial charges may be incurred if Device is taken out of the U.S. even if no services are intentionally used. Billing for international roaming usage may be delayed up to three billing cycles due to reporting between carriers. Taxes are additional. If you want to block the ability to make and receive calls or use data functions while roaming internationally, you may request that by calling 1-314-925-6925 (at no charge from your wireless phone). For AT&T Canada and Mexico Travel Minutes, package and overage rates apply only in Canada or Mexico, and if you remove the package before your monthly bill cycle ends, the included monthly minutes allotment will be reduced proportionately.

### 4.6.1.4 International Data:

International data rates apply to all data usage outside the U.S., Puerto Rico and U.S.V.I., including accessing cloud-based services to upload/download/stream content. International data roaming may be reduced to 2G speeds. Many Devices, including iPhone, transmit and receive data messages without user intervention and can generate unexpected charges when powered "on" outside the United States, Puerto Rico and U.S.V.I. AT&T may send "alerts" via SMS or email, to notify you of data usage. These are courtesy alerts. There is no guarantee you will receive them. They are not a guarantee of a particular bill limit. Receipt of Visual Voicemail messages are charged at international data pay-per-use rates unless customer has an international data plan/package, in which case receipt of Visual Voicemail messages decrement Kilobytes included in such plan/package.

### 4.6.1.5 Data Global Add-Ons and Global Messaging Plans/Packages:

Require that domestic data or messaging capability be in place. Rates apply only for usage within "roam zone" comprised of select carriers. Within the roam zone, overage rate applies if you exceed the MBs allotted for any Data Global Add-On or the messages allotted for any Global Messaging Plan/Package. International roaming pay-per-use rates apply in countries outside the roam zone. See att.com/globalcountries for current roam zone list.

### 4.6.1.6 Data Connect Global/North America Plans:

Do not include capability to place a voice call and require a 1 year agreement. For specific terms regarding international data plans, see Section 6.10.2 of the Wireless Customer Agreement.

### 4.6.1.7 Cruise Ship Roaming:

Cruise ship roaming rates apply for calls placed or data used while on the ship.

### 4.6.1.8 International Miscellaneous

**Export Restrictions:** You are solely responsible for complying with U.S. Export Control laws and regulations, and the import laws and regulations of foreign countries when traveling internationally with your Device.

### 5.0 WHAT VOICE SERVICES DOES AT&T OFFER?

V03122018

ATT-WIL-05997

**5.1 What Are The General Terms That Apply To All AT&T Voice Rate Plans?**

You may obtain usage information by calling customer service or using one of our automated systems. **Pricing/Taxes/No Proration:** Prices do not include taxes, directory assistance, roaming, Universal Service Fees, and other surcharges. Final month's charges are not prorated. **Activation Fees:** Activation Fee may apply for each new line. **Nights and Weekends:** Nights are 9:00 p.m. to 6:00 a.m. Weekends are 9:00 p.m. Friday to 6:00 a.m. Monday (based on time of day at the cell site or switch providing your Service). Included long distance calls can be made from the 50 United States, Puerto Rico and U.S. Virgin Islands to the 50 United States, Puerto Rico, U.S. Virgin Islands, Guam and Northern Mariana Islands. Roaming charges do not apply when roaming within the Services area of land-based networks of the 50 United States, Puerto Rico and U.S. Virgin Islands. Additional charges apply to Services used outside the land borders of the U.S., Puerto Rico and U.S. Virgin Islands.

**5.2 Voicemail**

Unless you subscribe to an Unlimited Voice Plan or are an upstate New York customer subscribing to Enhanced Voicemail, airtime charges apply to calls to your voicemail service, including calls where the caller does not leave a message, because the call has been completed, calls to listen to, send, reply to, or forward messages, or to perform other activities with your voicemail service, including calls forwarded from other phones to your voicemail service. You are solely responsible for establishing and maintaining security passwords to protect against unauthorized use of your voicemail service. For information as to the number of voicemail messages you can store, when voicemail messages will be deleted, and other voicemail features, see att.com/wirelessvoicemail. We reserve the right to change the number of voicemails you can store, the length you can store voicemail messages, when we delete voicemail messages, and other voicemail features without notice. We may deactivate your voicemail service if you do not initialize it within a reasonable period after activation. We will reactivate the service upon your request. See att.com/global for information about using voicemail internationally.

**5.3 Voicemail-To-Text (VMTT)**

AT&T is not responsible, nor liable for: 1) errors in the conversion of or its inability to transcribe voicemail messages to text/email; 2) lost or misdirected messages; or, 3) content that is unlawful, harmful, threatening, abusive, obscene, tortious, or otherwise objectionable.

We do not filter, edit or control voice, text, or email messages, or guarantee the security of messages. We can interrupt, restrict or terminate VMTT without notice, if your use of VMTT adversely impacts AT&T's network, for example that could occur from abnormal calling patterns or an unusually large number of repeated calls and messages; or if your use is otherwise abusive, fraudulent, or does not comply with the law.

You are solely responsible for and will comply with all applicable laws as to the content of any text messages or emails you receive from VMTT that you forward or include in a reply to any other person. You authorize AT&T or a third party working on AT&T's behalf to listen to, and transcribe all or part of a voicemail message and to convert such voicemail message into text/email, and to use voicemail

V03122018

ATT-WIL-05998

messages and transcriptions to enhance, train and improve AT&T's speech recognition and transcription services, software and equipment.

Charges for VMTT include the conversion of the voicemail message and the text message sent to your wireless device. Additional charges, however, may apply to receiving email on your wireless device from VMTT, as well as, replying to or forwarding VMTT messages via SMS (text) or email, depending on your plan.

SMS (text messaging) blocking is incompatible with VMTT. (If you do not have a texting plan on your handset, we add a texting pay per use feature when you add VMTT with text delivery.) If you are traveling outside the U.S. coverage area, you will incur international data charges for emails received from VMTT, as well as, charges for emails you respond to or forward from VMTT, unless you have an international data plan and the usage falls within the plan's usage limits.

Transcription times cannot be guaranteed. Customers purchasing email delivery are responsible for providing a correct email address and updating the email address when changes to the email account are made.

If you choose SMS (text) delivery, VMTT only converts the first 480 characters of a voicemail message into text and you will receive up to three text messages of a transcribed message. The transcription, therefore, may not include the entire voicemail message with SMS delivery. Adding VMTT will create a new voicemail box and all messages and greetings will be deleted from your current voicemail box.

**5.4 Unlimited Voice Services**

Unlimited voice Services are provided primarily for reasonably uninterrupted live dialog between two individuals. If your use of unlimited voice Services for conference calling or call forwarding exceeds 750 minutes per month, AT&T may, at its option, terminate your Service or change your plan to one with no unlimited usage components.

AT&T may, in its sole discretion, terminate your Service or change your plan to one with no unlimited voice usage if it reasonably determines or has a reasonable basis to believe that you are engaged in any of the following prohibited activities: (1) maintaining an open line of communication to provide dispatch or monitoring services; (2) accessing or providing access to multi-party chat line services; (3) using the Service with a SIM box or SIM server network to generate or simulate voice calls; (4) transmitting broadcasts; (5) transmitting pre-recorded materials; (6) telemarketing; (7) initiating autodialed calls; (8) initiating any other calls or connections that are not for the purposes of reasonably uninterrupted live dialog between individuals; (9) using the Service for any fraudulent purpose; (10) reselling or rebilling the Service either alone or as part of any other good or service; or (11) any abusive use of our network or Services.

**5.5 Caller ID**

Your caller identification information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent

ATT-WIL-05999

you from blocking the transmission of caller identification information. Contact customer service for information on blocking the display of your name and number. Caller ID blocking is not available when using Data Services, and your wireless number is transmitted to Internet sites you visit.

### 5.6 Rollover® Minutes

If applicable to your plan, Rollover Minutes accumulate and expire through 12 rolling bill periods. Bill Period 1 (activation) unused Anytime Minutes will not carry over. Bill Period 2 unused Anytime Minutes will begin to carry over. Rollover Minutes accumulated starting with Bill Period 2 will expire each bill period as they reach a 12-bill-period age. Rollover Minutes will also expire immediately upon default or if customer changes to a non-Rollover plan. If you change plans (including the formation of a FamilyTalk plan), or if an existing subscriber joins your existing FamilyTalk plan, any accumulated Rollover Minutes in excess of your new plan or the primary FamilyTalk line's included Anytime Minutes will expire. Rollover Minutes are not redeemable for cash or credit and are not transferable. If you change to non-AT&T Unity plans with Rollover Minutes (including the formation of a FamilyTalk plan) any accumulated Rollover Minutes in excess of your new non-AT&T Unity plan or the primary non-AT&T Unity FamilyTalk line's included Anytime Minutes will expire.

### 5.7 Mobile To Mobile Minutes

If applicable to your plan, Mobile to Mobile Minutes may be used when directly dialing or receiving calls from any other AT&T wireless phone number from within your calling area. Mobile to Mobile Minutes may not be used for interconnection to other networks. Calls to AT&T voicemail and return calls from voicemail are not included.

### 5.8 Family Talk® Plan

If applicable to your plan, FamilyTalk may require up to a two-year Service Commitment for each line. FamilyTalk plans include only package minutes included with the primary number, and minutes are shared by the additional lines. The rate shown for additional minutes applies to all minutes in excess of the Anytime Minutes. FamilyTalk requires two lines. If the rate plan for the primary number is changed to an ineligible plan or the primary number is disconnected, one of the existing additional lines shall become the primary number on the rate plan previously subscribed to by the former primary number; if only one line remains, it shall be converted to the closest single line rate.

### 5.9 A-List®

A-List is available only with select Nation, FamilyTalk and Unity plans. Nation Plan and Individual Subscribers can place/receive calls to/from up to 5 (and FamilyTalk subscribers can place/receive calls to/from up to 10) wireline or wireless telephone numbers without being charged for airtime minutes. All qualifying lines on a FamilyTalk account share the same 10 A-List numbers. Only standard domestic wireline or wireless numbers may be added and A-List is only for domestic calls. Directory assistance, 900 numbers, chat lines, pay per call numbers, customer's own wireless or Voice Mail access numbers, numbers for call routing services and call forwarding services from multiple phones, and machine to machine numbers are not eligible. Depending on the PBX system, a private telephone system often serving businesses, AT&T may not be able to determine if your selected PBX A-List number is

V03122018

ATT-WIL-06000

calling/receiving calls from your wireless number and airtime charges could apply. Forwarded calls will be billed based on the originating number, not the call forwarding number, and airtime charges may apply. Only voice calling is eligible. A-List number selections may only be managed online via MyWireless Account. Selected telephone numbers do not become active until 24 hours after added. AT&T reserves the right to block any A-List number and to reduce the amount of telephone numbers that can be used for A-List without notice. A-List is not eligible on Save/Promotional Plans.

**5.10 AT&T Viva Mexico℠ ("Mexico Plan") & AT&T Nation®/FamilyTalk® With Canada ("Canada Plan")**

Certain eligibility requirements apply. Anytime Minutes and Night and Weekend Minutes between Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, or Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan, will be treated for billing purposes as calls to and from your U.S. wireless coverage area.

Calls made from or received in Mexico and Canada cannot exceed your monthly off-net usage allowance (the lesser of 750 min./mo. or 40% of your Anytime Minutes/mo.) in any two consecutive months. Calls made from or received in Mexico and Canada will not qualify as Mobile to Mobile Minutes. Special rates apply for data usage in Mexico and Canada. International long distance text, instant, picture and video messaging rates apply to messaging from the U.S. to Mexico and Canada and international roaming rates apply when such messages are sent from Mexico and Canada.

International Roaming charges apply when using voice and data Services outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area, if you subscribe to the Canada Plan. International long distance charges apply when calling to areas outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan.

Anytime Minutes are primarily for live dialog between two people. You may not use your Services other than as intended by AT&T and applicable law. Plans are for individual, non-commercial use only and are not for resale. Unlimited Microcell Calling feature cannot be used on accounts with Viva Mexico and Nation Canada calling plans.

**5.11 AT&T Unity℠ And AT&T Unity℠-FamilyTalk® Plans Requirements**

**5.11.1 Eligibility Requirements:**

AT&T local and wireless combined bill required. For residential customers, qualifying AT&T local plan from AT&T required. For business customers, qualifying AT&T local service plan required. Specific AT&T Services that qualify vary by location; see att.com or call 1-800-288-2020. Certain business accounts are not eligible for Unity plans. Discounts on any other combined-bill wireless plans will be lost if an AT&T Unity plan is added to your combined bill. If an existing wireless plan is upgraded to an AT&T Unity plan, all discounts and promotions will be lost when subscribing to that plan.

**5.11.2 AT&T Unity℠ Minutes:**

V03122018

ATT-WIL-06001

AT&T Unity Calling Minutes may be used when directly dialing or receiving calls from any other eligible AT&T wireline or wireless phone number from within your calling area. Calls to AT&T voicemail and return calls from voicemail not included. AT&T Unity Minutes are not included when checking usage for the current billing period.

**5.12 VoiceDial Services**

Regular airtime charges apply. Mobile to Mobile Minutes do not apply. Calls to 911, 411, 611, 711 and international dialing cannot be completed with VoiceDial Services. Caller ID cannot be blocked. Caller ID will be delivered on calls, even if you have permanently blocked your name and number. For complete terms and conditions, see att.com/voicedial.

**5.13 AT&T Messaging Unlimited with Mobile to Any Mobile Calling Feature**

Available only with select Nation, FamilyTalk, and BusinessTalk plans and can be discontinued at anytime. Messaging Unlimited Plan required. Mobile to Any Mobile minutes only apply when you directly dial another U.S. mobile number or directly receive a call from another U.S. mobile phone number from within your calling area in the U.S., Puerto Rico, or U.S.V.I. Mobile to Any Mobile is not available with the AT&T Viva Mexico or AT&T Nation/FamilyTalk with Canada plans. Calls made through Voice Connect, calls to directory assistance, and calls to voicemail and return calls from voicemail are not included. Only numbers included in the wireless number database that AT&T uses will be treated as a call to a mobile number or a call received from a mobile number. So for example, Type 1 numbers belonging to other carriers and not included in the industry wireless LNP database, and numbers for which ports to wireless service have not yet completed, will not be treated as a call to a mobile number or a call received from a mobile number. Also calls made to and calls received from mobile toll-free numbers, mobile chat lines, mobile directory assistance, calling applications, numbers for call routing and call forwarding services, and machine to machine numbers are not included.

**6.0 WHAT DATA AND MESSAGING SERVICES DOES AT&T OFFER?**

**6.1 What Are The General Terms That Apply To All Data And Messaging Plans?**

AT&T provides wireless data and messaging Services, including but not limited to, features that may be used with Data Services and wireless content and applications ("Data Services"). The absolute capacity of the wireless data network is limited; consequently, Data Services may only be used for permitted activities. Pricing and data allowances for Data Services are device dependent and based on the capabilities and capacity of each Device.

**For Data Services with a monthly megabyte (MB) or gigabyte (GB) data allowance, once you exceed your monthly data allowance you will be automatically charged for overage as specified in the applicable rate plan. All data allowances, including overages, must be used in the billing period in which the allowance is provided. Unused data allowances will not roll over to subsequent billing periods.**

V03122018

ATT-WIL-06002

AT&T data plans are designed for use with only one of the following distinct Device types: (1) Smartphones, (2) basic and Quick Messaging phones, (3) tablets, (4) LaptopConnect cards, (5) stand-alone Mobile Hotspot devices, and (6) Home Bases. A data plan designated for one type of device may not be used with another type of device. For example, a data plan designated for use with a basic phone or a Smartphone may not be used with a LaptopConnect card, tablet, or stand-alone Mobile Hotspot device, by tethering devices together, by SIM card transfer, or any other means. A data tethering plan, however, may be purchased for an additional fee to enable tethering on a compatible device. An Activation Fee may apply for each data line.

Consumer data plans do not allow access to corporate email, company intranet sites, and other business applications. Access to corporate email, company intranet sites, and/or other business applications requires an applicable Enterprise Data plan. Enterprise Email requires an eligible data plan and Device. Terms may vary depending on selected Enterprise Email solution.

AT&T RESERVES THE RIGHT TO TERMINATE YOUR DATA SERVICES WITH OR WITHOUT CAUSE, INCLUDING WITHOUT LIMITATION, UPON EXPIRATION OR TERMINATION OF YOUR WIRELESS CUSTOMER AGREEMENT.

**6.2 What Are The Intended Uses Of AT&T's Wireless Data Service?**

AT&T's wireless data network is a shared resource, which AT&T manages for the benefit of all of its customers so that they can enjoy a consistent, high-quality mobile broadband experience and a broad range of mobile Internet services, applications and content. However, certain activities and uses of the network by an individual customer or small group of customers can negatively impact the use and enjoyment of the network by others. Therefore, certain activities and uses of AT&T's wireless data service are permitted and others are prohibited. The terms and conditions of your use of AT&T's wireless data service are set forth below.

**Permitted Activities.** AT&T's wireless data services are intended to be used for the following permitted activities: (i) web browsing; (ii) email; and (iii) intranet access if permitted by your rate plan (for example, access to corporate intranets, email, and individual productivity applications like customer relationship management, sales force, and field service automation); (d) uploading and downloading applications and content to and from the Internet or third-party application stores, and (e) using applications and content without excessively contributing to network congestion.

You agree to use AT&T's wireless data services only for these permitted activities.

**Prohibited Activities:** AT&T's wireless data services are not intended to be used in any manner which has any of the following effects and such use is prohibited if it: (a) conflicts with applicable law, (b) hinders other customers' access to the wireless network, (c) compromises network security or capacity, (d) excessively and disproportionately contributes to network congestion, (e) adversely impacts network service levels or legitimate data flows, (f) degrades network performance, (g) causes harm to the network or other customers, (h) is resold either alone or as part of any other good or service, (i) tethers a wireless device to a computing device (such as a computer, Smartphone, eBook or eReader, media player, laptop, or other devices with similar functions) through use of connection kits, applications, devices or

V03122018

ATT-WIL-06003

accessories (using wired or wireless technology) and you have not subscribed to a specific data plan designed for this purpose, or (j) there is a specific data plan required for a particular use and you have not subscribed to that plan.

The following specific uses of AT&T's wireless data service are prohibited:

- AT&T's wireless data services may not be used in any manner that defeats, obstructs or penetrates, or attempts to defeat, obstruct or penetrate the security measures of AT&T's wireless network or systems, or another entity's network or systems; that accesses, or attempts to access without authority, the accounts of others; or that adversely affects the ability of other people or systems to use either AT&T's wireless services or other parties' Internet-based resources. For example, this includes, but is not limited to, malicious software or "malware" that is designed, intentionally or unintentionally, to infiltrate a network or computer system such as spyware, worms, Trojan horses, rootkits, and/or crimeware; "denial of service" attacks against a network host or individual user; and "spam" or unsolicited commercial or bulk email (or activities that have the effect of facilitating unsolicited commercial email or unsolicited bulk e-mail).

- AT&T's wireless data services may not be used in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance by maintaining a sustained and continuous wireless data service connection or active wireless Internet connection. For example, this includes, but is not limited to, server devices or host computer applications such as continuous Web camera posts or broadcasts, automatic data feeds, or automated machine-to-machine connections; "auto-responders," "cancel-bots," or similar automated or manual routines that generate excessive amounts of traffic or that disrupt user groups or email use by others; use of the service as a substitute or backup for private lines or full-time or dedicated data connections; peer-to-peer (P2P) file sharing services; and software or other devices that maintain continuous active Internet connections when a connection would otherwise be idle or any "keep alive" functions, unless they adhere to AT&T data retry requirements (as may be modified from time to time).

- AT&T's wireless data services also may not be used with high bandwidth applications, services and content that are not optimized to work with AT&T's wireless data services and, therefore disproportionately and excessively contribute to network congestion. This includes, but is not limited to, redirecting television signals for viewing on computing devices, web broadcasting, and/or the operation of servers, telemetry devices, or supervisory control and data acquisition devices, unless they meet AT&T's wireless data services optimization requirements.

You agree not to use AT&T's wireless data services for any of these prohibited activities.

**AT&T's Rights to Ensure Compliance.** You agree that AT&T has the right to take any and all actions necessary to enforce this Section 6.2 if you use AT&T's wireless data services in any manner that is prohibited, including, but not limited to, the following actions:

- AT&T may modify, without advance notice, the permitted and prohibited activities, and the optimization requirements for your wireless data services;

V03122018

ATT-WIL-06004

- AT&T may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the availability of wireless bandwidth and spectrum;

- AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means;

- AT&T may use reasonable methods to monitor and collect customer usage information to better optimize the operation of the network. Details concerning the information that AT&T collects about its customers, and how it uses and protects that information are addressed in the AT&T Privacy Policy (see att.com/privacy);

- If you are an AT&T unlimited data plan customer, AT&T may migrate you from the unlimited data plan to a tiered data plan and bill you the appropriate monthly fees. We will provide you with notice of this change at least one billing cycle in advance either by a bill insert, email, text message, or other appropriate means;

- AT&T may interrupt, suspend, cancel or terminate your wireless data services without advance notice.

**Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use. You further agree that "unlimited" does not mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.

**6.3 What Are The Voice And Data Plan Requirements?**

A voice plan is required on all voice-capable Devices, unless specifically noted otherwise in the terms governing your plan.

An eligible tiered pricing data plan is required for certain Devices, including iPhones and other designated Smartphones. Eligible voice and tiered pricing data plans cover voice and data usage in the U.S. and do not cover International voice and data usage and charges. If it is determined that you are using a voice-capable Device without a voice plan, or that you are using an iPhone or designated Smartphone without an eligible voice and tiered data plan, AT&T reserves the right to switch you to the required plan or plans and bill you the appropriate monthly fees. In the case of the tiered data plan, you will be placed on the data plan which provides you with the greatest monthly data usage allowance. If you determine that you do not require that much data usage in a month, you may request a lower data tier at a lower monthly recurring fee.

**6.4 How Does AT&T Calculate My Data Usage/Billing?**

V03122018

ATT-WIL-06005

DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, INCLUDING BUT NOT LIMITED TO: (i) SENDING OR RECEIVING EMAIL, DOCUMENTS, OR OTHER CONTENT, (ii) ACCESSING WEBSITES, OR (iii) DOWNLOADING AND USING APPLICATIONS. SOME APPLICATIONS, CONTENT, PROGRAMS, AND SOFTWARE THAT YOU DOWNLOAD OR THAT COMES PRE-LOADED ON YOUR DEVICE AUTOMATICALLY AND REGULARLY SEND AND RECEIVE DATA TRANSMISSIONS IN ORDER TO FUNCTION PROPERLY, WITHOUT YOU AFFIRMATIVELY INITIATING THE REQUEST AND WITHOUT YOUR KNOWLEDGE. FOR EXAMPLE, APPLICATIONS THAT PROVIDE REAL-TIME INFORMATION AND LOCATION-BASED APPLICATIONS CONNECT TO OUR NETWORK, AND SEND AND RECEIVE UPDATED INFORMATION SO THAT IT IS AVAILABLE TO YOU WHEN YOU WANT TO ACCESS IT. IN ADDITION, ANY ADVERTISEMENTS OR ADVERTISER-RELATED MESSAGES OR DATA DELIVERED TO YOUR DEVICE, EVEN IF DELIVERED TO AN APPLICATION, AS WELL AS ANY MESSAGES OR CONTENT THAT INITIATE IN RESPONSE TO AN ADVERTISEMENT, WILL COUNT TOWARD YOUR DATA USAGE. YOU WILL BE BILLED FOR ALL DATA TRANSPORT AND USAGE WHEN YOUR DEVICE IS CONNECTED TO OUR NETWORK, INCLUDING THAT WHICH YOU AFFIRMATIVELY INITIATE OR THAT WHICH RUNS AUTOMATICALLY IN THE BACKGROUND WITHOUT YOUR KNOWLEDGE, AND WHETHER SUCCESSFUL OR NOT. A DATA SESSION INITIATED ON THE AT&T NETWORK WILL CONTINUE ITS CONNECTION OVER THE AT&T NETWORK UNTIL THE DATA TRANSMISSION IS CONCLUDED, EVEN WHEN YOU CONNECT TO A WI-FI NETWORK DURING THE TRANSMISSION.

Unless designated for International or Canada use, prices and included use apply to access and use on AT&T's wireless network and the wireless networks of other companies with which AT&T has a contractual relationship within the United States and its territories (Puerto Rico and the U.S. Virgin Islands), excluding areas within the Gulf of Mexico.

Usage on networks not owned by AT&T is limited as provided in your data plan. Charges will be based on the location of the site receiving and transmitting service and not the location of the subscriber. Mobile Broadband and 4G access requires a compatible device.

Data Service charges paid in advance for monthly or annual Data Services are nonrefundable. Some Data Services may require an additional monthly subscription fee and/or be subject to additional charges and restrictions. Prices do not include taxes, directory assistance, roaming, universal services fees or other surcharges.

In order to assess your usage during an applicable billing period, you may obtain approximate usage information by calling customer service or using one of our automated systems.

**6.5 Text Messaging And Picture/Video Messaging**

If you do not enroll in a monthly recurring plan for messaging, data, or Video Share, you may have access to messaging, data, and video share services and be charged on a pay-per-use basis if you use those services.

V03122018

ATT-WIL-06006

Messages are limited to 160 characters per message. Premium text and picture/video messages are charged at their stated rates. Standard rates apply to all incoming messages when in the U.S. Different, non-standard per message charges apply to international messages sent from the U.S.

Text, Picture, and Video messages are charged when sent or received, whether read or unread, solicited or unsolicited. AT&T does not guarantee delivery of messages. Text, Picture, and Video messages, including downloaded content, not delivered within 3 days will be deleted. AT&T reserves the right to change this delivery period as needed without notification.

You are charged for each part of messages that are delivered to you in multiple parts. Picture/Video Messaging, data plan, and Text Messaging may need to be provisioned on an account in order to use Picture/Video Messaging. Some elements of Picture/Video messages may not be accessible, viewable, or heard due to limitations on certain wireless phones, PCs, or e-mail.

AT&T reserves the right to change the Picture/Video message size limit at any time without notification. Picture/Video Messaging pricing is for domestic messages only. When a single message is sent to multiple recipients, the sender is charged for one message for each recipient and each recipient is charged for the message received.

Text message notifications may be sent to non-Picture/Video Messaging subscribers if they subscribe to Text Messaging. You may receive unsolicited messages from third parties as a result of visiting Internet sites, and a per-message charge may apply whether the message is read or unread, solicited or unsolicited.

You agree you will not use our messaging services to send messages that contain advertising or a commercial solicitation to any person or entity without their consent. You will have the burden of proving consent with clear and convincing evidence if a person or entity complains you did not obtain their consent. Consent cannot be evidenced by third party lists you purchased or obtained. You further agree you will not use our messaging service to send messages that: (a) are bulk messages (b) are automatically generated; (c) can disrupt AT&T's network; (d) harass or threaten another person (e) interfere with another customer's use or enjoyment of AT&T's Services; (f) generate significant or serious customer complaints, (g) that falsify or mask the sender/originator of the message; or (h) violate any law or regulation. AT&T reserves the right, but is not obligated, to deny, disconnect, suspend, modify and/or terminate your messaging service or messaging services with any associated account(s), or to deny, disconnect, suspend, modify and/or terminate the account(s), without notice, as to anyone using messaging services in any manner that is prohibited. Our failure to take any action in the event of a violation shall not be construed as a waiver of the right to enforce such terms, conditions, or policies. Advertising and commercial solicitations do not include messaging that: (a) facilitates, completes, or confirms a commercial transaction where the recipient of such message has previously agreed to enter into with the sender of such message; or (b) provides account information, service or product information, warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient of such message.

**6.6 Unlimited Messaging**

V03122018

ATT-WIL-06007

Unlimited Messaging Plans or plans with unlimited messaging include only AT&T's Short Messaging Service (SMS) and Multimedia Messaging Service (MMS) and not any other messaging services or applications. Messages are intended for direct communication between phones and must originate from your phone. Messages sent to tablets, laptops, or other connected devices are excluded from Unlimited Messaging Plans or plans including unlimited messaging. Messages sent through applications may incur data charges. We may terminate or restrict your messaging Service for tethered messaging, excessive use or misuse.

### 6.7 Mobile Email

Requires e-mail account with compatible internet service provider and a downloaded or preloaded e-mail application for the wireless device. Access and use of Mobile Email is billed by total volume of data sent and received (in kilobytes) in accordance with your data plan. E-mail attachments cannot be sent, downloaded, read, or forwarded on the mobile device. Only a paper clip icon appears indicating an attachment. You must view attachments from your PC. Upgrades to the application may be required in order to continue to use the Service. Wireless data usage charges will apply for downloading the application and any upgrades.

### 6.8 Mobile Video

Compatible Phone and eligible data plan required. Service not available outside AT&T's Mobile Broadband and 4G coverage areas. Premium content is charged at stated monthly subscription rates or at stated pay per view rates. Content rotates and is subject to withdrawal. Mobile Video is for individual use, not for resale, commercial purposes or public broadcast. Content can only be displayed on the device screen. No content may be captured, downloaded, forwarded, duplicated, stored, or transmitted. The content owner reserves and owns all content rights. All trademarks, service marks, logos, and copyrights not owned by AT&T are the property of their owners. Some Mobile Video content is intended for mature audiences and may be inappropriate for younger viewers. Parental guidance suggested. Use Parental Controls to restrict access to mature content. Content may be provided by independent providers, and AT&T is not responsible for their content. Providers may collect certain information from your use for tracking and managing content usage.

### 6.9 AT&T Wi-Fi Services

**AT&T Wi-Fi service use with a Wi-Fi capable wireless device is subject to the Terms of Services & Acceptable Use Policy ("Terms") found at att.com/attwifitosaup. Your use represents your agreement to those Terms, incorporated herein by reference.** AT&T Wi-Fi Basic service is available at no additional charge to wireless customers with select Wi-Fi capable devices and a qualified data rate plan. Other restrictions may apply.

### 6.10 DataConnect Plans

### 6.10.1 What Are the General Terms that Apply to All DataConnect Plans?

A voice plan is not required with DataConnect plans.

V03122018

ATT-WIL-06008

We may, at our discretion, suspend your account if we believe your data usage is excessive, unusual or is better suited to another rate plan. If you are on a data plan that does not include a monthly MB/GB allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; provided that, prior to the imposition of any additional charges, AT&T shall provide you with notice and you shall have the right to terminate your Data Service.

**6.10.2 Data Global Add-On/DataConnect Global Plans/DataConnect North America Plans**

Available countries, coverage and participating international carriers included in the "Select International Roam Zone" and "Select Canada/Mexico Roam Zone" vary from our generally available Canada/international wireless data roam zones and may not be as extensive. The Select International Roam Zone is restricted to select international wireless carrier(s). Select Canada/Mexico Roam Zone is restricted to select wireless carrier(s) and coverage areas within Canada and Mexico. See att.com/dataconnectglobal for a current list of participating carriers and eligible roam zones. With respect to the countries included in the Select International Roam Zone, you will be restricted from accessing Data Service through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones. With the DataConnect North America Plan, you will be restricted from accessing Data Service through any non-participating Canada/Mexico wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones.

DATA GLOBAL ADD-ON- May only be used with eligible Equipment. Domestic data usage not included. Qualified domestic wireless data plan required. If combined with a wireless voice plan that includes international voice roaming, your international wireless voice roaming in countries included in the Global Data Add-On's Select International Roam Zone will be limited to the participating Canada/international wireless carriers and you will be restricted from voice roaming through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international voice roam zones.

DATACONNECT GLOBAL/NORTH AMERICA PLANS - Requires minimum one-year Service Commitment and you must remain on the plan, for a minimum one-year term. Voice access is restricted and prohibited.

**6.11 AT&T DataPlus℠/AT&T DataPro℠ Plans**

**6.11.1 AT&T Data Plans With Tethering**

Tethering is a wireless or wired method in which your AT&T mobile device is used as a modem or router to provide a Internet Access connection to other devices, such as laptops, netbooks, tablets, smartphones, other phones, USB modems, network routers, mobile hotspots, media players, gaming consoles, and other data-capable devices. AT&T data plans with tethering enabled may be used for tethering your AT&T Mobile device to other devices. If you are on a data plan that does not include a monthly megabyte allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; prior to the imposition of any additional

ATT-WIL-06009

charges, AT&T shall provide you with notice and you shall have the right to terminate your Service (early termination charges may apply).

### 6.11.2 Blackberry® Personal

Supports personal email access to up to 10 Internet email accounts. Users storing more than 1,000 emails or email older than 30 days, may have some emails automatically deleted. May not be used to access corporate email such as BlackBerry Enterprise Server.

### 6.11.3 Blackberry® Connect; Blackberry Enterprise; Blackberry International

Supports BlackBerry Enterprise Server™ for corporate access (valid Client Access License required), and personal email access to up to 10 Internet email accounts as per BlackBerry Personal. BlackBerry International requires a minimum one-year agreement.

### 6.12 GOOD Plan

Requires compatible Good Server and, as to each end user, a compatible Good Client Access License (CAL) for use with a qualifying AT&T data plan. Solution includes software, products and related services provided by Good Technology, Inc. ("Good"), which are subject to applicable Good terms and conditions. Good is solely responsible for all statements regarding, and technical support for, its software, products and services.

### 6.13 Microsoft® Direct Push

Requires compatible Microsoft® Exchange Server and, as to each end user, a compatible device, a Direct Push enabled email account, and a qualifying AT&T Data Plan. Plans include end user customer support from AT&T for compatible devices. AT&T does not sell, supply, install or otherwise support Microsoft® software, products or services (including without limitation, Exchange and Direct Push).

### 6.14 AT&T Mobile Share® Plans (with Unlimited Talk and Text)

AT&T Mobile Share plans, including Mobile Share Value plans, allow you to share a monthly allotment of domestic wireless data usage, along with unlimited domestic talk and texting services among up to ten (10) Devices. You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share plan you select. You must specifically identify the devices (the "Designated Devices") that will share your monthly allotment of data usage under the Mobile Share plan you select. If you add a WI Device for unlimited talk only, it will be counted as one of the (10) Designated Devices under the Mobile Share plan. Designated Devices can include: smartphone(s), tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), mobile hotspot(s), basic or quick messaging phone(s), WI Device(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share plan you select, plus any other data (such as available Rollover Data) that you may have for use during the billing period, you will automatically be charged for overage as specified in your rate plan. Unless specified otherwise, data allowances, including overages and Rollover Data, must be used in the billing period provided or you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Device(s) during a

V03122018

ATT-WIL-06010

specific billing cycle, but monthly charges for the suspended Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share plans with capable Designated Devices; provided, however, that such use is limited to a maximum of five (5) simultaneous users per Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share plan or when you activate an additional Device on an existing Mobile Share plan. Access to corporate email, intranet sites and/or other business applications may be available for an additional monthly charge per Device (no additional charge for Mobile Share Value plans). Discounts otherwise applicable to your Mobile Share rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

**Rollover Data℠**: Only Mobile Share Value® plans include the Rollover Data feature. With Rollover Data, unused data from the monthly plan allotment rounds up to the nearest MB and carries over for one billing period. **Unused Rollover Data automatically expires after one billing period or with any plan change (such as changing data amounts or termination).** Unused overage data does not roll over. Rollover Data is always consumed last, after your other data allowances. Unused Rollover Data is not redeemable for cash or credit and is not transferable including to other Mobile Share Value groups on your account. Mobile Share and Mobile Share Data-only plans do not include Rollover Data.

If you use a Mobile Share plan with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) simultaneous users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.

**Device upgrades**: If you upgrade to a new smartphone, a discounted access charge is only available for that line when purchasing a new smartphone via AT&T Next℠ or when you bring your own smartphone or you purchase a new smartphone at full retail price. If you upgrade your Device to a new smartphone on a 2-year Service Commitment, that line is ineligible for the discount and the discount is lost.

**6.15 AT&T Mobile Share - Data Plans (for Data-Only Devices)**

AT&T Mobile Share - Data plans allow you to share a monthly allotment of domestic wireless data usage among up to ten (10) 3G, HSPA+ or LTE Devices (excluding smartphones and basic or quick messaging phones). You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share - Data plan you select. You must specifically identify one or more eligible devices (the "Designated Data Devices") that will share your monthly allotment of data usage under the Mobile Share - Data plan you select. Designated Data Devices can include: tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), or mobile hotspot(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share - Data plan you select, you will automatically be charged for overage as specified in your rate plan. If, during a billing period, you do not use all of the data allotment in the Mobile Share - Data plan you select, you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Designated Data Device(s) during a specific billing cycle, but monthly charges for the suspended Designated Data Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share - Data plans with capable Designated Data Devices; provided, however, that such use is

ATT-WIL-06011

limited to a maximum of five (5) simultaneous users per Designated Data Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share - Data plan or when you activate an additional Designated Data Device on an existing Mobile Share - Data plan. Designated Data Devices that are capable of accessing corporate email, intranet sites and/or other business applications may do so for no additional monthly access charge. Discounts otherwise applicable to your Mobile Share - Data rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

If you use a Mobile Share - Data plan with a smartphone, with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) simultaneous users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.

**7.0 AT&T Wireless Home Services**

**7.1 AT&T Wireless Home Phone Service**

AT&T Wireless Home Phone ("WHP") service utilizes mobile wireless gateway Equipment now called an AT&T Wireless Internet device ("WI Device", formerly called a Wireless Home Phone device or WHP Device). With WHP service, the WI Device allows you to connect a landline phone to place and receive calls over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

WHP service provides voice service only and requires that you subscribe to an eligible wireless voice plan option, such as: (1) Wireless Home Phone unlimited plan or (2) AT&T Mobile Share plan. If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Text messaging, data services, features and international roaming are not supported by WHP service. If you use a wireless voice plan not designed for WHP service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

**7.2 AT&T Wireless Internet Service**

AT&T Wireless Internet service (formerly Wireless Home Phone and Internet service or WHPI) also utilizes the WI Device (the WHPI service used the Home Base device. With AT&T Wireless Internet service, the WI Device allows you to connect a landline phone to place and receive calls, and to connect up to twelve (12) Internet-capable devices (one (1) via Ethernet and ten (10) via Wi-Fi) to have mobile

ATT-WIL-06012

broadband Internet access over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

AT&T Wireless Internet service requires that you subscribe to an eligible wireless voice and/or data plan to take advantage of one or both capabilities. Tiered shared data plan options allow you to share a monthly allotment of domestic wireless data usage among your connected internet-capable devices. If your data usage exceeds the monthly data allotment of the plan you select during a billing period, you automatically will be charged for overages as specified in your plan. If you do not use all of the monthly data allotment of the plan you select during a billing period, you forfeit that usage. You may also add your WI Device to your AT&T Mobile Share plan if the monthly allotment of domestic wireless data usage under your AT&T Mobile Share plan is 10 GB or more.

If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Messaging services and international roaming are not supported by AT&T Wireless Internet service. If you use a wireless voice and/or data plan not designed for AT&T Wireless Internet service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

## 8.0 ARE THERE OTHER TERMS AND CONDITIONS THAT APPLY TO FEATURES AND APPLICATIONS?

Terms and conditions for certain features and applications are provided on the Device at the time of feature/application activation or first use. Certain features/applications will not be available in all areas at all times.

## 9.0 WHAT IS AT&T ROADSIDE ASSISTANCE & OPTIONAL AT&T MOBILE INSURANCE, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack?

### 9.1 AT&T Roadside Assistance

AT&T Roadside Assistance ("RA") is an optional feature that may be purchased separately and automatically billed to the wireless account. RA service is provided by American Traveler Motor Club, Inc., a licensed motor club. For complete RA Terms and Conditions, refer to your RA Welcome Kit or go to att.com/roadside.

V03122018

ATT-WIL-06013

**9.2 Optional AT&T Mobile Insurance, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack**

If eligible, you have 30 days from activation or upgrade to enroll in optional AT&T Mobile Insurance, AT&T Mobile Protection Pack or AT&T Multi-Device Protection Pack. For details visit www.att.com/deviceprotection. AT&T Mobile Insurance and AT&T Multi Device Insurance are underwritten by Continental Casualty Company, a CNA company (CNA) and administered by Asurion Protection Services, LLC (in California, Asurion Protection Services Insurance Agency, LLC, CA Lic. #OD63161, in Puerto Rico, Asurion Protection Services of Puerto Rico, Inc.), CNA's licensed agent for the customers of AT&T.

**10.0 WHAT OTHER TERMS AND CONDITIONS APPLY TO MY WIRELESS SERVICE?**

**10.1 Intellectual Property**

You must respect the intellectual property rights of AT&T, our third-party content providers, and any other owner of intellectual property whose protected property may appear on any website and/or dialogue box controlled by AT&T or accessed through the AT&T's websites. Except for material in the public domain, all material displayed in association with the Service is copyrighted or trademarked. Except for personal, non-commercial use, trademarked and copyrighted material may not be copied, downloaded, redistributed, modified or otherwise exploited, in whole or in part, without the permission of the owner. The RIM and BlackBerry families of related marks, images and symbols are the exclusive properties and trademarks or registered trademarks of Research In Motion Limited - used by permission. Good, the Good logo and GoodLink are trademarks of Good Technology, Inc., in the United States and/or other countries. Good Technology, Inc., and its products and services are not related to, sponsored by or affiliated with Research In Motion Limited. All other marks contained herein are the property of their respective owners.

©2012 AT&T Intellectual Property. All rights reserved. AT&T, AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. Apple iPhone: ™ and © 2010 Apple Inc. All rights reserved. Apple is a trademark of Apple Inc., registered in the U.S. and other countries. iPhone is a trademark of Apple Inc.

**10.2 Severability**

If any provision of this Agreement is found to be unenforceable by a court or agency of competent jurisdiction, the remaining provisions will remain in full force and effect. The foregoing does not apply to the prohibition against class or representative actions that is part of the arbitration clause; if that prohibition is found to be unenforceable, the arbitration clause (but only the arbitration clause) shall be null and void.

**10.3 Assignment; Governing Law; English Language**

**10.3.1 Assignment**

V03122018

ATT-WIL-06014

AT&T may assign this Agreement, but you may not assign this Agreement without our prior written consent.

### 10.3.2 Governing Law

The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law. In the event of a dispute between us, the law of the state of your billing address at the time the dispute is commenced, whether in litigation or arbitration, shall govern except to the extent that such law is preempted by or inconsistent with applicable federal law.

### 10.3.3 English Language

The original version of this Agreement is in the English language. Any discrepancy or conflicts between the English version and any other language version will be resolved with reference to and by interpreting the English version.

### 10.4 Lifeline Services

As part of a federal government program, AT&T offers discounted wireless service to qualified low-income residents in selected states. For questions or to apply for Lifeline service, call 1-800-377-9450. Puerto Rico customers should contact 1-787-405-5463. For tips on how to protect against fraud, please visit the CPUC's website at, CalPhoneInfo.com.

### 10.5 Trial Services

Trial Services are subject to the terms and conditions of this Agreement; may have limited availability; and may be withdrawn at any time.

### 10.6 NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)

AT&T has chosen to offer wireless emergency alerts within portions of its service area, as defined by the terms and conditions of its Agreement, on wireless emergency alert capable devices.

There is no additional charge for these wireless emergency alerts. Wireless emergency alerts may not be available on all devices or in the entire service area, or if a subscriber is outside of the AT&T service area. In areas in which the emergency alerts are transmitted, such alerts may not be received by a subscriber or user of AT&T's wireless service even though the subscriber has a device capable of receiving them.

For details on the availability of this service and wireless emergency alert capable devices, please ask a sales representative, or go to att.com and click the Wireless Emergency Alerts link. This notice is required by FCC Rule 47 C.F.R. § 10.250 (Commercial Mobile Alert Service).

In transmitting emergency alerts pursuant to federal law, AT&T, including its officers, directors, employees, vendors, and agents, shall not be liable to any subscriber to, or user of, AT&T's wireless

V03122018

ATT-WIL-06015

service or equipment for any act or omission related to or any harm resulting from the transmission of, or the failure to transmit, an emergency alert; or the release to a government entity or agency, public safety, fire service, law enforcement official, emergency medical service, or emergency facility of subscriber information used in connection with delivering an emergency alert.

## 11.0 WHAT TERMS APPLY ONLY TO SPECIFIC STATES?

### 11.1 California: What If There Are Unauthorized Charges Billed To My Device?

You are not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. Once you report to us that the Device is lost or stolen and your Device is suspended, you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com.

If you notify us of any charges on your bill you claim are unauthorized, we will investigate. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including but not limited to, your monthly fee. We both have a duty to act in good faith and in a reasonable and responsible manner including in connection with the loss or theft of your Device.

### 11.2 Connecticut: Questions About Your Service

If you have any questions or concerns about your AT&T Service, please call Customer Care at 1-800-331-0500, dial 611 from your wireless phone, or visit att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance Service, please call 1-800-288-2020 or visit att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Public Utilities Regulatory Authority (PURA). Online: ct.gov.pura; Phone: 1-800-382-4586; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

### 11.3 Puerto Rico

If you are a Puerto Rico customer and we cannot resolve your issue, you may notify the Telecommunications Regulatory Board of Puerto Rico of your grievance. Mail: 500 Ave Roberto H. Todd, (Parada 18), San Juan, Puerto Rico 00907-3941; Phone: 1-787-756-0804 or 1-866-578-5500; Online: jrtpr.gobierno.pr, in addition to having available arbitration, as provided in Section 2.0.

V03122018

ATT-WIL-06016

# EXHIBIT 3

# PART 2 OF 2

# Wireless Customer Agreement

**FMS SA T 1118 9960 E**

V11012018

Case 5:19-cv-00475-BO     Document 127-4     Filed 03/30/22     Page 121 of 246

ATT-WIL-01498



**WIRELESS CUSTOMER AGREEMENT**
**TABLE OF CONTENTS**

**1.0   TERM COMMITMENT, CHARGES, BILLING AND PAYMENT**

**1.1   What Is The Term Of My Service? How Can I Fulfill My Service Commitment? What are My Rights to Cancel Service and Terminate My Agreement?**
**1.2   What are AT&T's Rights to Cancel My Service(s) and Terminate My Agreement?**
**1.3   Can AT&T Change My Terms and Rates?**
**1.4   How Will I Receive My Bill? What Charges Am I Responsible For?  How Much Time Do I Have To Dispute My Bill?**
**1.5   How Does AT&T Calculate My Bill?**
**1.6   Are Advance Payments And/Or Deposits Required?**
**1.7   What if I fail to pay my AT&T Bill when it is due?**
**1.8   What Happens If My Check Bounces?**
**1.9   Are There Business or Government Benefits?**
**1.10   Who Can Access My Account and for What Purpose?**
**1.11   How will AT&T communicate with me about my Service?**

**2.0   HOW DO I RESOLVE DISPUTES WITH AT&T?**

**2.1   Dispute Resolution By Binding Arbitration**
**2.2   Arbitration Agreement**
**2.3   Puerto Rico Customers**

**3.0   TERMS RELATING TO YOUR DEVICE AND CONTENT**

**3.1   Your Device**
**3.2   Where and How Does AT&T Service Work?**
**3.3   What Information, Content, And Applications Are Provided By Third Parties?**
**3.4   How Can I Get Mobile Content?**
**3.5   Am I Responsible If Someone Makes A Purchase With My Device?**
**3.6   Does AT&T Collect Location-Based Network Performance Information From My Device?  Can I Use Location-Based Services With My Device?**
**3.7   What If My Device Is Lost Or Stolen?**

**4.0   TERMS RELATING TO THE USE AND LIMITATIONS OF SERVICE**

**4.1   What Are The Limitations On Service And Liability?**
**4.2   How Can I Use My AT&T Service?**
**4.3   Who Is Responsible For Security?**
**4.4   How Can I Use the Software?**
**4.5   How Can I Use Another Carrier's Network (Off-Net Usage)?**
         **4.5.1   Voice**
         **4.5.2   Data**
         **4.5.3   Messaging**
         **4.5.4   Notice**

**4.6   How Do I Get Service Outside AT&T's Wireless Network (Roaming)?**
         **4.6.1   International Services**
                 **4.6.1.1  International Long Distance**
                 **4.6.1.2  International Long Distance Text, Picture & Video Messaging**
                 **4.6.1.3  International Roaming**
                 **4.6.1.4  International Data**
                 **4.6.1.5  Data Global Add-Ons and Global Messaging Plans/Packages**
                 **4.6.1.6  Data Connect Global/North America Plans**

V11012018

ATT-WIL-01499

        **4.6.1.7 Cruise Ship Roaming**
        **4.6.1.8 International Miscellaneous**

**5.0 WHAT VOICE SERVICES DOES AT&T OFFER?**

    **5.1** <u>**What Are The General Terms That Apply To All AT&T Voice Rate Plans?**</u>
    **5.2** <u>**Voicemail**</u>
    **5.3** <u>**Voicemail-To-Text (VMTT)**</u>
    **5.4** <u>**Unlimited Voice Services**</u>
    **5.5** <u>**Caller ID**</u>
    **5.6** <u>**Rollover® Minutes**</u>
    **5.7** <u>**Mobile To Mobile Minutes**</u>
    **5.8** <u>**FamilyTalk® Plan**</u>
    **5.9** <u>**A-List®**</u>
    **5.10** <u>**AT&T Viva Mexico$^{SM}$ ("Mexico Plan") & AT&T Nation®/FamilyTalk® With Canada**</u>
<u>**("Canada Plan")**</u>
    **5.11** <u>**AT&T Unity$^{SM}$ And AT&T Unity$^{SM}$-FamilyTalk® Plans Requirements**</u>
        **5.11.1 Eligibility Requirements**
        **5.11.2 AT&T Unity$^{SM}$ Minutes**
    **5.12** <u>**VoiceDial Services**</u>
    **5.13** <u>**AT&T Messaging Unlimited with Mobile to Any Mobile Calling Feature**</u>

**6.0 WHAT DATA AND MESSAGING SERVICES DOES AT&T OFFER?**

    **6.1** <u>**What Are The General Terms That Apply To All Data And Messaging Plans?**</u>
    **6.2** <u>**What Are The Intended Uses Of AT&T's Wireless Data Service?**</u>
    **6.3** <u>**What Are The Voice And Data Plan Requirements?**</u>
    **6.4** <u>**How Does AT&T Calculate My Data Usage/Billing?**</u>
    **6.5** <u>**Text Messaging And Picture/Video Messaging**</u>
    **6.6** <u>**Unlimited Messaging**</u>
    **6.7** <u>**Mobile Email**</u>
    **6.8** <u>**Mobile Video**</u>
    **6.9** <u>**AT&T Wi-Fi Services**</u>
    **6.10** <u>**DataConnect Plans**</u>
        **6.10.1 What Are the General Terms that Apply to All DataConnect Plans?**
        **6.10.2 Data Global Add-On/DataConnect Global Plans/DataConnect North America**
              **Plans**
    **6.11** <u>**AT&T DataPlus$^{SM}$/AT&T DataPro$^{SM}$ Plans**</u>
        **6.11.1 AT&T Data Plans With Tethering**
        **6.11.2 Blackberry® Personal**
        **6.11.3 Blackberry® Connect; Blackberry Enterprise; Blackberry International**
    **6.12** <u>**GOOD Plan**</u>
    **6.13** <u>**Microsoft® Direct Push**</u>
    **6.14** <u>**AT&T Mobile Share Plans (with Unlimited Talk and Text)**</u>
    **6.15** <u>**AT&T Mobile Share – Data Plans (for Data-Only Devices)**</u>

**7.0 AT&T WIRELESS HOME SERVICES**

    **7.1** <u>**AT&T Wireless Home Phone Service**</u>
    **7.2** <u>**AT&T Wireless Internet Service**</u>

**8.0 ARE THERE OTHER TERMS AND CONDITIONS THAT APPLY TO FEATURES AND APPLICATIONS?**

**9.0 WHAT IS AT&T ROADSIDE ASSISTANCE & OPTIONAL AT&T MOBILE INSURANCE?**

V11012018

ATT-WIL-01500

**9.1**  **AT&T Roadside Assistance**
**9.2**  **Optional AT&T Mobile Insurance, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack**

**10.0**  **WHAT OTHER TERMS AND CONDITIONS APPLY TO MY WIRELESS SERVICE?**

**10.1**  **Intellectual Property**
**10.2**  **Severability**
**10.3**  **Assignment; Governing Law; English Language**
    **10.3.1  Assignment**
    **10.3.2  Governing Law**
    **10.3.3  English Language**
**10.4**  **Lifeline Services**
**10.5**  **Trial Services**
**10.6**  **NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)**

**11.0**  **WHAT TERMS APPLY ONLY TO SPECIFIC STATES?**

**11.1**  **California: What If There Are Unauthorized Charges Billed To My Device?**
**11.2**  **Connecticut: Questions About Your Service**
**11.3**  **Puerto Rico**

V11012018

ATT-WIL-01501

**WIRELESS CUSTOMER AGREEMENT ("Agreement")**

"AT&T" or "we," "us," or "our" refers to AT&T Mobility LLC, acting on behalf of its affiliates doing business as AT&T or other brands owned by AT&T. "You" or "your" refers to the person or entity that is the customer of record.

**PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION, INCLUDING OUR USE OF YOUR LOCATION INFORMATION (SEE SECTION 3.6). THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.**

This Agreement, including the AT&T Privacy Policy Located at att.com/privacy, Customer Service Summary, and terms of service for wireless products, features, applications, and services (including content and other AT&T services included with your wireless service) ("Services") not otherwise described herein that are posted on applicable AT&T websites or devices, and any documents expressly referred to herein or therein, make up the complete agreement between you and AT&T and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement.

AT&T's wireless network may provide broadband access to the Internet. For more information about how AT&T helps transmit information to points on the Internet and how we manage our network, please see the Broadband Information page which can be found at: www.att.com/broadbandinfo.

**1.0 TERM COMMITMENT, CHARGES, BILLING AND PAYMENT**

**1.1 What Is The Term Of My Service? How Can I Fulfill My Service Commitment? What are My Rights to Cancel Service and Terminate My Agreement?**

AT&T wireless Service(s) may be used with: (a) a mobile device that contains a SIM that is assigned to your account ("Device") and/or, (b) a device that is designed and purchased for use exclusively on AT&T's network ("Equipment").

**Term of Service.**

Your Agreement begins on the day we activate your Service(s) and continues through the Term of Service, typically a 12 month or 24 month period ("Service Commitment"), specified on your Customer Service Summary. At the end of your service commitment, this Agreement will automatically continue on a month-to-month basis. If your Agreement has no Service Commitment, it is a month-to-month Agreement.

**Device Activation.**

If You purchased a device that was shipped to You, You agree to activate the device within seven (7) days of the shipment date. If Your device is not activated by You, we may activate the device for You within a month of shipping and Your monthly recurring charges, and any applicable Service Commitment, will begin.

V11012018

ATT-WIL-01502

**Fulfillment of Service Commitment.**

You have received certain benefits from us in exchange for your Service Commitment, which may include, but are not limited to, a subsidized wireless device. There are two alternative ways to fulfill your Service Commitment. You can pay for the Services described in your Customer Service Summary for the term of your Service Commitment, or you can terminate your Agreement prior to the end of your Service Commitment and pay an Early Termination Fee ("ETF"). The Early Termination Fee is not a penalty, but rather is an alternative means for you to perform your obligations under the Agreement that partially compensates us for the fact that the Service Commitment on which your rate plan is based was not completed.

**Your Termination Rights.**

Within the first 14 days after service activation, you may terminate your Agreement for any reason and not be required to pay an ETF. If you terminate within three (3) days of accepting the Agreement, AT&T will refund your activation fee, if any. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement, and you agree to return to AT&T any Equipment you purchased from AT&T in connection with your Service Commitment. If you fail to return this Equipment, you will be charged the difference between the amount you paid AT&T for the Equipment and the amount you would have been charged for the Equipment had you not agreed to a Service Commitment. AT&T also may charge you a restocking fee for any returned Equipment. Some dealers may impose additional fees.

After the first 14 days, you may terminate your Agreement for any reason. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement along with the applicable ETF. The Early Termination Fee is either: (a) $325 or (b) $150. The ETF reduces each full month of your Service Commitment that you complete. To determine whether your Equipment has a $325 Early Termination Fee or a $150 Early Termination Fee, and the amount of reduction, check att.com/equipmentETF.

After your Service Commitment ends and you are on a month-to-month Agreement, you may terminate your Agreement at any time with 30 days notice without incurring an ETF. If you sign a new Agreement before the end of the term of your existing Agreement and terminate that new Agreement within 14 days as allowed above, you agree that you will be bound by the terms and conditions of your existing Agreement including fulfillment of any remaining Service Commitment thereunder.

**1.2 Under What are AT&T's Rights to Cancel My Service(s) and Terminate My Agreement?**

AT&T may interrupt, suspend or cancel your Services and terminate your Agreement without advance notice for any reason including, but not limited to, the following:

- Any conduct that we believe violates this Agreement or AT&T's Acceptable Use Policy;
- Any conduct that involves the use of abusive, derogatory, insulting, threatening, vulgar or similarly unreasonable language or behavior directed at any of our employees or representatives whether it be in person, over the phone, or in writing;
- Any abusive use of our network or Services;
- You use your Device/Equipment and/or our Services for an unlawful or fraudulent purpose;

V11012018

ATT-WIL-01503

- You use your Device/Equipment and/or our Services in any way that: (a) is harmful to, interferes with, or negatively affects our network, other customers, or the network of any other provider, (b) is harmful to, interferes with, or negatively affects our Services or operations, (c) infringes intellectual property rights of AT&T or others, (d) results in the publication of threatening, offensive or illegal material, or (e) generates spam or other abusive messaging or calling, a security risk, or a violation of privacy;

- You resell our Services either alone or as part of any other good or service;

- You fail to make all required payments when due;

- Your credit has deteriorated and/or we believe that there is a risk of non-payment;

- You refuse to pay any required advance payment or deposit;

- We discover that you are underage;

- You provide inaccurate or misleading credit information; or

- You modify your device from its manufacturer's specifications.

AT&T's rights under this Section 1.2 are in addition to any specific rights that we reserve in other provisions of this Agreement to interrupt, suspend, modify, or cancel your Services and terminate your Agreement.

After your Service Commitment ends and you are on a month-to-month Agreement, AT&T may terminate your Agreement at any time with 30 days notice.

### 1.3  Can AT&T Change My Terms And Rates?

From time to time we might make changes to this Agreement.  This could include charges, discounts, coverage, technologies, and other Service terms. We commit that we'll provide you with notice either in your monthly bill or separately at least 30 days before we make any materially adverse change. So, for instance, if we increase your rate plan or the price of any of your Services more than what we've previously told you (such as in your Customer Service Summary) those would be materially adverse changes. But, not all changes are materially adverse. For example, here is a list of some changes that are not materially adverse: (1) increases to international roaming rates; (2) increases to charges for international long distance rates; (3) increases to AT&T fees and taxes imposed by the government and passed on to you; and (4) changes to surcharges and regulatory cost recovery charges that do not exceed the limits set forth in your Agreement. We also want you to know that, if we make a materially adverse change during your Service Commitment (if any), you can cancel impacted Service without paying an early termination fee. **But, you do need to notify us of your desire to cancel Service at the following address within 30 days of receiving the notice:  AT&T, PO Box 10330, Fort Wayne, IN 46851.**

### 1.4  How Will I Receive My Bill? What Charges Am I Responsible For? How Much Time Do I Have To Dispute My Bill?

You will receive an electronic (paperless) bill at AT&T's online account management site unless you tell us you want a paper bill. You will be given the option to choose electronic billing or paper billing when you purchase service. Each month we will send you an email notice when your electronic bill is available online. This will be sent to your official email address on file with AT&T. You are required to keep your email address current and to notify us immediately of

V11012018

ATT-WIL-01504

any change in your email address. You always have the option of switching back to a paper bill by changing your billing preferences at AT&T's online account management site. You will not receive a paper bill in the mail unless you expressly request one.

You are responsible for paying all charges for or resulting from Services provided under this Agreement, including any activation fee that may apply to each voice or data line. You will receive monthly bills that are due in full.

IF YOU DISPUTE ANY CHARGES ON YOUR BILL, YOU MUST NOTIFY US IN WRITING AT AT&T BILL DISPUTE, 1025 LENOX PARK, ATLANTA, GA 30319 WITHIN 100 DAYS OF THE DATE OF THE BILL OR YOU'LL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL AND TO PARTICIPATE IN ANY LEGAL ACTION RAISING SUCH DISPUTE.

Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; restoral and reactivation charges; any other charges or calls billed to your phone number; and applicable taxes and governmental fees, whether assessed directly upon you or upon AT&T.

To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you're required to provide us with your residential or business street address. If you don't provide us with such address, or if it falls outside our licensed Services area, we may reasonably designate a PPU within the licensed Services area for you. You must live and have a mailing address within AT&T's owned network coverage area.

**Auto Bill Pay:**  If you enroll your account for automatic bill payments ("Auto Bill Pay"), you authorized AT&T to charge your debit/credit card or bank account automatically to pay your monthly statements, as well as any unpaid balances and fees if your AT&T service is disconnected. To cancel your authorization for Auto Bill Pay, you must call 1-800-288-2020.  You should also contact your card issuer or financial institution to advise that you have cancelled your enrollment.   You will lose any promotional credits associated with your account if you opt out from Auto Bill Pay.

**1.5** How Does AT&T Calculate My Bill?

Usage and monthly fees will be billed as specified in your customer service summary or rate plan information online. If the Equipment you order is shipped to you, your Services may be activated before you take delivery of the Equipment so that you can use it promptly upon receipt. Thus, you may be charged for Services while your Equipment is still in transit. If, upon receiving your first bill, you have been charged for Services while your Equipment was in transit, you may contact Customer Care 1-800-331-0500 to request a credit. Except as provided below, monthly Services and certain other charges are billed one month in advance, and there is no proration of such charges if Service is terminated on other than the last day of your billing cycle. Monthly Service and certain other charges are billed in arrears if you're a former customer of AT&T Wireless and maintain uninterrupted Service on select AT&T rate plans, however, if you elect to receive your bills for your Services combined with your wireline phone bill (where available) you will be billed in advance as provided above. You agree to pay for all services used with your Device.

AIRTIME AND OTHER MEASURED USAGE ("CHARGEABLE TIME") IS BILLED IN FULL-MINUTE INCREMENTS, AND ACTUAL AIRTIME AND USAGE ARE ROUNDED UP TO THE NEXT FULL-MINUTE INCREMENT AT THE END OF EACH CALL FOR BILLING PURPOSES. AT&T CHARGES A FULL MINUTE OF AIRTIME USAGE FOR

V11012018

ATT-WIL-01505

EVERY FRACTION OF THE LAST MINUTE OF AIRTIME USED ON EACH WIRELESS CALL. UNLESS OTHERWISE PROVIDED IN YOUR PLAN, MINUTES WILL BE DEPLETED ACCORDING TO USAGE IN THE FOLLOWING ORDER: NIGHT AND WEEKEND MINUTES, MOBILE TO MOBILE MINUTES, ANYTIME MINUTES AND ROLLOVER, EXCEPT THAT MINUTES THAT ARE PART OF BOTH A LIMITED PACKAGE AND AN UNLIMITED PACKAGE WILL NOT BE DEPLETED FROM THE LIMITED PACKAGE. Chargeable Time begins for outgoing calls when you press SEND (or similar key) and for incoming calls when a signal connection from the caller is established with our facilities. Chargeable Time ends after you press END (or similar key), but not until your wireless telephone's signal of call disconnect is received by our facilities and the call disconnect signal has been confirmed.

All outgoing calls for which we receive answer supervision or which have at least 30 seconds of Chargeable Time, including ring time, shall incur a minimum of one minute airtime charge. Answer supervision is generally received when a call is answered; however, answer supervision may also be generated by voicemail systems, private branch exchanges, and interexchange switching equipment. Chargeable Time may include time for us to recognize that only one party has disconnected from the call, time to clear the channels in use, and ring time. Chargeable Time may also occur from other uses of our facilities, including by way of example, voicemail deposits and retrievals, and call transfers. Calls that begin in one rate period and end in another rate period may be billed in their entirety at the rates for the period in which the call began.

DATA TRANSPORT OR USAGE IS CALCULATED IN FULL-KILOBYTE INCREMENTS, AND ACTUAL TRANSPORT OR USAGE IS ROUNDED UP TO THE NEXT FULL-KILOBYTE INCREMENT AT THE END OF EACH DATA SESSION FOR BILLING PURPOSES. AT&T CALCULATES A FULL KILOBYTE OF DATA TRANSPORT/USAGE FOR EVERY FRACTION OF THE LAST KILOBYTE OF DATA TRANSPORT/USAGE USED ON EACH DATA SESSION. TRANSPORT OR USAGE IS BILLED EITHER BY THE KILOBYTE ("KB") OR MEGABYTE ("MB"). IF BILLED BY MB, THE FULL KBs CALCULATED FOR EACH DATA SESSION DURING THE BILLING PERIOD ARE TOTALED AND ROUNDED UP TO NEXT FULL MB INCREMENT TO DETERMINE BILLING. IF BILLED BY KB, THE FULL KBs CALCULATED FOR EACH DATA SESSION DURING THE BILLING PERIOD ARE TOTALED TO DETERMINE BILLING. NETWORK OVERHEAD, SOFTWARE UPDATE REQUESTS, EMAIL NOTIFICATIONS, AND RESEND REQUESTS CAUSED BY NETWORK ERRORS CAN INCREASE MEASURED KILOBYTES. DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, AS DISCUSSED IN MORE DETAIL IN SECTION 6.4.

If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, megabytes or messages), unless otherwise specifically provided as a part of such rate plan, any unused allotment of Services from one billing cycle will not carry over to any other billing cycle. We may bill you in a format as we determine from time to time. Additional charges may apply for additional copies of your bill, or for detailed information about your usage of Services.

**Delayed Billing:** Billing of usage for calls, messages, data or other Services (such as usage when roaming on other carriers' networks, including internationally) may occasionally be delayed. Such usage charges may appear in a later billing cycle, will be deducted from Anytime monthly minutes or other Services allotments for the month when the usage is actually billed, and may result in additional charges for that month. Those minutes will be applied against your Anytime monthly minutes in the month in which the calls appear on your bill. You also remain responsible for

V11012018

ATT-WIL-01506

paying your monthly Service fee if your Service is suspended for nonpayment. We may require payment by money order, cashier's check, or a similarly secure form of payment at our discretion.

**1.6 Are Advance Payments And/Or Deposits Required?**

We may require you to make deposits or advance payments for Services, which we may offset against any unpaid balance on your account. Interest won't be paid on advance payments or deposits unless required by law. We may require additional advance payments or deposits if we determine that the initial payment was inadequate. Based on your creditworthiness as we determine it, we may establish a credit limit and restrict Services or features. If your account balance goes beyond the limit we set for you, we may immediately interrupt or suspend Services until your balance is brought below the limit. Any charges you incur in excess of your limit become immediately due. If you have more than one account with us, you must keep all accounts in good standing to maintain Services. If one account is past due or over its limit, all accounts in your name are subject to interruption or termination and all other available collection remedies.

**1.7 What if I fail to pay my AT&T Bill when it is due?**

You agree that for each bill not paid in full by the due date, AT&T may charge and you will pay a late payment fee of $5.75. Restrictive endorsements are void.

You expressly authorize, and specifically consent to allowing, AT&T and/or its outside collection agencies, outside counsel, or other agents to contact you in connection with any and all matters relating to unpaid past due charges billed by AT&T to you. You agree that, for attempts to collect unpaid past due charges, such contact may be made to any mailing address, telephone number, cellular phone number, e-mail address, or any other electronic address that you have provided, or may in the future provide, to AT&T. You agree and acknowledge that any e-mail address or any other electronic address that you provide to AT&T is your private address and is not accessible to unauthorized third parties. For attempts to collect unpaid charges, you agree that in addition to individual persons attempting to communicate directly with you, any type of contact described above may be made using, among other methods, pre-recorded or artificial voice messages delivered by an automatic telephone dialing system, pre-set e-mail messages delivered by an automatic e-mailing system, or any other pre-set electronic messages delivered by any other automatic electronic messaging system.

**1.8 What Happens If My Check Bounces?**

We'll charge you up to $30 (depending on applicable law) for any check or other instrument (including credit card charge backs) returned unpaid for any reason.

**1.9 Are There Business or Government Benefits?**

You may receive or be eligible for certain discounts, credits, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement"). All such Benefits are provided to you solely as a result of the corresponding Business Agreement, and may be modified or terminated without notice. You may also be eligible for certain additional rate plans and/or other Services. Please see http://www.att.com/iru-additional-terms for such Services and the associated additional terms, which are hereby incorporated by reference.

V11012018

ATT-WIL-01507

If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your account information with it or its authorized agents. If you use Service(s) and/or receive certain Benefits tied to a Business Agreement with us, but you're liable for your own charges, then you authorize us to share enough account information with it or its authorized agents to verify your continuing eligibility for those Services or Benefits.

You may receive Benefits because of your agreement to have the charges for your Services, billed ("Joint Billing") by a wireline company affiliated with AT&T ("Affiliate") or because you subscribe to certain services provided by an Affiliate. If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.

**1.10 Who Can Access My Account and for What Purpose?**

You may add an Authorized/Approved User to Your account. Doing so authorizes Us to provide the Authorized/Approved User with information about, and access to, Your account. Authorized/Approved Users include:

(a) A person authorized by You to act on Your behalf with respect to Your account when the person is in a retail store;

(b) A person who calls into customer service and provides sufficient account information; and

(c) A person who registers for secondary access to Your account in AT&T's online account management system, provides sufficient account information, and has access to a device that is billed to Your account.

Authorized/Approved Users can view Your account and payment information, make changes to the plans under Your account, purchase devices including via financing agreements, add new lines of service, and perform other account functions. You are responsible for all changes made or actions taken by Authorized/Approved Users.

By taking these actions as Your agent, Authorized/Approved Users authorize Us to perform a credit check on You, share Your credit information between Us and our Affiliates, and obtain a credit report on You from a consumer reporting agency.

You may remove an Authorized/Approved User at any time by contacting Us. The removal will take effect after we have a reasonable opportunity to process the request. If You remove an Authorized/Approved User, we recommend that You reset your account passcode and online credentials.

You consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you. In any event, we reserve the right to contact you by any means regarding customer service-related notifications, or other such information.

**1.11 How will AT&T communicate with me about my Service?**

As your wireless carrier, we will need to communicate with you about your Service on occasion. We and our authorized agents may contact you by: bill message, text message, email, phone call, postal mail, in-app notification, push notification, or by other reasonable means, to advise you about your Service or other matters we believe may be of interest to you. **We and our authorized agents may use any one or a combination of these methods of**

V11012018

ATT-WIL-01508

communication to convey important notices (for example, changes to this Agreement, to your Service, legal notices, etc.). **You expressly consent on behalf of all the wireless lines on your account to all such methods of communication regarding your Service, whether active or inactive.**

Email and text messages to your AT&T device are two of the primary methods that we use to contact you. The email address you provide at the time of ordering or Service activation is the email address we will use to communicate with you. You can update your email address through myAT&T, using the myAT&T app, or by calling Customer Care at 800.331.0500. **Notices from us to you are considered immediately delivered when we send them to your email address or by text message to your AT&T device.**

Bill messages and inserts are another key way we share information with you. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. **Please do not overlook the important messages section of your bill.**

## 2.0 HOW DO I RESOLVE DISPUTES WITH AT&T?

### 2.1 <u>Dispute Resolution By Binding Arbitration</u>

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.**

<u>Summary:</u>

Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1-800-331-0500. **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.** For any non-frivolous claim that does not exceed $75,000, AT&T will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), AT&T will pay you more than the amount of the arbitrator's award and will pay your attorney (if any) twice his or her reasonable attorneys' fees if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute.

### 2.2 <u>Arbitration Agreement</u>

1. AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

V11012018

ATT-WIL-01509

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;

- claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);

- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

- claims that may arise after the termination of this Agreement.

References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an individual action in small claims court. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

2. A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to AT&T should be addressed to: Office for Dispute Resolution, AT&T, 1025 Lenox Park Blvd., Atlanta, GA 30319 ("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If AT&T and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or AT&T may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by AT&T or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or AT&T is entitled. You may download or copy a form Notice and a form to initiate arbitration at att.com/arbitration-forms.

3. After AT&T receives notice at the Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000. (The filing fee currently is $200 for claims under $10,000 but is subject to change by the arbitration provider. If you are unable to pay this fee, AT&T will pay it directly upon receiving a written request at the Notice Address.) The arbitration will be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. The AAA Rules are available online at adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.) The arbitrator is bound by the terms of this Agreement. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision are for the court to decide. Unless AT&T and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If

V11012018

ATT-WIL-01510

your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as otherwise provided for herein, AT&T will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse AT&T for all monies previously disbursed by it that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek more than $75,000 in damages, the payment of these fees will be governed by the AAA rules.

4.  If, after finding in your favor in any respect on the merits of your claim, the arbitrator issues you an award that is greater than the value of AT&T's last written settlement offer made before an arbitrator was selected, then AT&T will:

    *   pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater; and

    *   pay your attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably accrues for investigating, preparing, and pursuing your claim in arbitration ("the attorney premium").

    If AT&T did not make a written offer to settle the dispute before an arbitrator was selected, you and your attorney will be entitled to receive the alternative payment and the attorney premium, respectively, if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment and the attorney premium at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits.

5.  The right to attorneys' fees and expenses discussed in paragraph (4) supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this provision does not preclude the arbitrator from awarding you that amount. However, you may not recover duplicative awards of attorneys' fees or costs. Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award.

6.  The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

7.  Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address) during your Service Commitment, you may reject any such change by sending us written notice within 30 days of the change to

V11012018

ATT-WIL-01511

the Arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

**2.3 <u>Puerto Rico Customers</u>**

For Puerto Rico customers, references to "small claims court" in sections 2.1 and 2.2 should be understood to mean the Puerto Rico Telecommunications Regulatory Board.

**3.0 TERMS RELATING TO YOUR DEVICE AND CONTENT**

**3.1 <u>Your Device</u>**

Your Device must be compatible with, and not interfere with, our Services and must comply with all applicable laws, rules, and regulations. We may periodically program your Device remotely with system settings for roaming service, to direct your Device to use network services most appropriate for your typical usage, and other features that cannot be changed manually. Some device manufacturers will no longer pre-load certain applications into the device memory. As a result, AT&T may remotely pre-load certain applications to your device at activation and periodically update those applications. You can delete any application that AT&T remotely pre-loads on your device.

You agree that you won't make any modifications to your Equipment or its programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems.

If you bought a Device from AT&T, it may have been programmed with a SIM lock which will prevent it from operating with other compatible wireless telephone carriers' services. If you wish to use this Device with the service of another wireless telephone carrier, you must enter a numeric Unlock Code to unlock the phone. AT&T will provide the Unlock Code upon request, provided that you meet certain criteria including, but not limited to the following: (a) you have paid for your Device in full; (b) your account has been active for at least sixty days and is in good standing (i.e. it has no past due amount or unpaid balance owed AT&T); (c) you have fulfilled your Service Commitment by expiration of any contractual term, upgrading to a new Device under AT&T's standard or early upgrade policies, or payment of any applicable ETF; (d) your Device has not been reported lost or stolen; and (e) AT&T has the Unlock Code or can reasonably obtain it from the manufacturer. AT&T will unlock a maximum of five phones per account, per year. For Devices sold with a Prepaid Plan, AT&T will provide you with the Unlock Code upon request if you provide a detailed receipt or other proof of purchase of the phone and AT&T has the Unlock Code or can reasonably obtain it from the manufacturer. For further details on eligibility requirements and for assistance on obtaining the Unlock Code for your handset, please call 1-800-331-0500 or visit an AT&T company store.

You are solely responsible for complying with U.S. Export Control laws and regulations and the import laws and regulations of foreign countries when traveling internationally with your Device.

**3.2 <u>Where and How Does AT&T Service Work?</u>**

AT&T does not guarantee availability of wireless network. Services may be subject to certain Device and compatibility/limitations including memory, storage, network availability, coverage, accessibility and data conversion

V11012018

ATT-WIL-01512

limitations. Services (including without limitation, eligibility requirements, plans, pricing, features and/or service areas) are subject to change without notice.

When outside AT&T's coverage area, access will be limited to information and applications previously downloaded to or resident on your device. Coverage areas vary between AT&T network technologies. See coverage map(s), available at store or from your sales representative, for details or the coverage map at www.att.com/coverageviewer.

Actual network speeds depend upon device characteristics, network, network availability and coverage levels, tasks, file characteristics, applications and other factors. Performance may be impacted by transmission limitations, terrain, in-building/in-vehicle use and capacity constraints.

### 3.3 What Information, Content, And Applications Are Provided By Third Parties?

Certain information, applications, or other content is provided by independently owned and operated content providers or service providers who are subject to change at any time without notice.

AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.

Third-party content or service providers may impose additional charges. Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services. It is your responsibility to read the rules or service agreements of each content provider or service provider.

Any information you involuntarily or voluntarily provide to third parties is governed by their policies or terms. The accuracy, appropriateness, content, completeness, timeliness, usefulness, security, safety, merchantability, fitness for a particular purpose, transmission or correct sequencing of any application, information or downloaded data is not guaranteed or warranted by AT&T or any content providers or other third party. Delays or omissions may occur. Neither AT&T nor its content providers, service providers or other third parties shall be liable to you for any loss or injury arising out of or caused, in whole or in part, by your use of any information, application or content, or any information, application, or other content acquired through the Service.

You acknowledge that every business or personal decision, to some degree or another, represents an assumption of risk, and that neither AT&T nor its content and service providers or suppliers, in providing information, applications or other content or services, or access to information, applications, or other content underwrites, can underwrite, or assumes your risk in any manner whatsoever.

### 3.4 How Can I Get Mobile Content?

You understand that Devices can be used to acquire or purchase goods, content, and services (including subscription plans) like ring tones, graphics, games, applications and news alerts from AT&T or other companies ("Content"). You understand that you are responsible for all authorized charges associated with such Content from any Device assigned to your account, that these charges will appear on your bill (including charges on behalf of other

V11012018

ATT-WIL-01513

companies), and that such purchases can be restricted by using parental controls available from an AT&T salesperson, or by calling AT&T. Any person using any Device assigned to your account to order Content on your account may be deemed to have corresponding authority to consent to the use or disclosure of your account information, including customer proprietary network information (CPNI), to facilitate the processing or provisioning of and/or billing for such Content. CPNI is information that relates to the quantity, technical configuration, type, destination, location and amount of use of a telecommunications service, and you have the right, and AT&T has the duty under federal law, to protect the confidentiality of CPNI. You have the right to withhold authorization of this disclosure and use of your CPNI without affecting the provision of any service(s) to which you currently subscribe from AT&T.

You are responsible for reviewing your monthly bills to ensure that all charges for Content are accurate.

Additionally, you have full-time access to your Content purchase transaction history on our website. You may contest and seek refunds for unauthorized purchases and purchases with which you are not satisfied. AT&T reserves the right to restrict Content purchases or terminate the account of anyone who seeks refunds on improper grounds or otherwise abuses this Service.

Actual Content may vary based on the Device capabilities. Content may be delivered in multiple messages. Content charges are incurred at the stated one-time download rate or subscription rate, plus a per kilobyte or per megabyte default pay per use charge for the Content transport when delivered, unless you have a data plan and such charges appear separately on your bill. You will be charged each time you download Content. Data Service charges apply.

### 3.5 Am I Responsible If Someone Makes A Purchase With My Device?

Except as otherwise provided in this Agreement, if your Device is used by others to make Content purchases, you are responsible for all such purchases. If this occurs, you are giving those other users your authority to:

1. make Content purchases from those Devices, and to incur charges for those Content purchases that will appear on your bill;

2. give consent required for that Content, including the consent to use that user's location information to deliver customized information to that user's Device; or

3. make any representation required for that content, including a representation of the user's age, if requested.

Usage by others can be restricted by use of parental controls or similar features. Visit att.com/smartlimits to learn more.

### 3.6 Does AT&T Collect Location-Based Network Performance Information From My Device? Can I Use Location-Based Services With My Device?

AT&T collects information about the approximate location of your Device in relation to our cell towers and the Global Positioning System (GPS). We use that information, as well as other usage and performance information also obtained from our network and your Device, to provide you with wireless voice and data services, and to maintain and improve our network and the quality of your wireless experience. We may also use location information to create aggregate data from which your personally identifiable information has been removed or obscured. Such aggregate

V11012018

ATT-WIL-01514

data may be used for a variety of purposes such as scientific and marketing research and services such as vehicle traffic volume monitoring. It is your responsibility to notify users on your account that we may collect and use location information from Devices.

Your Device is also capable of using optional Content at your request or the request of a user on your account, offered by AT&T or third parties that make use of a Device's location information ("Location-Based Services"). Please review the terms and conditions and the associated privacy policy for each Location-Based Service to learn how the location information will be used and protected. For more information on Location-Based Services, please visit att.com/privacy.

Our directory assistance service (411) may use the location of a Device to deliver relevant customized 411 information based upon the user's request for a listing or other 411 service. By using this directory assistance service, the user is consenting to our use of that user's location information for such purpose. This location information may be disclosed to a third party to perform the directory assistance service and for no other purpose. Such location information will be retained only as long as is necessary to provide the relevant customized 411 information and will be discarded after such use. Please see our privacy policy at att.com/privacy for additional details.

### 3.7 What If My Device Is Lost Or Stolen?

If your wireless Device is lost or stolen, you must contact us immediately to report the Device lost or stolen. You're not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Once you report to us that the Device is lost or stolen, you will not be responsible for subsequent charges incurred by that Device.

You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. You may be asked to provide information and you may submit information to support your claim. We will advise you of the result of our investigation within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to, your monthly fee. We both have a duty to act in good faith in a reasonable and responsible manner including in connection with the loss or theft of your Device. (California Customers see Section 11.1 "California: What if there are Unauthorized Charges Billed to My Device?" below.)

### 4.0 TERMS RELATING TO THE USE AND LIMITATIONS OF SERVICE

### 4.1 What Are The Limitations On Service And Liability?

Unless prohibited by law, the following limitations of liability apply. Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers. We may block access to certain categories of numbers (e.g., 976, 900, and international destinations) at our sole discretion.

V11012018

ATT-WIL-01515

Additional hardware, software, subscription, credit or debit card, Internet access from your compatible PC and/or special network connection may be required and you are solely responsible for arranging for or obtaining all such requirements. Some solutions may require third party products and/or services, which are subject to any applicable third party terms and conditions and may require separate purchase from and/or agreement with the third party provider. AT&T is not responsible for any consequential damages caused in any way by the preceding hardware, software or other items/requirements for which you are responsible.

Not all plans or Services are available for purchase or use in all sales channels, in all areas or with all devices. AT&T is not responsible for loss or disclosure of any sensitive information you transmit. AT&T's wireless services are not equivalent to wireline Internet. AT&T is not responsible for nonproprietary services or their effects on devices.

We may, but do not have the obligation to, refuse to transmit any information through the Services and may screen and delete information prior to delivery of that information to you. There are gaps in service within the Services areas shown on coverage maps, which, by their nature, are only approximations of actual coverage.

WE DO NOT GUARANTEE YOU UNINTERRUPTED SERVICE OR COVERAGE. WE CANNOT ASSURE YOU THAT IF YOU PLACE A 911 CALL YOU WILL BE FOUND. AIRTIME AND OTHER SERVICE CHARGES APPLY TO ALL CALLS, INCLUDING INVOLUNTARILY TERMINATED CALLS. AT&T MAKES NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, ACCURACY, SECURITY, OR PERFORMANCE REGARDING ANY SERVICES, SOFTWARE OR GOODS, AND IN NO EVENT SHALL AT&T BE LIABLE, WHETHER OR NOT DUE TO ITS OWN NEGLIGENCE, for any:

   a.  act or omission of a third party;

   b.  mistakes, omissions, interruptions, errors, failures to transmit, delays, or defects in the Services or Software provided by or through us;

   c.  damage or injury caused by the use of Services, Software, or Device, including use in a vehicle;

   d.  claims against you by third parties;

   e.  damage or injury caused by a suspension or termination of Services or Software by AT&T; or

   f.  damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service.

Notwithstanding the foregoing, if your Service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly Service fee for the time period your Service was unavailable, not to exceed the monthly Service fee. Our liability to you for Service failures is limited solely to the credit set forth above.

Unless prohibited by law, AT&T isn't liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, Services, Software, or Devices provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injuries.

To the full extent allowed by law, you hereby release, indemnify, and hold AT&T and its officers, directors, employees and agents harmless from and against any and all claims of any person or entity for damages of any nature arising in any way from or relating to, directly or indirectly, service provided by AT&T or any person's use thereof (including, but not limited to, vehicular damage and personal injury), INCLUDING CLAIMS ARISING IN WHOLE OR IN PART

V11012018

ATT-WIL-01516

FROM THE ALLEGED NEGLIGENCE OF AT&T, or any violation by you of this Agreement. This obligation shall survive termination of your Service with AT&T. AT&T is not liable to you for changes in operation, equipment, or technology that cause your Device or Software to be rendered obsolete or require modification.

SOME STATES, INCLUDING THE STATE OF KANSAS, DON'T ALLOW DISCLAIMERS OF IMPLIED WARRANTIES OR LIMITS ON REMEDIES FOR BREACH. THEREFORE, THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THIS AGREEMENT GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

**4.2 Who Can I Use My AT&T Service?**

All use of AT&T's wireless network and Services is governed by AT&T's Acceptable Use Policy, which can be found at att.com/AcceptableUsePolicy, as determined solely by AT&T. AT&T can revise its Acceptable Use Policy at any time without notice by updating this posting.

**4.3 Who Is Responsible For Security?**

AT&T DOES NOT GUARANTEE SECURITY. Data encryption is available with some, but not all, Services sold by AT&T. If you use your Device to access company email or information, it is your responsibility to ensure your use complies with your company's internal IT and security procedures.

**4.4 How Can I Use the Software?**

The software, interfaces, documentation, data, and content provided for your Equipment as may be updated, downloaded, or replaced by feature enhancements, software updates, system restore software or data generated or provided subsequently by AT&T (hereinafter "Software") is licensed, not sold, to you by AT&T and/or its licensors/suppliers for use only on your Equipment. Your use of the Software shall comply with its intended purposes as determined by us, all applicable laws, and AT&T's Acceptable Use Policy at att.com/AcceptableUsePolicy.

You are not permitted to use the Software in any manner not authorized by this License. You may not (and you agree not to enable others to) copy, decompile, reverse engineer, disassemble, reproduce, attempt to derive the source code of, decrypt, modify, defeat protective mechanisms, combine with other software, or create derivative works of the Software or any portion thereof. You may not rent, lease, lend, sell, redistribute, transfer or sublicense the Software or any portion thereof. You agree the Software contains proprietary content and information owned by AT&T and/or its licensors/suppliers.

AT&T and its licensors/suppliers reserve the right to change, suspend, terminate, remove, impose limits on the use or access to, or disable access to, the Software at any time without notice and will have no liability for doing so. You acknowledge AT&T's Software licensors/suppliers are intended third party beneficiaries of this license, including the indemnification, limitation of liability, disclaimer of warranty provisions found in this Agreement.

**4.5 How Can I Use Another Carrier's Network (Off-Net Usage)?**

**4.5.1 Voice**

V11012018

ATT-WIL-01517

If your use of minutes (including unlimited Services) on other carrier networks ("off-net voice usage") during any two consecutive months exceed your off-net voice usage allowance, AT&T may, at its option, terminate your Services, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net voice usage. Your off-net voice usage allowance is equal to the lesser of 750 minutes or 40% of the Anytime Minutes included with your plan.

**4.5.2 Data**

If you use Data Services on other carriers' wireless networks ("off-net data usage") your data usage may be reduced to 2G speeds.  In addition, if your off-net data usage during any month exceeds your off-net data usage allowance, AT&T may at its option terminate your access to Data Services, deny your continued use of other carriers' coverage, further reduce your off-net data usage speed, or change your plan to one imposing usage charges for off-net data usage. Your off-net data usage allowance is equal to the lesser of 100 megabytes or 20% of the kilobytes included with your plan. You may be required to use a Device programmed with AT&T's preferred roaming database.

**4.5.3 Messaging**

If you use messaging services (including unlimited Services) on other carrier networks ("off-net messaging usage") during any two consecutive months exceed your off-net messaging usage allowance, AT&T may, at its option, terminate your messaging service, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net messaging usage. Your off-net messaging usage allowance is equal to the lesser of 3,000 messages or 50% of the messages included with your plan.

**4.5.4 Notice**

If you exceed your allowances stated above and AT&T determines to suspend or terminate your access, deny your usage of other carrier's coverage, or change your plan to a different plan, AT&T will provide notice and you may terminate this Agreement.

**4.6 How Do I Get Service Outside AT&T's Wireless Network (Roaming)?**

Services originated or received while outside your plan's included coverage area are subject to roaming charges. Domestic roaming charges for wireless data or voice Services may be charged with some plans when outside AT&T's wireless network. International roaming rates apply for any voice, messaging or data usage incurred outside the U.S., Puerto Rico and U.S. Virgin Islands. Use of Services when roaming is dependent upon roaming carrier's support of applicable network technology and functionality. Display on your device may not indicate whether you will incur roaming charges. Check with roaming carriers individually for support and coverage details.

**4.6.1 International Services**

Certain eligibility restrictions apply which may be based on service tenure, payment history and/or credit. Rates are subject to change. For countries, rates and additional details, see att.com/global.

**4.6.1.1 International Long Distance:**

V11012018

ATT-WIL-01518

International rates apply for calls made and messages sent from the U.S., Puerto Rico and U.S.V.I. to another country. Calling or messaging to some countries may not be available. Calls to wireless numbers and numbers for special services, such as Premium Rated Services, may cost more than calls to wireline numbers. If a customer calls an overseas wireline number and the call is forwarded to a wireless number, the customer will be charged for a call terminated to a wireless number. International Long Distance calling rates are charged per minute and apply throughout the same footprint in which the customer's airtime package minutes apply.

### 4.6.1.2 International Long Distance Text, Picture & Video Messaging:

Additional charges apply for premium messages and content. Messages over 300 KBs are billed an additional 50¢/message. For a complete list of countries, please visit att.com/text2world.

### 4.6.1.3 International Roaming:

Compatible Device required. Your plan may include the capability to make and receive calls and texts and use data while roaming internationally. AT&T, in its sole discretion, may block your ability to use your Device while roaming internationally until eligibility criteria are met. International roaming rates, which vary by country, apply for all calls placed or received while outside the United States, Puerto Rico and U.S.V.I. Please consult att.com/global or call 611 from your mobile device or 800-331-0500 for a list of currently available countries and carriers. All countries may not be available for roaming. All carriers within available countries may not be available on certain plans or packages. Availability, quality of coverage and services while roaming are not guaranteed. When roaming internationally, you will be charged international roaming airtime rates including when incoming calls are routed to voicemail, even if no message is left. Substantial charges may be incurred if Device is taken out of the U.S. even if no services are intentionally used. Billing for international roaming usage may be delayed up to three billing cycles due to reporting between carriers. Taxes are additional. If you want to block the ability to make and receive calls or use data functions while roaming internationally, you may request that by calling 1-314-925-6925 (at no charge from your wireless phone). For AT&T Canada and Mexico Travel Minutes, package and overage rates apply only in Canada or Mexico, and if you remove the package before your monthly bill cycle ends, the included monthly minutes allotment will be reduced proportionately.

### 4.6.1.4 International Data:

International data rates apply to all data usage outside the U.S., Puerto Rico and U.S.V.I., including accessing cloud-based services to upload/download/stream content. International data roaming may be reduced to 2G speeds. Many Devices, including iPhone, transmit and receive data messages without user intervention and can generate unexpected charges when powered "on" outside the United States, Puerto Rico and U.S.V.I. AT&T may send "alerts" via SMS or email, to notify you of data usage. These are courtesy alerts. There is no guarantee you will receive them. They are not a guarantee of a particular bill limit. Receipt of Visual Voicemail messages are charged at international data pay-per-use rates unless customer has an international data plan/package, in which case receipt of Visual Voicemail messages decrement Kilobytes included in such plan/package.

### 4.6.1.5 Data Global Add-Ons and Global Messaging Plans/Packages:

Require that domestic data or messaging capability be in place. Rates apply only for usage within "roam zone" comprised of select carriers. Within the roam zone, overage rate applies if you exceed the MBs allotted for any Data

V11012018

ATT-WIL-01519

Global Add-On or the messages allotted for any Global Messaging Plan/Package. International roaming pay-per-use rates apply in countries outside the roam zone. See att.com/globalcountries for current roam zone list.

**4.6.1.6 Data Connect Global/North America Plans:**

Do not include capability to place a voice call and require a 1 year agreement. For specific terms regarding international data plans, see Section 6.10.2 of the Wireless Customer Agreement.

**4.6.1.7 Cruise Ship Roaming:**

Cruise ship roaming rates apply for calls placed or data used while on the ship.

**4.6.1.8 International Miscellaneous**

**Export Restrictions:** You are solely responsible for complying with U.S. Export Control laws and regulations, and the import laws and regulations of foreign countries when traveling internationally with your Device.

**5.0 WHAT VOICE SERVICES DOES AT&T OFFER?**

**5.1 Whal Are The General Terms That Apply To All AT&T Voice Rate Plans?**

You may obtain usage information by calling customer service or using one of our automated systems. **Pricing/Taxes/No Proration:** Prices do not include taxes, directory assistance, roaming, Universal Service Fees, and other surcharges. Final month's charges are not prorated. **Activation Fees:** Activation Fee may apply for each new line. **Nights and Weekends:** Nights are 9:00 p.m. to 6:00 a.m. Weekends are 9:00 p.m. Friday to 6:00 a.m. Monday (based on time of day at the cell site or switch providing your Service). Included long distance calls can be made from the 50 United States, Puerto Rico and U.S. Virgin Islands to the 50 United States, Puerto Rico, U.S. Virgin Islands, Guam and Northern Mariana Islands. Roaming charges do not apply when roaming within the Services area of land-based networks of the 50 United States, Puerto Rico and U.S. Virgin Islands. Additional charges apply to Services used outside the land borders of the U.S., Puerto Rico and U.S. Virgin Islands.

**5.2 Voicemail**

Unless you subscribe to an Unlimited Voice Plan or are an upstate New York customer subscribing to Enhanced Voicemail, airtime charges apply to calls to your voicemail service, including calls where the caller does not leave a message, because the call has been completed, calls to listen to, send, reply to, or forward messages, or to perform other activities with your voicemail service, including calls forwarded from other phones to your voicemail service. You are solely responsible for establishing and maintaining security passwords to protect against unauthorized use of your voicemail service. For information as to the number of voicemail messages you can store, when voicemail messages will be deleted, and other voicemail features, see att.com/wirelessvoicemail. We reserve the right to change the number of voicemails you can store, the length you can store voicemail messages, when we delete voicemail messages, and other voicemail features without notice. We may deactivate your voicemail service if you do not initialize it within a reasonable period after activation. We will reactivate the service upon your request. See att.com/global for information about using voicemail internationally.

V11012018

ATT-WIL-01520

**5.3 Voicemail-To-Text (VMTT)**

AT&T is not responsible, nor liable for: 1) errors in the conversion of or its inability to transcribe voicemail messages to text/email; 2) lost or misdirected messages; or, 3) content that is unlawful, harmful, threatening, abusive, obscene, tortious, or otherwise objectionable.

We do not filter, edit or control voice, text, or email messages, or guarantee the security of messages. We can interrupt, restrict or terminate VMTT without notice, if your use of VMTT adversely impacts AT&T's network, for example that could occur from abnormal calling patterns or an unusually large number of repeated calls and messages; or if your use is otherwise abusive, fraudulent, or does not comply with the law.

You are solely responsible for and will comply with all applicable laws as to the content of any text messages or emails you receive from VMTT that you forward or include in a reply to any other person. You authorize AT&T or a third party working on AT&T's behalf to listen to, and transcribe all or part of a voicemail message and to convert such voicemail message into text/email, and to use voicemail messages and transcriptions to enhance, train and improve AT&T's speech recognition and transcription services, software and equipment.

Charges for VMTT include the conversion of the voicemail message and the text message sent to your wireless device. Additional charges, however, may apply to receiving email on your wireless device from VMTT, as well as, replying to or forwarding VMTT messages via SMS (text) or email, depending on your plan.

SMS (text messaging) blocking is incompatible with VMTT. (If you do not have a texting plan on your handset, we add a texting pay per use feature when you add VMTT with text delivery.) If you are traveling outside the U.S. coverage area, you will incur international data charges for emails received from VMTT, as well as, charges for emails you respond to or forward from VMTT, unless you have an international data plan and the usage falls within the plan's usage limits.

Transcription times cannot be guaranteed. Customers purchasing email delivery are responsible for providing a correct email address and updating the email address when changes to the email account are made.

If you choose SMS (text) delivery, VMTT only converts the first 480 characters of a voicemail message into text and you will receive up to three text messages of a transcribed message. The transcription, therefore, may not include the entire voicemail message with SMS delivery. Adding VMTT will create a new voicemail box and all messages and greetings will be deleted from your current voicemail box.

**5.4 Unlimited Voice Services**

Unlimited voice Services are provided primarily for reasonably uninterrupted live dialog between two individuals. If your use of unlimited voice Services for conference calling or call forwarding exceeds 750 minutes per month, AT&T may, at its option, terminate your Service or change your plan to one with no unlimited usage components.

AT&T may, in its sole discretion, terminate your Service or change your plan to one with no unlimited voice usage if it reasonably determines or has a reasonable basis to believe that you are engaged in any of the following prohibited activities: (1) maintaining an open line of communication to provide dispatch or monitoring services; (2) accessing or providing access to multi-party chat line services; (3) using the Service with a SIM box or SIM server network to

V11012018

ATT-WIL-01521

generate or simulate voice calls; (4) transmitting broadcasts; (5) transmitting pre-recorded materials; (6) telemarketing; (7) initiating autodialed calls; (8) initiating any other calls or connections that are not for the purposes of reasonably uninterrupted live dialog between individuals; (9) using the Service for any fraudulent purpose; (10) reselling or rebilling the Service either alone or as part of any other good or service; or (11) any abusive use of our network or Services.

**5.5 <u>Caller ID</u>**

Your caller identification information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of caller identification information. Contact customer service for information on blocking the display of your name and number. Caller ID blocking is not available when using Data Services, and your wireless number is transmitted to Internet sites you visit. If applicable to your plan and Device, an in-coming call identification feature may apply that will notify of in-coming calls and that may apply generic labels such as telemarketing, suspected spam, and/or suspected fraud to some of those calls.

**5.6 <u>Rollover® Minutes</u>**

If applicable to your plan, Rollover Minutes accumulate and expire through 12 rolling bill periods. Bill Period 1 (activation) unused Anytime Minutes will not carry over. Bill Period 2 unused Anytime Minutes will begin to carry over. Rollover Minutes accumulated starting with Bill Period 2 will expire each bill period as they reach a 12-bill-period age. Rollover Minutes will also expire immediately upon default or if customer changes to a non-Rollover plan. If you change plans (including the formation of a FamilyTalk plan), or if an existing subscriber joins your existing FamilyTalk plan, any accumulated Rollover Minutes in excess of your new plan or the primary FamilyTalk line's included Anytime Minutes will expire. Rollover Minutes are not redeemable for cash or credit and are not transferable. If you change to non-AT&T Unity plans with Rollover Minutes (including the formation of a FamilyTalk plan) any accumulated Rollover Minutes in excess of your new non-AT&T Unity plan or the primary non-AT&T Unity FamilyTalk line's included Anytime Minutes will expire.

**5.7 <u>Mobile To Mobile Minutes</u>**

If applicable to your plan, Mobile to Mobile Minutes may be used when directly dialing or receiving calls from any other AT&T wireless phone number from within your calling area. Mobile to Mobile Minutes may not be used for interconnection to other networks. Calls to AT&T voicemail and return calls from voicemail are not included.

**5.8 <u>Family Talk® Plan</u>**

If applicable to your plan, FamilyTalk may require up to a two-year Service Commitment for each line. FamilyTalk plans include only package minutes included with the primary number, and minutes are shared by the additional lines. The rate shown for additional minutes applies to all minutes in excess of the Anytime Minutes. FamilyTalk requires two lines. If the rate plan for the primary number is changed to an ineligible plan or the primary number is disconnected, one of the existing additional lines shall become the primary number on the rate plan previously subscribed to by the former primary number; if only one line remains, it shall be converted to the closest single line rate.

**5.9 <u>A-List®</u>**

V11012018

ATT-WIL-01522

A-List is available only with select Nation, FamilyTalk and Unity plans. Nation Plan and Individual Subscribers can place/receive calls to/from up to 5 (and FamilyTalk subscribers can place/receive calls to/from up to 10) wireline or wireless telephone numbers without being charged for airtime minutes. All qualifying lines on a FamilyTalk account share the same 10 A-List numbers. Only standard domestic wireline or wireless numbers may be added and A-List is only for domestic calls. Directory assistance, 900 numbers, chat lines, pay per call numbers, customer's own wireless or Voice Mail access numbers, numbers for call routing services and call forwarding services from multiple phones, and machine to machine numbers are not eligible. Depending on the PBX system, a private telephone system often serving businesses, AT&T may not be able to determine if your selected PBX A-List number is calling/receiving calls from your wireless number and airtime charges could apply. Forwarded calls will be billed based on the originating number, not the call forwarding number, and airtime charges may apply. Only voice calling is eligible. A-List number selections may only be managed online via MyWireless Account. Selected telephone numbers do not become active until 24 hours after added. AT&T reserves the right to block any A-List number and to reduce the amount of telephone numbers that can be used for A-List without notice. A-List is not eligible on Save/Promotional Plans.

### 5.10 AT&T Viva Mexico℠ ("Mexico Plan") & AT&T Nation®/FamilyTalk® With Canada ("Canada Plan")

Certain eligibility requirements apply. Anytime Minutes and Night and Weekend Minutes between Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, or Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan, will be treated for billing purposes as calls to and from your U.S. wireless coverage area.

Calls made from or received in Mexico and Canada cannot exceed your monthly off-net usage allowance (the lesser of 750 min./mo. or 40% of your Anytime Minutes/mo.) in any two consecutive months. Calls made from or received in Mexico and Canada will not qualify as Mobile to Mobile Minutes. Special rates apply for data usage in Mexico and Canada. International long distance text, instant, picture and video messaging rates apply to messaging from the U.S. to Mexico and Canada and international roaming rates apply when such messages are sent from Mexico and Canada.

International Roaming charges apply when using voice and data Services outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area, if you subscribe to the Canada Plan. International long distance charges apply when calling to areas outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan.

Anytime Minutes are primarily for live dialog between two people. You may not use your Services other than as intended by AT&T and applicable law. Plans are for individual, non-commercial use only and are not for resale. Unlimited Microcell Calling feature cannot be used on accounts with Viva Mexico and Nation Canada calling plans.

### 5.11 AT&T Unity℠ And AT&T Unity℠-FamilyTalk® Plans Requirements

**5.11.1 Eligibility Requirements:**

AT&T local and wireless combined bill required. For residential customers, qualifying AT&T local plan from AT&T required. For business customers, qualifying AT&T local service plan required. Specific AT&T Services that qualify vary by location; see att.com or call 1-800-288-2020. Certain business accounts are not eligible for Unity plans.

V11012018

ATT-WIL-01523

Discounts on any other combined-bill wireless plans will be lost if an AT&T Unity plan is added to your combined bill. If an existing wireless plan is upgraded to an AT&T Unity plan, all discounts and promotions will be lost when subscribing to that plan.

**5.11.2 AT&T Unity℠ Minutes:**

AT&T Unity Calling Minutes may be used when directly dialing or receiving calls from any other eligible AT&T wireline or wireless phone number from within your calling area. Calls to AT&T voicemail and return calls from voicemail not included. AT&T Unity Minutes are not included when checking usage for the current billing period.

**5.12 <u>VoiceDial Services</u>**

Regular airtime charges apply. Mobile to Mobile Minutes do not apply. Calls to 911, 411, 611, 711 and international dialing cannot be completed with VoiceDial Services. Caller ID cannot be blocked. Caller ID will be delivered on calls, even if you have permanently blocked your name and number. For complete terms and conditions, see att.com/voicedial.

**5.13 <u>AT&T Messaging Unlimited with Mobile to Any Mobile Calling Feature</u>**

Available only with select Nation, FamilyTalk, and BusinessTalk plans and can be discontinued at anytime. Messaging Unlimited Plan required. Mobile to Any Mobile minutes only apply when you directly dial another U.S. mobile number or directly receive a call from another U.S. mobile phone number from within your calling area in the U.S., Puerto Rico, or U.S.V.I. Mobile to Any Mobile is not available with the AT&T Viva Mexico or AT&T Nation/FamilyTalk with Canada plans. Calls made through Voice Connect, calls to directory assistance, and calls to voicemail and return calls from voicemail are not included. Only numbers included in the wireless number database that AT&T uses will be treated as a call to a mobile number or a call received from a mobile number. So for example, Type 1 numbers belonging to other carriers and not included in the industry wireless LNP database, and numbers for which ports to wireless service have not yet completed, will not be treated as a call to a mobile number or a call received from a mobile number. Also calls made to and calls received from mobile toll-free numbers, mobile chat lines, mobile directory assistance, calling applications, numbers for call routing and call forwarding services, and machine to machine numbers are not included.

**6.0 WHAT DATA AND MESSAGING SERVICES DOES AT&T OFFER?**

**6.1 <u>What Are The General Terms That Apply To All Data And Messaging Plans?</u>**

AT&T provides wireless data and messaging Services, including but not limited to, features that may be used with Data Services and wireless content and applications ("Data Services"). The absolute capacity of the wireless data network is limited; consequently, Data Services may only be used for permitted activities. Pricing and data allowances for Data Services are device dependent and based on the capabilities and capacity of each Device.

**For Data Services with a monthly megabyte (MB) or gigabyte (GB) data allowance, once you exceed your monthly data allowance you will be automatically charged for overage as specified in the applicable rate plan. All data allowances, including overages, must be used in the billing period in which the allowance is provided. Unused data allowances will not roll over to subsequent billing periods.**

V11012018

ATT-WIL-01524

AT&T data plans are designed for use with only one of the following distinct Device types: (1) Smartphones, (2) basic and Quick Messaging phones, (3) tablets, (4) LaptopConnect cards, (5) stand-alone Mobile Hotspot devices, and (6) Home Bases. A data plan designated for one type of device may not be used with another type of device. For example, a data plan designated for use with a basic phone or a Smartphone may not be used with a LaptopConnect card, tablet, or stand-alone Mobile Hotspot device, by tethering devices together, by SIM card transfer, or any other means. A data tethering plan, however, may be purchased for an additional fee to enable tethering on a compatible device. An Activation Fee may apply for each data line.

Consumer data plans do not allow access to corporate email, company intranet sites, and other business applications. Access to corporate email, company intranet sites, and/or other business applications requires an applicable Enterprise Data plan. Enterprise Email requires an eligible data plan and Device. Terms may vary depending on selected Enterprise Email solution.

AT&T RESERVES THE RIGHT TO TERMINATE YOUR DATA SERVICES WITH OR WITHOUT CAUSE, INCLUDING WITHOUT LIMITATION, UPON EXPIRATION OR TERMINATION OF YOUR WIRELESS CUSTOMER AGREEMENT.

**6.2 <u>What Are The Intended Uses Of AT&T's Wireless Data Service?</u>**

AT&T's wireless data network is a shared resource, which AT&T manages for the benefit of all of its customers so that they can enjoy a consistent, high-quality mobile broadband experience and a broad range of mobile Internet services, applications and content. However, certain activities and uses of the network by an individual customer or small group of customers can negatively impact the use and enjoyment of the network by others. Therefore, certain activities and uses of AT&T's wireless data service are permitted and others are prohibited. The terms and conditions of your use of AT&T's wireless data service are set forth below.

**Permitted Activities.** AT&T's wireless data services are intended to be used for the following permitted activities: (i) web browsing; (ii) email; and (iii) intranet access if permitted by your rate plan (for example, access to corporate intranets, email, and individual productivity applications like customer relationship management, sales force, and field service automation); (d) uploading and downloading applications and content to and from the Internet or third-party application stores, and (e) using applications and content without excessively contributing to network congestion.

You agree to use AT&T's wireless data services <u>only</u> for these permitted activities.

**Prohibited Activities:** AT&T's wireless data services are not intended to be used in any manner which has any of the following effects and such use is prohibited if it: (a) conflicts with applicable law, (b) hinders other customers' access to the wireless network, (c) compromises network security or capacity, (d) excessively and disproportionately contributes to network congestion, (e) adversely impacts network service levels or legitimate data flows, (f) degrades network performance, (g) causes harm to the network or other customers, (h) is resold either alone or as part of any other good or service, (i) tethers a wireless device to a computing device (such as a computer, Smartphone, eBook or eReader, media player, laptop, or other devices with similar functions) through use of connection kits, applications, devices or accessories (using wired or wireless technology) and you have not subscribed to a specific data plan designed for this purpose, or (j) there is a specific data plan required for a particular use and you have not subscribed to that plan.

V11012018

ATT-WIL-01525

The following specific uses of AT&T's wireless data service are prohibited:

- AT&T's wireless data services may <u>not</u> be used in any manner that defeats, obstructs or penetrates, or attempts to defeat, obstruct or penetrate the security measures of AT&T's wireless network or systems, or another entity's network or systems; that accesses, or attempts to access without authority, the accounts of others; or that adversely affects the ability of other people or systems to use either AT&T's wireless services or other parties' Internet-based resources. For example, this includes, but is not limited to, malicious software or "malware" that is designed, intentionally or unintentionally, to infiltrate a network or computer system such as spyware, worms, Trojan horses, rootkits, and/or crimeware; "denial of service" attacks against a network host or individual user; and "spam" or unsolicited commercial or bulk email (or activities that have the effect of facilitating unsolicited commercial email or unsolicited bulk e-mail).

- AT&T's wireless data services may not be used in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance by maintaining a sustained and continuous wireless data service connection or active wireless Internet connection. For example, this includes, but is not limited to, server devices or host computer applications such as continuous Web camera posts or broadcasts, automatic data feeds, or automated machine-to-machine connections; "auto-responders," "cancel-bots," or similar automated or manual routines that generate excessive amounts of traffic or that disrupt user groups or email use by others; use of the service as a substitute or backup for private lines or full-time or dedicated data connections; peer-to-peer (P2P) file sharing services; and software or other devices that maintain continuous active Internet connections when a connection would otherwise be idle or any "keep alive" functions, unless they adhere to AT&T data retry requirements (as may be modified from time to time).

- AT&T's wireless data services also may <u>not</u> be used with high bandwidth applications, services and content that are not optimized to work with AT&T's wireless data services and, therefore disproportionately and excessively contribute to network congestion. This includes, but is not limited to, redirecting television signals for viewing on computing devices, web broadcasting, and/or the operation of servers, telemetry devices, or supervisory control and data acquisition devices, unless they meet AT&T's wireless data services optimization requirements.

You agree not to use AT&T's wireless data services for any of these prohibited activities.

**AT&T's Rights to Ensure Compliance.** You agree that AT&T has the right to take any and all actions necessary to enforce this Section 6.2 if you use AT&T's wireless data services in any manner that is prohibited, including, but not limited to, the following actions:

- AT&T may modify, without advance notice, the permitted and prohibited activities, and the optimization requirements for your wireless data services;

- AT&T may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the availability of wireless bandwidth and spectrum;

- AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. AT&T will provide you with advance notice of

V11012018

ATT-WIL-01526

the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means;

- AT&T may use reasonable methods to monitor and collect customer usage information to better optimize the operation of the network. Details concerning the information that AT&T collects about its customers, and how it uses and protects that information are addressed in the AT&T Privacy Policy (see att.com/privacy);

- If you are an AT&T unlimited data plan customer, AT&T may migrate you from the unlimited data plan to a tiered data plan and bill you the appropriate monthly fees. We will provide you with notice of this change at least one billing cycle in advance either by a bill insert, email, text message, or other appropriate means;

- AT&T may interrupt, suspend, cancel or terminate your wireless data services without advance notice.

**Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use. You further agree that "unlimited" does not mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.

### 6.3 What Are The Voice And Data Plan Requirements?

A voice plan is required on all voice-capable Devices, unless specifically noted otherwise in the terms governing your plan.

An eligible tiered pricing data plan is required for certain Devices, including iPhones and other designated Smartphones. Eligible voice and tiered pricing data plans cover voice and data usage in the U.S. and do not cover International voice and data usage and charges. If it is determined that you are using a voice-capable Device without a voice plan, or that you are using an iPhone or designated Smartphone without an eligible voice and tiered data plan, AT&T reserves the right to switch you to the required plan or plans and bill you the appropriate monthly fees. In the case of the tiered data plan, you will be placed on the data plan which provides you with the greatest monthly data usage allowance. If you determine that you do not require that much data usage in a month, you may request a lower data tier at a lower monthly recurring fee.

### 6.4 How Does AT&T Calculate My Data Usage/Billing?

DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, INCLUDING BUT NOT LIMITED TO: (i) SENDING OR RECEIVING EMAIL, DOCUMENTS, OR OTHER CONTENT, (ii) ACCESSING WEBSITES, OR (iii) DOWNLOADING AND USING APPLICATIONS. SOME APPLICATIONS, CONTENT, PROGRAMS, AND SOFTWARE THAT YOU DOWNLOAD OR THAT COMES PRE-LOADED ON YOUR DEVICE AUTOMATICALLY AND REGULARLY SEND AND RECEIVE DATA TRANSMISSIONS IN ORDER TO FUNCTION PROPERLY, WITHOUT YOU AFFIRMATIVELY INITIATING THE REQUEST AND WITHOUT YOUR KNOWLEDGE. FOR EXAMPLE, APPLICATIONS THAT PROVIDE REAL-TIME INFORMATION AND LOCATION-BASED APPLICATIONS CONNECT TO OUR NETWORK, AND SEND AND RECEIVE UPDATED INFORMATION SO THAT IT IS AVAILABLE TO YOU WHEN YOU WANT TO ACCESS IT. IN ADDITION, ANY ADVERTISEMENTS OR ADVERTISER-RELATED MESSAGES OR DATA DELIVERED TO YOUR DEVICE, EVEN IF DELIVERED TO AN APPLICATION, AS WELL AS ANY MESSAGES OR CONTENT THAT

V11012018

ATT-WIL-01527

INITIATE IN RESPONSE TO AN ADVERTISEMENT, WILL COUNT TOWARD YOUR DATA USAGE. YOU WILL BE BILLED FOR ALL DATA TRANSPORT AND USAGE WHEN YOUR DEVICE IS CONNECTED TO OUR NETWORK, INCLUDING THAT WHICH YOU AFFIRMATIVELY INITIATE OR THAT WHICH RUNS AUTOMATICALLY IN THE BACKGROUND WITHOUT YOUR KNOWLEDGE, AND WHETHER SUCCESSFUL OR NOT. A DATA SESSION INITIATED ON THE AT&T NETWORK WILL CONTINUE ITS CONNECTION OVER THE AT&T NETWORK UNTIL THE DATA TRANSMISSION IS CONCLUDED, EVEN WHEN YOU CONNECT TO A WI-FI NETWORK DURING THE TRANSMISSION.

Unless designated for International or Canada use, prices and included use apply to access and use on AT&T's wireless network and the wireless networks of other companies with which AT&T has a contractual relationship within the United States and its territories (Puerto Rico and the U.S. Virgin Islands), excluding areas within the Gulf of Mexico.

Usage on networks not owned by AT&T is limited as provided in your data plan. Charges will be based on the location of the site receiving and transmitting service and not the location of the subscriber. Mobile Broadband and 4G access requires a compatible device.

Data Service charges paid in advance for monthly or annual Data Services are nonrefundable. Some Data Services may require an additional monthly subscription fee and/or be subject to additional charges and restrictions. Prices do not include taxes, directory assistance, roaming, universal services fees or other surcharges.

In order to assess your usage during an applicable billing period, you may obtain approximate usage information by calling customer service or using one of our automated systems.

**6.5 Text Messaging And Picture/Video Messaging**

If you do not enroll in a monthly recurring plan for messaging, data, or Video Share, you may have access to messaging, data, and video share services and be charged on a pay-per-use basis if you use those services.

Messages are limited to 160 characters per message. Premium text and picture/video messages are charged at their stated rates. Standard rates apply to all incoming messages when in the U.S. Different, non-standard per message charges apply to international messages sent from the U.S.

Text, Picture, and Video messages are charged when sent or received, whether read or unread, solicited or unsolicited. AT&T does not guarantee delivery of messages. Text, Picture, and Video messages, including downloaded content, not delivered within 3 days will be deleted. AT&T reserves the right to change this delivery period as needed without notification.

You are charged for each part of messages that are delivered to you in multiple parts. Picture/Video Messaging, data plan, and Text Messaging may need to be provisioned on an account in order to use Picture/Video Messaging. Some elements of Picture/Video messages may not be accessible, viewable, or heard due to limitations on certain wireless phones, PCs, or e-mail.

V11012018

ATT-WIL-01528

AT&T reserves the right to change the Picture/Video message size limit at any time without notification. Picture/Video Messaging pricing is for domestic messages only. When a single message is sent to multiple recipients, the sender is charged for one message for each recipient and each recipient is charged for the message received.

Text message notifications may be sent to non-Picture/Video Messaging subscribers if they subscribe to Text Messaging. You may receive unsolicited messages from third parties as a result of visiting Internet sites, and a per-message charge may apply whether the message is read or unread, solicited or unsolicited.

You agree you will not use our messaging services to send messages that contain advertising or a commercial solicitation to any person or entity without their consent. You will have the burden of proving consent with clear and convincing evidence if a person or entity complains you did not obtain their consent. Consent cannot be evidenced by third party lists you purchased or obtained. You further agree you will not use our messaging service to send messages that: (a) are bulk messages (b) are automatically generated; (c) can disrupt AT&T's network; (d) harass or threaten another person (e) interfere with another customer's use or enjoyment of AT&T's Services; (f) generate significant or serious customer complaints, (g) that falsify or mask the sender/originator of the message; or (h) violate any law or regulation. AT&T reserves the right, but is not obligated, to deny, disconnect, suspend, modify and/or terminate your messaging service or messaging services with any associated account(s), or to deny, disconnect, suspend, modify and/or terminate the account(s), without notice, as to anyone using messaging services in any manner that is prohibited. Our failure to take any action in the event of a violation shall not be construed as a waiver of the right to enforce such terms, conditions, or policies. Advertising and commercial solicitations do not include messaging that: (a) facilitates, completes, or confirms a commercial transaction where the recipient of such message has previously agreed to enter into with the sender of such message; or (b) provides account information, service or product information, warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient of such message.

## 6.6 **Unlimited Messaging**

Unlimited Messaging Plans or plans with unlimited messaging include only AT&T's Short Messaging Service (SMS) and Multimedia Messaging Service (MMS) and not any other messaging services or applications. Messages are intended for direct communication between phones and must originate from your phone. Messages sent to tablets, laptops, or other connected devices are excluded from Unlimited Messaging Plans or plans including unlimited messaging. Messages sent through applications may incur data charges. We may terminate or restrict your messaging Service for tethered messaging, excessive use or misuse.

## 6.7 **Mobile Email**

Requires e-mail account with compatible internet service provider and a downloaded or preloaded e-mail application for the wireless device. Access and use of Mobile Email is billed by total volume of data sent and received (in kilobytes) in accordance with your data plan. E-mail attachments cannot be sent, downloaded, read, or forwarded on the mobile device. Only a paper clip icon appears indicating an attachment. You must view attachments from your PC. Upgrades to the application may be required in order to continue to use the Service. Wireless data usage charges will apply for downloading the application and any upgrades.

## 6.8 **Mobile Video**

V11012018

ATT-WIL-01529

Compatible Phone and eligible data plan required. Service not available outside AT&T's Mobile Broadband and 4G coverage areas. Premium content is charged at stated monthly subscription rates or at stated pay per view rates. Content rotates and is subject to withdrawal. Mobile Video is for individual use, not for resale, commercial purposes or public broadcast. Content can only be displayed on the device screen. No content may be captured, downloaded, forwarded, duplicated, stored, or transmitted. The content owner reserves and owns all content rights. All trademarks, service marks, logos, and copyrights not owned by AT&T are the property of their owners. Some Mobile Video content is intended for mature audiences and may be inappropriate for younger viewers. Parental guidance suggested. Use Parental Controls to restrict access to mature content. Content may be provided by independent providers, and AT&T is not responsible for their content. Providers may collect certain information from your use for tracking and managing content usage.

## 6.9 AT&T Wi-Fi Services

- **AT&T Wi-Fi service use with a Wi-Fi capable wireless device is subject to the Terms of Services & Acceptable Use Policy ("Terms") found at att.com/attwifitosaup. Your use represents your agreement to those Terms, incorporated herein by reference.** AT&T Wi-Fi Basic service is available at no additional charge to wireless customers with select Wi-Fi capable devices and a qualified data rate plan. Other restrictions may apply.

## 6.10 DataConnect Plans

### 6.10.1 What Are the General Terms that Apply to All DataConnect Plans?

A voice plan is not required with DataConnect plans.

We may, at our discretion, suspend your account if we believe your data usage is excessive, unusual or is better suited to another rate plan. If you are on a data plan that does not include a monthly MB/GB allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; provided that, prior to the imposition of any additional charges, AT&T shall provide you with notice and you shall have the right to terminate your Data Service.

### 6.10.2 Data Global Add-On/DataConnect Global Plans/DataConnect North America Plans

Available countries, coverage and participating international carriers included in the "Select International Roam Zone" and "Select Canada/Mexico Roam Zone" vary from our generally available Canada/international wireless data roam zones and may not be as extensive. The Select International Roam Zone is restricted to select international wireless carrier(s). Select Canada/Mexico Roam Zone is restricted to select wireless carrier(s) and coverage areas within Canada and Mexico. See att.com/dataconnectglobal for a current list of participating carriers and eligible roam zones. With respect to the countries included in the Select International Roam Zone, you will be restricted from accessing Data Service through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones. With the DataConnect North America Plan, you will be restricted from accessing Data Service through any non-participating Canada/Mexico wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones.

V11012018

ATT-WIL-01530

DATA GLOBAL ADD-ON- May only be used with eligible Equipment. Domestic data usage not included. Qualified domestic wireless data plan required. If combined with a wireless voice plan that includes international voice roaming, your international wireless voice roaming in countries included in the Global Data Add-On's Select International Roam Zone will be limited to the participating Canada/international wireless carriers and you will be restricted from voice roaming through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international voice roam zones.

DATACONNECT GLOBAL/NORTH AMERICA PLANS - Requires minimum one-year Service Commitment and you must remain on the plan, for a minimum one-year term. Voice access is restricted and prohibited.

### 6.11 AT&T DataPlus℠/AT&T DataPro℠ Plans

**6.11.1 AT&T Data Plans With Tethering**

Tethering is a wireless or wired method in which your AT&T mobile device is used as a modem or router to provide a Internet Access connection to other devices, such as laptops, netbooks, tablets, smartphones, other phones, USB modems, network routers, mobile hotspots, media players, gaming consoles, and other data-capable devices. AT&T data plans with tethering enabled may be used for tethering your AT&T Mobile device to other devices. If you are on a data plan that does not include a monthly megabyte allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; prior to the imposition of any additional charges, AT&T shall provide you with notice and you shall have the right to terminate your Service (early termination charges may apply).

**6.11.2 Blackberry® Personal**

Supports personal email access to up to 10 Internet email accounts. Users storing more than 1,000 emails or email older than 30 days, may have some emails automatically deleted. May not be used to access corporate email such as BlackBerry Enterprise Server.

**6.11.3 Blackberry® Connect; Blackberry Enterprise; Blackberry International**

Supports BlackBerry Enterprise Server™ for corporate access (valid Client Access License required), and personal email access to up to 10 Internet email accounts as per BlackBerry Personal. BlackBerry International requires a minimum one-year agreement.

### 6.12 GOOD Plan

Requires compatible Good Server and, as to each end user, a compatible Good Client Access License (CAL) for use with a qualifying AT&T data plan. Solution includes software, products and related services provided by Good Technology, Inc. ("Good"), which are subject to applicable Good terms and conditions. Good is solely responsible for all statements regarding, and technical support for, its software, products and services.

### 6.13 Microsoft® Direct Push

Requires compatible Microsoft® Exchange Server and, as to each end user, a compatible device, a Direct Push enabled email account, and a qualifying AT&T Data Plan. Plans include end user customer support from AT&T for

V11012018

ATT-WIL-01531

compatible devices. AT&T does not sell, supply, install or otherwise support Microsoft® software, products or services (including without limitation, Exchange and Direct Push).

### 6.14 AT&T Mobile Share® Plans (with Unlimited Talk and Text)

AT&T Mobile Share plans, including Mobile Share Value plans, allow you to share a monthly allotment of domestic wireless data usage, along with unlimited domestic talk and texting services among up to ten (10) Devices. You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share plan you select. You must specifically identify the devices (the "Designated Devices") that will share your monthly allotment of data usage under the Mobile Share plan you select. If you add a WI Device for unlimited talk only, it will be counted as one of the (10) Designated Devices under the Mobile Share plan. Designated Devices can include: smartphone(s), tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), mobile hotspot(s), basic or quick messaging phone(s), WI Device(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share plan you select, plus any other data (such as available Rollover Data) that you may have for use during the billing period, you will automatically be charged for overage as specified in your rate plan. Unless specified otherwise, data allowances, including overages and Rollover Data, must be used in the billing period provided or you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Device(s) during a specific billing cycle, but monthly charges for the suspended Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share plans with capable Designated Devices; provided, however, that such use is limited to a maximum of five (5) simultaneous users per Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share plan or when you activate an additional Device on an existing Mobile Share plan. Access to corporate email, intranet sites and/or other business applications may be available for an additional monthly charge per Device (no additional charge for Mobile Share Value plans). Discounts otherwise applicable to your Mobile Share rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

**Rollover Data℠**: Only Mobile Share Value® plans include the Rollover Data feature. With Rollover Data, unused data from the monthly plan allotment rounds up to the nearest MB and carries over for one billing period. **Unused Rollover Data automatically expires after one billing period or with any plan change (such as changing data amounts or termination).** Unused overage data does not roll over. Rollover Data is always consumed last, after your other data allowances. Unused Rollover Data is not redeemable for cash or credit and is not transferable including to other Mobile Share Value groups on your account. Mobile Share and Mobile Share Data-only plans do not include Rollover Data.

If you use a Mobile Share plan with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) simultaneous users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.

**Device upgrades**: If you upgrade to a new smartphone, a discounted access charge is only available for that line when purchasing a new smartphone via AT&T Next℠ or when you bring your own smartphone or you purchase a new smartphone at full retail price. If you upgrade your Device to a new smartphone on a 2-year Service Commitment, that line is ineligible for the discount and the discount is lost.

### 6.15 AT&T Mobile Share - Data Plans (for Data-Only Devices)

V11012018

ATT-WIL-01532

AT&T Mobile Share - Data plans allow you to share a monthly allotment of domestic wireless data usage among up to ten (10) 3G, HSPA+ or LTE Devices (excluding smartphones and basic or quick messaging phones). You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share - Data plan you select. You must specifically identify one or more eligible devices (the "Designated Data Devices") that will share your monthly allotment of data usage under the Mobile Share - Data plan you select. Designated Data Devices can include: tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), or mobile hotspot(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share - Data plan you select, you will automatically be charged for overage as specified in your rate plan. If, during a billing period, you do not use all of the data allotment in the Mobile Share - Data plan you select, you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Designated Data Device(s) during a specific billing cycle, but monthly charges for the suspended Designated Data Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share - Data plans with capable Designated Data Devices; provided, however, that such use is limited to a maximum of five (5) simultaneous users per Designated Data Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share - Data plan or when you activate an additional Designated Data Device on an existing Mobile Share - Data plan. Designated Data Devices that are capable of accessing corporate email, intranet sites and/or other business applications may do so for no additional monthly access charge. Discounts otherwise applicable to your Mobile Share - Data rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

If you use a Mobile Share - Data plan with a smartphone, with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) simultaneous users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.


## 7.0 AT&T Wireless Home Services

### 7.1 <u>AT&T Wireless Home Phone Service</u>

AT&T Wireless Home Phone ("WHP") service utilizes mobile wireless gateway Equipment now called an AT&T Wireless Internet device ("WI Device", formerly called a Wireless Home Phone device or WHP Device). With WHP service, the WI Device allows you to connect a landline phone to place and receive calls over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

WHP service provides voice service only and requires that you subscribe to an eligible wireless voice plan option, such as: (1) Wireless Home Phone unlimited plan or (2) AT&T Mobile Share plan. If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Text messaging, data services, features and international roaming are not supported by WHP service. If you use a wireless voice plan not designed for WHP service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical

V11012018

ATT-WIL-01533

assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

## 7.2 AT&T <u>Wireless Internet Service</u>

AT&T Wireless Internet service (formerly Wireless Home Phone and Internet service or WHPI) also utilizes the WI Device (the WHPI service used the Home Base device. With AT&T Wireless Internet service, the WI Device allows you to connect a landline phone to place and receive calls, and to connect up to twelve (12) Internet-capable devices (one (1) via Ethernet and ten (10) via Wi-Fi) to have mobile broadband Internet access over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

AT&T Wireless Internet service requires that you subscribe to an eligible wireless voice and/or data plan to take advantage of one or both capabilities. Tiered shared data plan options allow you to share a monthly allotment of domestic wireless data usage among your connected internet-capable devices. If your data usage exceeds the monthly data allotment of the plan you select during a billing period, you automatically will be charged for overages as specified in your plan. If you do not use all of the monthly data allotment of the plan you select during a billing period, you forfeit that usage. You may also add your WI Device to your AT&T Mobile Share plan if the monthly allotment of domestic wireless data usage under your AT&T Mobile Share plan is 10 GB or more.

If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Messaging services and international roaming are not supported by AT&T Wireless Internet service. If you use a wireless voice and/or data plan not designed for AT&T Wireless Internet service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

## 8.0 ARE THERE OTHER TERMS AND CONDITIONS THAT APPLY TO FEATURES AND APPLICATIONS?

Terms and conditions for certain features and applications are provided on the Device at the time of feature/application activation or first use. Certain features/applications will not be available in all areas at all times.

## 9.0 WHAT IS AT&T ROADSIDE ASSISTANCE & OPTIONAL AT&T MOBILE INSURANCE, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack?

### 9.1 <u>AT&T Roadside Assistance</u>

V11012018

ATT-WIL-01534

AT&T Roadside Assistance ("RA") is an optional feature that may be purchased separately and automatically billed to the wireless account. RA service is provided by American Traveler Motor Club, Inc., a licensed motor club. For complete RA Terms and Conditions, refer to your RA Welcome Kit or go to att.com/roadside.

## 9.2 Optional AT&T Mobile Insurance, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack

If eligible, you have 30 days from activation or upgrade to enroll in optional AT&T Mobile Insurance, AT&T Mobile Protection Pack or AT&T Multi-Device Protection Pack. For details visit www.att.com/deviceprotection. AT&T Mobile Insurance and AT&T Multi Device Insurance are underwritten by Continental Casualty Company, a CNA company (CNA) and administered by Asurion Protection Services, LLC (in California, Asurion Protection Services Insurance Agency, LLC, CA Lic. #OD63161, in Puerto Rico, Asurion Protection Services of Puerto Rico, Inc.), CNA's licensed agent for the customers of AT&T.


## 10.0 WHAT OTHER TERMS AND CONDITIONS APPLY TO MY WIRELESS SERVICE?

## 10.1 Intellectual Property

You must respect the intellectual property rights of AT&T, our third-party content providers, and any other owner of intellectual property whose protected property may appear on any website and/or dialogue box controlled by AT&T or accessed through the AT&T's websites. Except for material in the public domain, all material displayed in association with the Service is copyrighted or trademarked. Except for personal, non-commercial use, trademarked and copyrighted material may not be copied, downloaded, redistributed, modified or otherwise exploited, in whole or in part, without the permission of the owner. The RIM and BlackBerry families of related marks, images and symbols are the exclusive properties and trademarks or registered trademarks of Research In Motion Limited - used by permission. Good, the Good logo and GoodLink are trademarks of Good Technology, Inc., in the United States and/or other countries. Good Technology, Inc., and its products and services are not related to, sponsored by or affiliated with Research In Motion Limited. All other marks contained herein are the property of their respective owners.

©2012 AT&T Intellectual Property. All rights reserved. AT&T, AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. Apple iPhone: ™ and © 2010 Apple Inc. All rights reserved. Apple is a trademark of Apple Inc., registered in the U.S. and other countries. iPhone is a trademark of Apple Inc.

## 10.2 Severability

If any provision of this Agreement is found to be unenforceable by a court or agency of competent jurisdiction, the remaining provisions will remain in full force and effect. The foregoing does not apply to the prohibition against class or representative actions that is part of the arbitration clause; if that prohibition is found to be unenforceable, the arbitration clause (but only the arbitration clause) shall be null and void.

## 10.3 Assignment; Governing Law; English Language

### 10.3.1 Assignment

V11012018

ATT-WIL-01535

AT&T may assign this Agreement, but you may not assign this Agreement without our prior written consent.

### 10.3.2 Governing Law

The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law. In the event of a dispute between us, the law of the state of your billing address at the time the dispute is commenced, whether in litigation or arbitration, shall govern except to the extent that such law is preempted by or inconsistent with applicable federal law.

### 10.3.3 English Language

The original version of this Agreement is in the English language. Any discrepancy or conflicts between the English version and any other language version will be resolved with reference to and by interpreting the English version.

### 10.4 <u>Lifeline Services</u>

As part of a federal government program, AT&T offers discounted wireless service to qualified low-income residents in selected states. For questions or to apply for Lifeline service, call 1-800-377-9450. Puerto Rico customers should contact 1-787-405-5463. For tips on how to protect against fraud, please visit the CPUC's website at, CalPhoneInfo.com.

### 10.5 <u>Trial Services</u>

Trial Services are subject to the terms and conditions of this Agreement; may have limited availability; and may be withdrawn at any time.

### 10.6 <u>NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)</u>

AT&T has chosen to offer wireless emergency alerts within portions of its service area, as defined by the terms and conditions of its Agreement, on wireless emergency alert capable devices.

There is no additional charge for these wireless emergency alerts. Wireless emergency alerts may not be available on all devices or in the entire service area, or if a subscriber is outside of the AT&T service area. In areas in which the emergency alerts are transmitted, such alerts may not be received by a subscriber or user of AT&T's wireless service even though the subscriber has a device capable of receiving them.

For details on the availability of this service and wireless emergency alert capable devices, please ask a sales representative, or go to att.com and click the Wireless Emergency Alerts link. This notice is required by FCC Rule 47 C.F.R. § 10.250 (Commercial Mobile Alert Service).

In transmitting emergency alerts pursuant to federal law, AT&T, including its officers, directors, employees, vendors, and agents, shall not be liable to any subscriber to, or user of, AT&T's wireless service or equipment for any act or omission related to or any harm resulting from the transmission of, or the failure to transmit, an emergency alert; or the release to a government entity or agency, public safety, fire service, law enforcement official, emergency medical service, or emergency facility of subscriber information used in connection with delivering an emergency alert.

V11012018

ATT-WIL-01536

**11.0 WHAT TERMS APPLY ONLY TO SPECIFIC STATES?**

**11.1** <u>**California: What If There Are Unauthorized Charges Billed To My Device?**</u>

You are not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. Once you report to us that the Device is lost or stolen and your Device is suspended, you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com.

If you notify us of any charges on your bill you claim are unauthorized, we will investigate. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including but not limited to, your monthly fee. We both have a duty to act in good faith and in a reasonable and responsible manner including in connection with the loss or theft of your Device.

**11.2** <u>**Connecticut: Questions About Your Service**</u>

If you have any questions or concerns about your AT&T Service, please call Customer Care at 1-800-331-0500, dial 611 from your wireless phone, or visit att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance Service, please call 1-800-288-2020 or visit att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Public Utilities Regulatory Authority (PURA). Online: ct.gov.pura; Phone: 1-800-382-4586; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

**11.3** <u>**Puerto Rico**</u>

If you are a Puerto Rico customer and we cannot resolve your issue, you may notify the Telecommunications Regulatory Board of Puerto Rico of your grievance. Mail: 500 Ave Roberto H. Todd, (Parada 18), San Juan, Puerto Rico 00907-3941; Phone: 1-787-756-0804 or 1-866-578-5500; Online: jrtpr.gobierno.pr, in addition to having available arbitration, as provided in Section 2.0.

V11012018

ATT-WIL-01537

# EXHIBIT 4

# [PUBLICLY AVAILABLE REDACTED VERSION]

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

JASON WILLIAMS,

    Plaintiff,

CERTIFIED COPY

vs.                 Case No. 5:19-cv-00475-BO

AT&T MOBILITY, LLC,

    Defendant.
_____/


CONFIDENTIAL
DEPOSITION OF VALERIE SCHEDER
30(b)(6)


November 30, 2021

Page 1 - 239     8:14 a.m. - 3:25 CST


REMOTELY REPORTED VIA VIDEO CONFERENCING

REPORTED BY:
Tamara L. Houston
CA CSR No. 7244, RPR, CCRR No. 140
FILE NO. 21-105691

THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

1   APPEARANCES:   (All participants appearing remotely)

2

3   For Plaintiff:

4        WITHERS BERGMAN LLP
         BY:     JOSEPH GALLO, ESQ.
5        430 Park Avenue
         10th Floor
6        New York, New York 10022-3505
         (212) 484.9882
7        Joseph.Gallo@withersworldwide.com

8

     For Defendant AT&T:
9
         KILPATRICK TOWNSEND & STOCKTON LLP
10       BY:  MICHAEL BRESLIN, ESQ.
         1100 Peachtree Street NE
11       Suite 2800
         Atlanta, Georgia 30309
12       (404) 815-6500
         mbreslin@kilpatricktownsend.com
13

14   Also Present:

15       NIKI OKCU, ESQ.   (AT&T in-house counsel)
         DEANE CARSTENSEN, Videographer
16

17

18

19

20

21

22

23

24

25





08:44:58

08:45:17

08:45:37

08:46:04

08:46:22

THE SULLIVAN GROUP OF COURT REPORTERS



08:46:41

08:47:00

08:47:16

08:47:27

08:47:48

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 166 of 246



08:48:10

08:48:28

08:48:46

08:49:03

08:49:16

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 167 of 246





Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 169 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 170 of 246



08:56:37

08:56:56

08:57:19

08:57:52

08:58:13

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 171 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 172 of 246



09:00:31

09:00:58

09:01:23

09:01:41

09:01:56

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 173 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 174 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 175 of 246



09:09:18

09:09:33

09:09:52

09:10:08

09:10:31



09:10:57

09:11:12

09:11:29

09:11:47

09:12:07

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 177 of 246



Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 178 of 246





Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 180 of 246



09:35:20

09:35:37

09:35:48

09:36:00

09:36:25



09:36:46

09:37:07

09:37:19

09:37:34

09:37:59

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 182 of 246



09:56:37

09:56:47

09:57:04

09:57:19

09:57:39

THE SULLIVAN GROUP OF COURT REPORTERS



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 184 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 185 of 246





Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 187 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 188 of 246



Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 189 of 246



10:06:51

10:07:10

10:07:32

10:07:38

10:07:49



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 191 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 192 of 246



10:10:47

10:10:56

10:11:17

10:11:36

10:11:58

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 193 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 194 of 246



10:13:53

10:14:17

10:14:33

10:14:49

10:15:06

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 195 of 246



10:15:28

10:15:47

10:16:10

10:16:25

10:16:38



10:28:20

10:28:39

10:29:03

10:29:23

10:29:39

THE SULLIVAN GROUP OF COURT REPORTERS



10:29:58

10:30:18

10:30:34

10:30:53

10:31:14

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 198 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 199 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 200 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 201 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 202 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 203 of 246



10:39:03

10:39:21

10:39:46

10:40:04

10:40:19

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 204 of 246





10:42:17

10:42:34

10:43:00

10:43:18

10:43:32

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 206 of 246



10:43:47

10:44:09

10:44:32

10:44:52

10:45:07

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 207 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 208 of 246



10:46:37

10:46:53

10:47:04

10:47:21

10:47:41

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 209 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 210 of 246



10:49:10

10:49:32

10:49:50

10:50:08

10:50:26

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 211 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 212 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 213 of 246



10:56:33

10:56:52

10:57:08

10:57:26

10:57:41

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 214 of 246



THE SULLIVAN GROUP OF COURT REPORTERS



10:59:32

10:59:50

11:00:01

11:00:15

11:00:35

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 216 of 246



11:00:52

11:01:08

11:01:26

11:01:41

11:02:00

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 217 of 246



11:02:18

11:02:32

11:02:47

11:03:01

11:03:17

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 218 of 246



THE SULLIVAN GROUP OF COURT REPORTERS

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 219 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 220 of 246



11:06:13

11:06:28

11:06:42

11:06:57

11:07:13

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 221 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 222 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 223 of 246



11:11:47

11:12:02

11:12:20

11:12:40

11:12:58

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 224 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 225 of 246



11:14:07

11:14:26

11:14:48

11:15:09

11:15:27

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 226 of 246



11:15:47

11:16:05

11:16:22

11:16:30

11:16:41

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 227 of 246



11:22:40

11:22:53

11:23:16

11:23:26

11:23:34

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 228 of 246



Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 229 of 246



Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 230 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 231 of 246





11:29:13

11:29:28

11:29:46

11:29:58

11:30:14

THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 233 of 246



THE SULLIVAN GROUP OF COURT REPORTERS
Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 234 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 235 of 246



Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 236 of 246



01:37:54

01:38:17

01:38:33

01:38:56

01:39:13

THE SULLIVAN GROUP OF COURT REPORTERS



02:03:46

02:04:03

02:04:14

02:04:23

02:04:39

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 238 of 246



02:04:57

02:05:09

02:05:29

02:05:47

02:06:03

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 239 of 246

```
 1                        )
        STATE OF CALIFORNIA)
 2                        )
 3           I, Tamara Houston,RPR, CRR, CSR No. 7244, a
 4      Certified Shorthand Reporter in the State of
 5      California, duly empowered to administer oaths, do
 6      hereby certify:
 7                I am the deposition officer that
 8      stenographically reported the testimony in the
 9      foregoing deposition;
10           Prior to being examined, the deponent was, by me,
11      first duly placed under oath;
12           The foregoing transcript is a true record of the
13      testimony given;
14           Pursuant to Rule 30(e) of the Federal Rules of
15      Civil Procedure, it was requested that the deponent
16      shall have 30 days to review the transcript;
17      therefore, any changes made by the deponent or whether
18      or not the deponent signed the transcript cannot at
19      this time be set forth.
20           I further certify that I am not interested in the
21      event of the action.
22           In witness whereof, I have hereunto subscribed my
23      name.
24      Dated December 14, 2021
25      _____
                     TAMARA HOUSTON, CSR 78244, RPR, CRR
```

# EXHIBIT 5

# [PUBLICLY AVAILABLE REDACTED VERSION]

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

JASON WILLIAMS,

    Plaintiff,

vs.                     Case No. 5:19-cv-00475-BO

AT&T MOBILITY, LLC,

    Defendant.
_____/

**CERTIFIED COPY**

CONFIDENTIAL
DEPOSITION OF RAY HILL
30(b)(6)

November 17, 2021

Page 1 - 301       9:02 a.m. - 6:48 p.m. EST

REMOTELY REPORTED VIA VIDEO CONFERENCING

REPORTED BY:
Tamara L. Houston
CA CSR No. 7244, RPR, CCRR No. 140
FILE NO. 21-105383

THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860 | 323.938.8750

```
 1    APPEARANCES:  (All participants appearing remotely)

 2

 3    For Plaintiff:

 4         WITHERS BERGMAN LLP
           BY:  CHRISTOPHER LAVIGNE, ESQ.
 5              JOSEPH GALLO, ESQ.
                LALINDRA SANICHAR
 6         430 Park Avenue
           10th Floor
 7         New York, New York 10022-3505
           (212) 484.9882
 8         christopher.lavigne@withersworldwide.com
           joseph.gallo@withersworldwide.com
 9

10    For Defendant AT&T:

11         KILPATRICK TOWNSEND & STOCKTON LLP
           BY:  MICHAEL BRESLIN, ESQ.
12         1100 Peachtree Street NE
           Suite 2800
13         Atlanta, Georgia 30309
           (404) 815-6500
14         mbreslin@kilpatricktownsend.com

15

      Also Present:
16
           NIKI OKCU, ESQ.  (AT&T in-house counsel)
17         Heriberto Garcia, Videographer

18

19

20

21

22

23

24

25
```



11:24:23

11:24:37

11:24:51

11:25:05

11:25:24

Case 5:19-cv-00475-BO    Document 127-4    Filed 03/30/22    Page 244 of 246



11:25:33

11:25:51

11:26:08

11:26:17

11:26:25

Case 5:19-cv-00475-BO   Document 127-4   Filed 03/30/22   Page 245 of 246

```
1                         )
    STATE OF CALIFORNIA )
2                         )

3         I, Tamara Houston,RPR, CRR, CSR No. 7244, a

4    Certified Shorthand Reporter in the State of California,

5    duly empowered to administer oaths, do hereby certify:

6              I am the deposition officer that

7    stenographically reported the testimony in the foregoing

8    deposition;

9         Prior to being examined, the deponent was, by me,

10   first duly placed under oath;

11        The foregoing transcript is a true record of the

12   testimony given;

13        Pursuant to Rule 30(e) of the Federal Rules of

14   Civil Procedure, it was requested that the deponent

15   shall have 30 days to review the transcript; therefore,

16   any changes made by the deponent or whether or not the

17   deponent signed the transcript cannot at this time be

18   set forth.

19        I further certify that I am not interested in the

20   event of the action.

21        In witness whereof, I have hereunto subscribed my

22   name.

23   Dated December 7, 2021

24   _____

     TAMARA HOUSTON
25   CSR 78244, RPR, CRR
```