**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

```
------------------------------------------------------  X
                                                        :
                                                        :
JASON WILLIAMS,                                         :          Case No. 5:19-cv-00475-BO
                                                        :
                    Plaintiff,                          :
                                                        :
         vs.                                            :
                                                        :
AT&T MOBILITY LLC,                                      :
                                                        :
                    Defendant.                          :
                                                        :
------------------------------------------------------  X
```

**PLAINTIFF JASON WILLIAMS' MEMORANDUM OF LAW IN OPPOSITION TO AT&T'S
MOTION FOR SUMMARY JUDGMENT OR FOR PARTIAL
SUMMARY JUDGMENT IN THE ALTERNATIVE ON PLAINTIFF'S COMPLAINT
(FED. R. CIV. PROC. 56)**

**Withers Bergman LLP**
Christopher LaVigne
Joseph Gallo
430 Park Avenue
New York, New York 10022
(212) 848-9800
Christopher.LaVigne@withersworldwide.com
Joseph.Gallo@withersworldwide.com

*Attorneys for Plaintiff Jason Williams*

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 4

ARGUMENT ....................................................................................................................... 7

I.     WILLIAMS HAS STANDING TO ASSERT CLAIMS FOR HIS LOSSES RELATED TO HIS MINING OPERATION DONE VIA APOLLO KIDS MINING, LLC BECAUSE (1) AT&T OWED HIM A DIRECT DUTY AND (2) HE SUFFERED INJURY SEPARATE AND APART FROM ANY INJURY TO APOLLO KIDS ............................................................ 7

II.    AT&T IS NOT ENTITLED TO SUMMARY JUDGMENT ON MR. WILLIAMS' PUNITIVE DAMAGES CLAIMS ................................................................................. 11

       a.     AT&T's Wireless Customer Agreement Does Not Prohibit Mr. Williams From Seeking Punitive Damages for His Claims ................................................................. 11

       b.     Mr. Williams is Entitled to Recover Punitive Damages .................................... 13

III.   AT&T IS NOT ENTITLED TO SUMMARY JUDGMENT ON MR. WILLIAMS' EMOTIONAL DISTRESS CLAIM ................................................................................. 18

IV.   AT&T IS NOT ENTITLED TO SUMMARY JUDGMENT ON MR. WILLIAMS' STATUTORY CLAIMS ................................................................................................. 22

       a.     AT&T Violated 47 U.S.C. § 222 By Failing to Protect Mr. William's Proprietary Information, Accessing That Information Without His Authorization, and Opening the Door for Hackers to Access That Information ............................................... 22

       b.     AT&T Violated the North Carolina Anti-Hacking Statute by Intentionally Disabling Mr. Williams' Phone Through the SIM Swaps ............................................... 23

V.    MR. WILLIAMS' UNFAIR TRADE PRACTICES AND NEGLIGENCE CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS DOCTRINE ....................................... 25

       a.     The Court's Previous Motion to Dismiss Order Regarding the Economic Loss Rule is Equally Applicable to This Motion for Summary Judgment ......................... 25

       b.     In Addition to the "Other Property" Exception, Two Other Exceptions to the Economic Loss Rule Are Based on Triable Issues of Fact ............................... 27

VI.   THE FACTUAL RECORD DEMONSTRATES THAT AT&T'S CONDUCT IS THE PROXIMATE CAUSE OF MR. WILLIAMS' INJURIES ....................................... 27

CONCLUSION ................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ada Liss Grp. v. Sara Lee Corp.*,
    No. 06CV610, 2010 WL 3910433 (M.D.N.C. Apr. 27, 2010)...........................................12

*Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l. Fund, L.P.*,
    829 A.2d 143 (Del. Ch. 2003) ......................................................................................10

*Barger v. McCoy Hillard & Parks*,
    346 N.C. 650 (1997)........................................................................................................7

*Bowers v. Estate of Mounger*,
    542 S.W.3d 470 (Tenn. Ct. App. 2017).......................................................................11

*In re Brokers, Inc.*,
    407 B.R. 693 (Bankr. M.D.N.C. 2009) .......................................................................14

*Bryant v. Aiken Reg'l Med. Centers Inc.*,
    333 F.3d 536 (4th Cir. 2003)........................................................................................18

*by Trs. of Rowan Tech. Coll. v. J Hyatt Hammond Assocs., Inc.*,
    313 N.C. 230 (1985) .....................................................................................................27

*Citigroup Inc. v. AHW Inv. P'ship*,
    140 A.3d 1125 (Del. 2016)..............................................................................................9

*Clark v. Clark*,
    2021-NCCOA-652, 867 S.E.2d 743 (N.C. App. 2021) ...............................................19

*In the Matter of Cox Commc'ns, Inc.*,
    30 F.C.C. Rcd. 12302 (2015) .......................................................................................22

*Daley-Bishop v. Long & Foster Prop. Mgmt.*,
    No. 5:19-CV-270-FL, 2020 WL 6059843 (E.D.N.C. June 3, 2020) (unpublished)...........12

*Dougherty v. Snyder*,
    621 Fed. 715, 717 (3d Cir. 2015) ................................................................................11

*Everhart v. O'Charley's Inc.*,
    200 N.C.App. 142 (2009)................................................................................14, 15, 19

*Hairston v. Alexander Tank & Equip Co*,
    310 N.C. 227 (1984).................................................................................................29, 30

*Holt v. N. Carolina Dep't of Transp.*,
    245 N.C. App. 167 (2016), *aff'd*, 396 N.C. 57 (2016) ...............................................30

*Hutchens v. Hankins*,
    63 N.C. App.1 (1983) ........................................................................................... 29

*Johnson v. Ruark Obstetrics & Gynecology Associates, P.A.*,
    327 N.C. 283 (1990) .......................................................................................... 21

*LeCann v. Cobham*,
    No. 10 CVS 11169, 2011 WL 3329317 (N.C. Super. Aug. 2, 2011) ................... 9

*Lima v. MH & WH, LLC*,
    No. 5:14-CV-896-FL, 2019 WL 2602142 (E.D.N.C. Mar. 8, 2019) .................. 19

*McKiver v. Murphy-Brown LLC*,
    980 F.3d 937 (4th Cir. 2020) ......................................................................... 14, 15

*McKnight v. Simpsons Beauty Supply, Inc.*,
    86 N.C. App. 451 (1987) .................................................................................... 19

*McWilliams, Murphy & Assocs., Inc. v. Heart & Vascular Clinic of N. Colorado, P.C.*,
    No. 1:08CV361, 2008 WL 4933956 (M.D.N.C. Nov. 14, 2008) ...................... 12

*N. C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*,
    294 N.C. 73 (1978) ............................................................................................ 27

*NAF Holdings, LLC. v. Li & Fung (Trading) Ltd.*,
    118 A.3d 175 (Del. 2015) ..................................................................................... 9

*Novacare Orthotics & Prosthetics E., Inc. v. Speelman*,
    137 N.C. App. 471 (2000) .................................................................................. 12

*Provectus Biopharmaceuticals, Inc. v. RSM US LLP*,
    No. 17 CVS 10396, 2018 WL 4700371 ............................................................ 12

*Rehkopf v. Ocwen Loan Servicing, LLC*,
    No. 1:15CV615, 2016 WL 6534247 (M.D.N.C. Nov. 2, 2016) ......................... 14

*Reis v. Hoots*,
    131 N.C. App. 721 (1998) .............................................................................. 19, 21

*Rouse v. Williams Realty Bldg. Co., Inc.*,
    143 N.C. App. 67 (2001), *aff'd*, 354 N.C. 357 (2001) ................................. 12, 16

*Sehoy Energy LP v. Haven Real Estate Grp., LLC*,
    No. CV 12387-VCG, 2017 WL 1380619 (Del. Ch. April 17, 2017) ................. 10

*Shinn v. Greeness*,
    218 F.R.D. 478 (M.D.N.C. 2003) ...................................................................... 13

*Suntrust Bank v. Dowdy*,
    No. 5:08-CV-458-DAN, 2010 WL 3834573 (E.D.N.C. Sept. 30, 2010) ........... 11

*Tise v. Yates Constr. Co.*,
   345 N.C. 456 (1997) .................................................................................................... 30

*United States v. Aramony*,
   166 F.3d 655 (4th Cir. 1999) ..................................................................................... 26

*United States v. Smalls*,
   720 F.3d 193 (4th Cir. 2013) ....................................................................................... 8

*Van Buren v. U.S.*,
   141 S.Ct. 16 (2021) .................................................................................................... 25

*Vandevender v. Blue Ridge of Raleigh, LLC*,
   901 F.3d 231 (4th Cir.), *as amended* (Aug. 27, 2018), *amended*, 756 F. 230 (4th Cir.
   2018).................................................................................................................. 13, 14, 16

*Waddle v. Sparks*,
   331 N.C. 73 (1992) ..................................................................................................... 19

*Williams v. Carolina Power & Light Co.*,
   296 N.C. 400 (1979) ................................................................................................... 28

*Zoutewelle v. Mathis*,
   2018 WL 4698735 (N.C. Super. Ct. Sept. 13, 2018) ................................................... 8

**Statutes**

47 U.S.C. § 222 ............................................................................................................. 22, 23

47 U.S.C. § 222(a) .............................................................................................................. 22

N.C. Gen. Stat. § 14-458 .......................................................................................... 23, 24, 25

N.C. Gen. Stat. § 57D-4-04 ................................................................................................ 11

**Other Authorities**

Fed. R. Civ. Proc. 56 ............................................................................................................ 1

iv

Plaintiff Jason Williams ("Plaintiff" or "Williams") respectfully submits this Memorandum of Law in Opposition to AT&T's Motion for Summary Judgment or for Partial Summary Judgment in the Alternative on Plaintiff's Complaint (Fed. R. Civ. Proc. 56).

## PRELIMINARY STATEMENT

Mr. Williams was an AT&T cellular customer until February 2019. On November 5, 2018, AT&T "swapped" the SIM card associated with Mr. Williams' account from his smart phone to a phone in the possession of unknown criminals, without Mr. Williams' authorization. AT&T's unauthorized SIM swap allowed those criminals to access and use Mr. Williams' phone number for calls and text messages, and prohibited Mr. Williams from accessing and using his own phone number. This was the equivalent of AT&T giving criminals the keys to Mr. Williams' kingdom. Once AT&T activated Mr. Williams' SIM Card on the criminal's phone, the criminals immediately and predictably used his phone number to harm Mr. Williams through the use of two-factor authentication, a commonly security measure that AT&T expressly encouraged its customers to use. Two-factor authentication allows cell phone customers to protect their online accounts through the use of one-time, temporary confirmations sent via text or phone call, to the particular phone number associated with those online accounts. The criminals were able to access and compromise many of Mr. Williams' online accounts, including his personal email account (which contained over a decade's worth of personal and financial information and which he has not been able to recover), bank accounts, and cryptocurrency accounts associated with his successful Bitcoin mining operation.

Mr. Williams was understandably frightened and shaken by the SIM swap and the resulting compromise of his personal, family, and business information. He contacted AT&T for help immediately after the first SIM swap on November 5, 2018. Over the next three months, Mr. Williams continued to seek help from AT&T and was in regular contact with AT&T agents about the threat of SIM swaps and the security of his account. During that period, AT&T's agents made multiple representations to Mr. Williams to assure him AT&T was taking steps to protect his account from future SIM swaps, including that further SIM card changes on his account would not be made without Mr. Williams personally

requesting a SIM card change in an AT&T store and showing two passports to prove his identity, and that Mr. Williams was placed on a special list of individuals who were at a high risk of being SIM swapped. These representations were often false and the security measures that were taken were completely inadequate or were completely ignored.

From November 5, 2018 until February 8, 2019, AT&T swapped the SIM card associated with Mr. Williams' account at least five (5) additional times, each time without his authorization, for a total of at least six (6) unauthorized SIM swaps. In doing so, AT&T's agents ignored numerous "Special Instructions" notations regarding Mr. Williams' account security that had been placed into the account notes associated with Mr. Williams phone number. The notations instructed AT&T agents accessing Mr. Williams' account to, among other things, not execute further SIM swap without Mr. Williams personally appearing in an AT&T store with two forms of photo identification, and to "use caution" when making changes to Mr. Williams' account. Nothing Mr. Williams did or said, and no action that AT&T took or represented that it took, was able to stop AT&T's own agents from repeatedly SIM swapping Mr. Williams' account. AT&T's SIM swap security practices completely failed to prevent the multiple SIM swaps on Mr. Williams' account, because they were negligently designed, negligently implemented, or completely and deliberately ignored by the AT&T agents and managers that SIM swapped Mr. Williams. Mr. Williams had no choice but to discontinue his AT&T service and switched to Verizon in February 2019. Since switching from AT&T to Verizon, Mr. Williams has not been subjected to another SIM swap.

The effects of AT&T's SIM swaps against Mr. Williams were foreseeable and severe. Mr. Williams' successful Bitcoin mining operation was disrupted when criminals used his phone number that AT&T gave them, and the two-factor authentication process that AT&T encouraged its customers to use, to siphon off the proceeds of that mining operation to themselves. Mr. Williams' justifiable fear of continued SIM swaps and security breaches ultimately led to the winding down of and decision not to restart that operation. Mr. Williams and his family were subjected to numerous personal threats to their property and safety, including a threat that Mr. Williams' daughter would be kidnapped. The FBI told Mr.

Williams that, after the SIM swaps, his personal information was available on the "Dark Web," for criminals to use it as they saw fit. Mr. Williams' online accounts, document storage accounts, social media accounts, cryptocurrency accounts, and traditional bank accounts, were compromised by hackers. Criminals took control of Mr. Williams' personal email account (which he has since been unable to regain control over), which contained over a decade's worth of personal and family information, including information regarding his and his family's social security and bank account numbers, and information about sensitive patents. Mr. Williams has proof that criminals used his personal email account to impersonate him and to make changes to, for example, his cryptocurrency accounts. At least once, a criminal impersonated Mr. Williams and convinced an acquaintance and business associate to transfer Bitcoin to the criminal, harming Mr. Williams' reputation. The understandable pressure that the repeated SIM swaps and privacy breaches put on Mr. Williams, his family, and his businesses, have caused him severe emotional distress.

In its summary judgment motion, AT&T has not disputed that it swapped Mr. Williams' SIM card six (6) separate times between November 2018 and 2019, each without Mr. Williams' authorization. Instead, like in its unsuccessful motion to dismiss filed at the outset of this lawsuit, AT&T uses its summary judgment motion to attempt to immunize itself from responsibility for those SIM swaps and their foreseeable consequences. Like its unsuccessful motion to dismiss, AT&T's summary judgment motion fails to explain why AT&T is entitled to the immunity it seeks. Mr. Williams' claims, whether sounding in statute or common law, are well-founded in North Carolina law and amply supported by facts revealed in discovery.

AT&T has taken the position throughout this litigation that everyone other than itself, including Mr. Williams, is responsible for the harm Mr. Williams suffered from AT&T's repeated unauthorized SIM swaps. AT&T's motion for summary judgment simply ignores the extensive evidence in the record demonstrating that AT&T utterly failed to protect Mr. Williams from SIM swaps perpetrated by its own agents. Mr. Williams is entitled to present that evidence to a jury, and to ask the jury to determine

AT&T's level of culpability for its SIM swaps against Mr. Williams and the foreseeable consequences of those SIM swaps. Accordingly, AT&T's motion for summary judgment should be denied in its entirety.

### STATEMENT OF FACTS

Mr. Williams was an AT&T cellular phone customer in November 2018. (App'x, Ex. 1 at ATT-WIL-00624-690.) On November 5, 2018, Mr. Williams was the victim of a "SIM swap" attack, in which AT&T swapped his SIM card without his authorization. (*Id*. at ATT-WIL00678, 676; App'x, Ex. 2.) As a result of the SIM swap, Mr. Williams lost access to and use of the phone number associated with his AT&T account, and access to and use of that phone number was provided to a third-party. (App'x, Ex. 3 at 154:8-155:12; *see also* Ex. 4 at 89:15-91:4; AT&T's Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Doc. No. 119 ("AT&T Mov. Br.") at 21.) From November 5, 2018, to February 8, 2019, AT&T conducted SIM swaps without his authorization at least five additional times. (*See, e.g.*, App'x, Ex. 1 at ATT-WIL-00678, 668, 658, 649, 647, 641; Ex. 2.) After the final SIM swap, in February 2019, Mr. Williams realized he could no longer trust AT&T to protect his account and switched his cell phone provider from AT&T to Verizon, keeping the same phone number. (App'x, Ex. 3 at 271:10-274:21; 304:12-305:22; Ex. 5 at 1-3.) Since switching from AT&T to Verizon, Mr. Williams has not been subject to any additional SIM swaps. (*Id*.)

During the period between November 5, 2018, and February 8, 2019, AT&T's agents made multiple representations to Mr. Williams about steps it was taking to protect his account from additional SIM swaps. (App'x, Ex. 3 at 304:12-305:22; Ex. 5 at 1-3.) AT&T's account notes associated with Mr. Williams' phone number include multiple "Special Instructions" indicating that additional security steps should be undertaken for future SIM swap requests on Mr. Williams' account. (App'x, Ex. 1 at ATT-WIL-00676 ("Customer was previous victim of Account Takeover on 11/05/18. Please use caution when making account changes/placing order."), 663 ("Do not verify by last 4 of ssn"), 649. ("TO ACCESS THE ACCOUNT MUST IDENTIFY ACCOUNT HOLDER VIA 2 PASSPORTS AND I.D. Do not make any changes over the phone at the request Jason Williams verified in store with 2 passports and 1 drivers license.") Robert Arno, an AT&T employee who investigates SIM swaps and other types of fraud,

testified that the most recently added "Special Instructions" notation for a particular customer account appears prominently in the system that AT&T employees use view that customer's account notes. (App'x, Ex. 6 at 154:10-157:20.)

By November 2018, as admitted by AT&T's expert, AT&T knew, or should have known, that unauthorized SIM swaps were serious threats to its customers. (*See* App'x, Ex. 7; Ex. 8; Ex. 9; Ex. 10.)

The November 5, 2018, SIM swap on Mr. Williams' account was performed by an AT&T agent named Stephen Defiore. (*See, e.g.*, App'x, Ex. 1 at ATT-WIL-00678; Ex. 4 at 131:12-134:19.) Defiore was an employee at Prime Communications, an authorized AT&T retailer. (*See* App'x, Ex. 11 at 2; Ex. 12.) AT&T's 30(b)(6) deponent regarding the topic of Mr. Williams' SIM swaps, Ray Hill, AT&T Director Project Program Management, testified that Defiore was a "manager." (App'x, Ex. 4 at 131:12-134:19.) Documents provided by Prime Communications indicate that Defiore was involved in more than one unauthorized SIM swap, and that he "took full responsibility" for the SIM swaps. (App'x, Ex. 12.) Ray Hill testified that – regardless of the various security protocols AT&T had in place to protect customer accounts – Defiore, and other AT&T agents operating in a "retail environment," had the ability to change any AT&T customer's SIM card simply by entering the last four digits of the customer's social security number and noting, without verification, that they had reviewed the customer's photo identification. (*See, e.g.*, App'x, Ex. 4 at 148:24-152:1.) AT&T's account notes reflect that this glaring security loophole was used numerous times by AT&T agents to conduct unauthorized SIM swaps to Mr. Williams' account, in the face of specific Special Instructions not to use this loophole to make changes to Mr. Williams' account. (App'x, Ex. 4 at 210:2-215:12.)

Mr. Williams was and is the sole member of Apollo Kids Mining, LLC ("Apollo"), through which he operated a successful Bitcoin mining operation. (*See* App'x, Ex. 3 at 25:19-24; 231:25-235:4; 237:5-19.) Williams was entitled to all of the proceeds from Apollo and its Bitcoin mining operation. (*Id.*) All of the proceeds from Mr. Williams' Bitcoin mining operation were deposited directly into online cryptocurrency accounts, each of which was accessed via Mr. Williams' personal email, and subject to his sole control. (*See* May 2, 2022 Declaration of Jason Williams ("Williams Decl.") ¶¶2-3; App'x, Ex. 13;

Ex. 14 at 4-7.) Mr. Williams' cryptocurrency accounts received the proceeds from his Apollo Bitcoin mining operation, as well as cryptocurrency he received from other sources. (Williams Decl. ¶4.)

As a result of the AT&T's first SIM swap of Mr. Williams' account, hackers were able to divert his Apollo Bitcoin mining operation proceeds from Mr. Williams' cryptocurrency accounts to an account (or accounts) controlled by the hackers. (*See* App'x, Ex. 2; Ex. 14 at 4-5; Ex. 3 at 90:24-92:5.) After AT&T's repeated SIM swaps of Mr. Williams' account compromised the safety of this mining operation, Mr. Williams was forced to discontinue it, or risk attacks against his other (as yet un-hacked) operations. (*See* App'x, Ex. 14 at 11-14; Ex. 3 at 256:9-259:19.)

As a result of the SIM swaps, Mr. Williams and his family were subject to multiple threats to his safety and privacy. (*See* Williams Decl. ¶¶ 5-7.) Mr. Williams received threatening calls and text messages from unknown individuals. (App'x, Ex. 15.) Mr. Williams received a text message threatening that his daughter[1] would be kidnapped. (App'x, Ex. 3 at 67:17-68:18; 72:14-73:6; Ex. 16 ("Answer the phone or your daughter will go missing tonight.")) When Mr. Williams contacted the local police about the kidnapping threat, they told him they could not protect him or his family. (App'x, Ex. 3 at 61:7-62:24.) The police told Mr. Williams to be "ready to use" a gun to protect himself and his family. (*Id.*) Mr. Williams purchased a gun, silencer, and other firearm accessories in response to the threats that followed the SIM swaps. (App'x, Ex. 17.) Agents at the FBI told Mr. Williams that his personal information had been released onto the "Dark Web," where it was available to criminals and hackers. (App'x, Ex. 3 at 112:11-22; 173:18-22; 259:10-263:11.) Criminals used Mr. Williams' phone number to impersonate him and convince an acquaintance to transfer Bitcoin to them, harming his reputation in the process. (App'x, Ex. 18.) Mr. Williams' online accounts, including his bank account and personal email account, and the information within those accounts, were compromised by hackers. (App'x, Ex. 19 at 5-7; Ex. 3 at 117:8-130:7; Ex. 20.) Mr. Williams has never been able to recover his personal email account,

---

[1] Contrary to the AT&T's motion (AT&T' Mov. Br. at 15), Mr. Williams is not seeking damages of any kind on behalf of this daughter. However, evidence of the kidnapping threat against his daughter is relevant to Mr. Williams' own emotional distress claims.

which contained over a decade's worth of his personal and financial information, since the SIM swap attacks. (*Id.*) .) Each of these events occurred during or immediately after each unauthorized SIM swap when AT&T provided criminals with direct use of Mr. Williams' phone number. (Williams Decl. at ¶ 5.) Mr. Williams testified about the emotional effects of the SIM swaps, and the resulting threats to him and his family' safety. (App'x, Ex. 3 at 61:16-21; 66:8-67:9; 70:15-18; 165:13-18.)

## ARGUMENT

### I.     Williams Has Standing to Assert Claims for his Losses Related to his Mining Operation done via Apollo Kids Mining, LLC Because (1) AT&T Owed Him a Direct Duty and (2) He Suffered Injury Separate and Apart from Any Injury to Apollo Kids

Because all of the damages to Mr. Williams' Apollo Bitcoin mining operation occurred as a result of AT&T's breach of contractual, statutory, and common-law duties that AT&T owed directly to Mr. Williams, Mr. Williams' claims to recover the damages to his mining operation are direct claims, not derivative claims. Thus, Mr. Williams has standing to assert these claims directly against AT&T, as a matter of settled North Carolina (and Delaware) law.

Under North Carolina law, a shareholder (or an LLC member) has standing to sue <u>directly</u> for injuries to the corporation (or LLC), "even if the corporation also has a cause of action arising from the same wrong," where ***either*** (a) "the shareholder can show that the wrongdoer owed him a special duty" ***<u>or</u>*** (b) "the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself." *See Barger v. McCoy Hillard & Parks,* 346 N.C. 650, 658-61 (1997). Here, both grounds for standing apply, although either one of them would be sufficient.

As the North Carolina Supreme Court held in *Barger*, "to proceed with [his] lawsuit under the first exception to the general rule, [Mr. Williams] must allege facts from which it may be inferred that [AT&T] owed plaintiff[] a special duty. *The special duty may arise from contract or otherwise* . . . The duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual." 346 N.C. at 659 (emphasis added). A special duty can be found where the defendant "performed individualized services directly for the shareholder." *Id.* It can also be found where a defendant made representations directly to a person, thus undertaking a separate duty to that person. *Id.* at 662.

That is exactly what happened here. Mr. Williams was a direct, individual customer of AT&T, and therefore AT&T's contractual, statutory, and common law duties were owed directly to Mr. Williams. Before AT&T facilitated the SIM-swap attacks against him, Mr. Williams operated a successful Bitcoin operation, via a single-member LLC, Apollo Kids Mining, LLC ("Apollo"). However, AT&T's duties to its customer, Mr. Williams, were entirely independent of, and unrelated to, Mr. Williams' status as the sole member of Apollo.

As Apollo's sole member, Williams was (and remains) entitled to all its proceeds. (*See* App'x, Ex. 3 at 25:19-24; 231:25-235:4; 237:5-19.) Therefore, before the SIM swap attacks, all of the Apollo proceeds were distributed directly into Mr. Williams' online cryptocurrency account, which was accessed via Mr. Williams' personal email, and subject to his sole control. (*See* Williams Decl. ¶¶2-3; App'x, Ex. 13; Ex. 14 at 4-7.) Mr. Williams's cryptocurrency accounts received the proceeds from his Apollo Bitcoin mining operation, as well as cryptocurrency he received from other sources. (Williams Decl. ¶4.) As a result of AT&T's first SIM swap of Mr. Williams' account, hackers were able to divert these distributions, and cause them to be sent to an account (or accounts) controlled by the hackers, rather than to Mr. Williams' account. (*See* App'x, Ex. 2; Ex. 14 at 4-5; Ex. 3 at 90:24-92:5.) After AT&T's repeated SIM swaps of Mr. Williams' account compromised the safety of this mining operation, Mr. Williams was forced to discontinue it, or risk attacks against his other (as yet un-hacked) operations. (*See* App'x, Ex. 14 at 11-14; Ex. 3 at 256:9-259:19.)

All of Mr. Williams' injuries, were thus caused by AT&T's repeated breaches of the duties it owed directly to Mr. Williams. Thus, as a matter of North Carolina law, Mr. Williams has standing to sue AT&T directly.[2] *Zoutewelle v. Mathis*, 2018 WL 4698735, at *9 (N.C. Super. Ct. Sept. 13, 2018) (unreported) (plaintiff had standing to sue former husband directly for conduct which harmed jointly

---

[2] AT&T fails to mention this exception in its papers, although it is clearly applicable, thus foreclosing its ability to argue the issue for the first time on reply, when Williams will have no opportunity to respond. *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013) ("[N]ew arguments cannot be raised in a reply brief.").

owned limited liability companies, based on marital settlement agreement under which husband owed duties directly to wife separate from duties he owed her as manager of the entities); *accord LeCann v. Cobham*, 2011 WL 3329317, at *5 (N.C. Super. Aug. 2, 2011) (unreported).

Furthermore, while AT&T fails to cite Delaware law, Apollo is a Delaware entity, and (to the extent Delaware law may apply) Delaware recognizes the same direct-duty exception. *See NAF Holdings, LLC. v. Li & Fung (Trading) Ltd.,* 118 A.3d 175, 179 (Del. 2015) ("[A] party to a commercial contract may sue to enforce it contractual rights directly, without proceeding by way of derivative action"). In *NAF,* plaintiff/shareholder executed a contract directly with defendant; defendant's breach damaged the value of certain wholly owned subsidiaries; plaintiff/shareholder brought a direct suit against defendant; and defendant moved to dismiss on the ground that the claims were derivative because the harm was done to a corporate entity. *Id.* at 179-180. The Delaware Supreme Court flatly disagreed and held that plaintiff – like any contracting party – could bring a direct claim for all the damages done to wholly-owned entities, because the claim belonged to plaintiff, as the contracting party. *Id.* at 181 ("It would be inconsistent with these legal principles to subject commercial parties to a burdensome demand excusal process before allowing them to sue on their own commercial contracts."). The Delaware Supreme Court in *NAF* further explained that claims in tort, contract, or for statutory harm are generally direct whenever a plaintiff "seek[s] to bring a claim that belonging to her personally," – *i.e.*, any claim based on breach of duties that defendant owed directly to plaintiff – even if "the corporation of which the plaintiff is the stockholder suffered the alleged harm." *Id.* at 180. *See also Citigroup Inc. v. AHW Inv. P'ship,* 140 A.3d 1125, 1138-39 (Del. 2016) (negligent misrepresentation and fraud claims were direct, because they arose from breaches of duty owed directly to shareholders, even if alleged harm was to corporation).

In its motion, AT&T does not attempt to deny, nor can it deny, that it had a commercial relationship with Mr. Williams, and that its contractual, statutory, and common-law duties ran directly to him. (AT&T's Mov. Br. at 9-11.) Indeed, AT&T has the temerity to argue both (1) that Mr. Williams cannot sue AT&T for the millions of dollars of losses associated with the shut-down of Apollo, because only Apollo can sue AT&T for those losses; **and** (2) that Apollo cannot sue AT&T for those losses,

because AT&T's contractual and other duties ran **only** to Mr. Williams. (*Id*.; AT&T's AKM Motion in Limine at 2.) In making this argument, AT&T establishes both that the direct duty exception applies here (thus giving Mr. Williams direct standing), and the reason why this exception is necessary on public policy grounds. By contrast, AT&T's apparent desire for a legal regime in which it can breach its duties with impunity, and leave nobody with standing to sue for the harm it causes is bad public policy, which has been rejected in both North Carolina and Delaware.

While this direct-duty standing is sufficient in and of itself, Mr. Williams also has standing because he has alleged direct injury, over and above (and different from) any injury suffered by Apollo. After the first SIM-swap attack on November 5, 2018, the hackers were able to direct the distribution of proceeds from Mr. Williams to themselves. (*See* App'x, Ex. 2; Ex. 14 at 4-5.) In diverting this distribution, the hackers stole directly from Mr. Williams, who suffered the injury.

Mr. Williams sought to continue Apollo's business through at least six SIM swaps and resulting hacks. However, ultimately, when the facility housing and powering these mining rigs shut down, Mr. Williams was afraid to restart the mining operation, because he believed the hackers would continue to attack these rigs, regardless of whether he used them within Apollo or within his other mining business (which had never been hacked, and to which he was understandably afraid to connect the Apollo operation). (*See* App'x, Ex. 14 at 11-14.) Furthermore, the FBI told Mr. Williams that, as a result of the hacks against him, his personal information (not Apollo's) was on the Dark Web, and he was concerned that he would repeatedly lose the ability to personally reap the proceeds from those rigs. (*See* App'x, Ex. 14 at 11-14; Ex. 3 at 256:9-259:19.) This is direct injury, especially because Apollo was a pass-through entity. *See Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l. Fund, L.P.*, 829 A.2d 143, 152 (Del. Ch. 2003) (finding claims direct in pass-through entity, where "whenever the value of the Fund is reduced, the injury accrues irrevocably and almost immediately to the current partners but will not harm those who later become partners . . . . Such losses confer only a fleeting injury to the Fund, one that is immediately and irrevocably passed through to the partners."); *see also Sehoy Energy LP v. Haven Real Estate Grp., LLC*, 2017 WL 1380619, *8-9 (Del. Ch. April 17, 2017) (unreported) (claims for loss of value of pass-through

entity, and for inability to withdraw investment from entity, likely belong directly to member, not entity); *Suntrust Bank v. Dowdy*, 2010 WL 3834573, *4-5 (E.D.N.C. Sept. 30, 2010).

Even if the Court were to find that these claims were derivative (and they are not), Apollo could simply assign the claims to Mr. Williams, its sole member. *See, e.g.*, N.C. Gen. Stat. § 57D-4-04 (limited liability companies may make in-kind distributions); *Bowers v. Estate of Mounger,* 542 S.W.3d 470, 482-83 (Tenn. Ct. App. 2017) (sole member had direct standing after limited liability company made a distribution transferring claim to its sole member); *cf. Dougherty v. Snyder,* 621 Fed. 715, 717 (3d Cir. 2015) (unreported) (rejecting post-judgment attempt of LLC to assign claim to its sole member, but stating that limited liability company could have assigned claim before judgment had been entered). Thus, if the Court deems it necessary (and it should not), Mr. Williams is prepared to cause Apollo to distribute all claims to Mr. Williams, leaving him free to prosecute them directly against AT&T.

In this same vein, if the Court determines that Mr. Williams cannot proceed on these claims in his own right, Mr. Williams will seek leave to amend the complaint to add Apollo as a plaintiff. In so doing, Mr. Williams will not need to add any substantive allegations, and will seek no damages on behalf of Apollo other than whatever damages Apollo suffered as a result of AT&T's direct breaches of its duties to Mr. Williams. Therefore, it would not entail any additional discovery, because all the information about Mr. Williams' Apollo mining operation, including the mining proceeds, financial information, and tax information, have already been provided to AT&T by Mr. Williams in discovery, and Mr. Williams testified at length about Apollo. (*See, e.g.*, App'x, Ex. 3 at 25:19-24; 231:25-235:4; 237:5-19.)

**II. AT&T Is Not Entitled to Summary Judgment on Mr. Williams' Punitive Damages Claims**

> **a. AT&T's Wireless Customer Agreement Does Not Prohibit Mr. Williams From Seeking Punitive Damages for His Claims**

AT&T cannot use vague and ambiguous language in its Wireless Customer Agreement (App'x, Ex. 21 (the "WCA")) – a contract it drafted unilaterally – to foreclose Williams' claim for punitive damages. Under North Carolina law, Williams is entitled to present these claims to the jury.

11

The WCA is governed by North Carolina law. (App'x, Ex. 22 at ¶10.3.2.) North Carolina flatly prohibits parties from contractually limiting their risks for claims (such as this one) involving intentional wrongdoing or gross negligence. *See, e.g.*, *Ada Liss Grp. v. Sara Lee Corp.*, 2010 WL 3910433 at *9 (M.D.N.C. Apr. 27, 2010) (not reported) ("There is absolutely no case law in North Carolina, on either the state or federal level, supporting the enforcement of exculpatory clauses for intentional wrongdoing," and doing so is "obviously contrary to sound law and policy" (citing *Restatement (Second) of Contracts* § 195 (2009))); *Provectus Biopharmaceuticals, Inc. v. RSM US LLP*, 2018 WL 4700371, at *24-25 2018 NCBS 100 (N.C. Super. Sept. 28, 2018) (not reported) (contractual provision forbidding consequential or punitive damages is not enforceable to the extent defendant's fault went beyond ordinary negligence, and thus inapplicable to claims of gross negligence, intentional misrepresentation, or fraudulent concealment) (collecting cases); Thus, contractual provision seeking to limit punitive damages for AT&T's gross negligence, fraud, or deliberate misconduct are unenforceable as a matter of law.

Likewise, because the WCA was drafted exclusively by AT&T, without any input from Mr. Williams, any ambiguity must be construed against AT&T. *Novacare Orthotics & Prosthetics E., Inc. v. Speelman,* 137 N.C. App. 471, 476 (2000) ("when an ambiguity is present in a written instrument, the court is to construe the ambiguity against the drafter—the party responsible for choosing the questionable language"); *McWilliams, Murphy & Assocs., Inc. v. Heart & Vascular Clinic of N. Colorado, P.C.*, 2008 WL 4933956, at *3 (M.D.N.C. Nov. 14, 2008) (not reported) (same); *Rouse v. Williams Realty Bldg. Co., Inc.*, 143 N.C. App. 67, 70 (2001), *aff'd*, 354 N.C. 357 (2001). Indeed, this is particularly true of exculpatory provisions in contracts, which are construed against the parties asserting them. *Daley-Bishop v. Long & Foster Prop. Mgmt.*, 2020 WL 6059843, at *5 (E.D.N.C. June 3, 2020) (unpublished), *report and recommendation adopted*, 2020 WL 4053595 (E.D.N.C. July 20, 2020) ("It is well-established that the language of an exculpatory clause is read against the party seeking to enforce it"); *accord Ada Liss Grp.*, 2010 WL 3910433 at *9 ("it is a universal rule that such [an] exculpatory clause is strictly construed against the party asserting it." (quoting Schenkel & Shultz, Inc. v. Hermon *F.* Fox & Asso*ciates, P.C.*, 362 N.C. 269, 274 (2008))).

Here, the WCA states:

> Unless prohibited by law, AT&T isn't liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, Services, Software, or Devices provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injury.

(App'x, Ex. 23 at ¶4.1.) On its face, this provision does not foreclose Mr. Williams' claim for punitive damages, because his allege d damages for are not limited to damages he suffered by the use, or inability to use, AT&T's services, software, or devices. Instead, he seeks damages because AT&T repeatedly SIM swapped his account, and transferred his phone number to an unauthorized user. Indeed, nothing in this provision purports to limit the damages recoverable if AT&T facilitates criminal hacking and data breaches, or if its employees commit grossly negligent or deliberately criminal acts and give themselves (or independent hackers) access to Mr. Williams' phone without his authorization, which is what happened in this case (*see infra* Section II.b.). Further, as noted above, any ambiguity in this provision must be read against AT&T and in favor of Mr. Williams. Accordingly, AT&T cannot rely on the WCA to dismiss Mr. Williams' punitive damages claims.

### b. Mr. Williams is Entitled to Recover Punitive Damages

Under North Carolina law, punitive damages are available where a defendant is liable for compensatory damages, and there is an aggravating factor, *i.e.*, fraud, malice, or willful and wanton conduct. *Vandevender v. Blue Ridge of Raleigh, LLC,* 901 F.3d 231, 237 (4th Cir.), *as amended* (Aug. 27, 2018), *amended,* 756 F. 230 (4th Cir. 2018). Willful and wanton conduct is the "conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows, or should know is reasonably likely to result in injury, damage, or other harm." *Id.*; *see Shinn v. Greeness,* 218 F.R.D. 478, 490 (M.D.N.C. 2003) (truck driver and employer potentially liable for punitive damages for participating in delivery system established by employer which encouraged or condoned violations of safety laws and regulations in order to meet requirements). In order for conduct to be willful, and merit punitive damages, there is no need for a malicious or evil purpose. Instead, "[a]n act is willful when there is a deliberate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the

safety of the person or property of another." *Vandevender,* 901 F.3d at 240 (quotation omitted) (punitive damages warranted against corporate defendant where it deliberately failed to discharge its duty to provide adequate staff and supplies for their nursing facility, even if it had no malicious or evil purpose in doing so).

Under North Carolina law, a corporate entity can be liable for punitive damages either: (a) where its own acts or policies constitute the aggravating factor, or (b) where officers, directors, or managers participated in or condoned the conduct. *McKiver v. Murphy-Brown LLC,* 980 F.3d 937, 970-71 (4th Cir. 2020) (punitive damages available against corporation where corporation knew that its policies had associated harms, but persisted in practices that were reasonably likely to cause harm to others and/or where officers and managers had notice of the harms yet persisted in maintaining the policies); *Rehkopf v. Ocwen Loan Servicing, LLC*, 2016 WL 6534247, *6-7 (M.D.N.C. Nov. 2, 2016) (not reported) (denying summary judgment on punitive damages claim where large company with compliance department and in-house counsel did not have policies in place to prevent employees from removing property from vacant, foreclosed homes before obtaining a writ of possession, and only put those policies in place after plaintiff's possessions were improperly removed); *In re Brokers, Inc*., 407 B.R. 693, 846-847 (Bankr. M.D.N.C. 2009) (corporation liable for punitive damages where one officer participated in the wrongful conduct, and corporation showed clear indifference to the ongoing damage to plaintiff's property by failing to discuss it at board meetings); *Everhart v. O'Charley's Inc.*, 200 N.C.App. 142, 152 (2009) (corporation can be liable for punitive damages where store manager intentionally turned a blind eye to danger to plaintiff, even if manager was not the one who caused the danger, and in addition there was evidence that manager was following corporate policy).

Here, AT&T's policies directly led to Mr. Williams' SIM swaps and demonstrate a "conscious and intentional disregard of and indifference to [his] rights and safety." *See Vandevender,* 901 F.3d at 237 (quoting N.C. Gen. Stat. § 1D-5(7)). In response to questioning about the November 5, 2018, SIM swap on Mr. Williams account, Mr. Hill testified that AT&T agents operating in a "retail environment," including the agent that conducted that November 5, 2018 SIM swap, Stephen Defiore (*see infra*), had the

ability to change any AT&T customer's SIM card by entering the last four digits of the customer's social security number and noting, without verification, that they had reviewed the customer's photo identification. (*See, e.g.*, App'x, Ex. 4 at 148:24-152:1). In essence, because there was no mechanism in place to prevent an AT&T agent from simply lying about seeing a customer's photo identification, an AT&T agent in a retail environment could conduct a SIM swap and transfer control of a customer's phone to a third party by simply entering the last four digits of that customer's social security number into AT&T's system, without even the appearance of any authorization from the customer. Even AT&T's own expert has indicated that SIM swaps were a known threat in November 2018. (*See* App'x, Ex. 7 ¶¶95-96.) AT&T's lax policies regarding SIM swaps in November 2018 demonstrate a shocking disregard of, and indifference to, the rights and safety of its customers, including Mr. Williams, and raise triable issues of fact regard AT&T's liability for punitive damages.

In addition, AT&T is liable for punitive damages because its officers, directors, or managers participated in or condoned the conduct. *McKiver*, 980 F.3d at 966. In this context, "'[t]he plain meaning of 'condone' is to 'forgive or overlook,' or 'permit the continuance of.'' [] This means, for example, '[a] manager condones employees' actions when the manager is aware of those actions and fails to intervene.'" *Id.* (quoting *Vandevender,* 901 F.3d at 239). Furthermore, the definition of manager is broad under North Carolina law, and includes personnel with managerial authority to switch SIM cards, or to approve matters as potentially significant as a SIM card transfer, given the risks to customers involved. *See Everhart*, 200 N.C. App. at 153 (manager is broadly defined as one who conducts, directs, or supervises something, and fact that employee was labeled a manager, and had at least some managerial authority, was sufficient evidence for punitive damages purposes).

Here, triable issues of fact prevent summary judgment with respect to AT&T's liability for punitive damages. The first SIM swap account on Mr. Williams' account took place on November 5, 2018, and at least five additional SIM swaps took place between November 5, 2018, and February 8, 2019. (*See, e.g.*, App'x, Ex. 1 at ATT-WIL-00678, 668, 658, 649, 647, 641.) By November 2018, AT&T knew, or should have known, that unauthorized SIM swaps were serious threats to its customers. (*See*

App'x, Ex. 8; Ex. 9; Ex. 10.) In fact, one of AT&T's own experts indicated in his report that by November 2018, *even AT&T's customers like Mr. Williams* should have been aware of the threat of SIM swaps. (*See* App'x, Ex. 7.) Surely, then, AT&T, as one of the nation's largest telecom providers, was or should have been aware that its customers, including Mr. Williams, could be targeted for SIM swaps in November 2018.

The November 5, 2018, SIM swap on Mr. Williams' account was performed by an AT&T agent named Stephen Defiore. (*See, e.g.*, App'x, Ex. 1 at ATT-WIL-00678; Ex. 4 at 131:12-134:19.) Defiore was an employee at Prime Communications, an authorized AT&T retailer. (*See* App'x, Ex. 11 at 2; App'x, Ex. 12.) AT&T's 30(b)(6) deponent regarding the topic of Mr. Williams' SIM swaps, Ray Hill, testified that Defiore was a "manager." (*See, e.g.*, App'x, Ex. 4 at 131:12-134:19.) Documents provided by Prime Communications indicate that Defiore was involved in more than one unauthorized SIM swap, and that he "took full responsibility" for the SIM swaps. (*See, e.g.*, App'x, Ex. 12.) This evidence supports the reasonable inference that Defiore, a "manager," intentionally changed Mr. Williams' SIM card on November 5, 2018, knowing he was doing so without Mr. Williams' authorization, and thereby intentionally provided it to a third-party who could use it for whatever purpose they wanted. These facts alone raise triable issues regarding AT&T's "conscious and intentional disregard of and indifference to the rights and safety" of Mr. Williams and foreclose AT&T's motion for summary judgment on this issue. *See Vandevender,* 901 F.3d at 237 (quoting N.C. Gen. Stat. § 1D-5(7)).

The subsequent (at least) five SIM swaps on Mr. Williams account, which took place between November 5, 2018 and February 8, 2019, further demonstrate AT&T's reckless disregard of Williams' rights and safety. During the time period when Mr. Williams was being subjected to these SIM swap attacks, AT&T made multiple representations to him about steps it was taking to protect his account from additional SIM swaps, including:

- In or about November 2018, on a phone call between Mr. Williams and AT&T, AT&T represented that it would add extra security to Mr. Williams' account by making changes and notations in his account, whereby the SIM card associated with his account could only be changed via an in-person request in a specific, identified Raleigh AT&T store.

- In or about November 2018, on a phone call between Mr. Williams and AT&T, AT&T represented that Mr. Williams' identity would have to be confirmed with two passports before AT&T would approve a SIM card change on his account.
- On or about December 2, 2018, at AT&T store in Raleigh, an AT&T employee said that certain warnings regarding Mr. Williams' account must be getting deleted from his AT&T account.
- On or about December 2, 2018, at AT&T store in Raleigh, an AT&T employee told Mr. Williams that he was on a special list of individuals who were at high risk of being SIM swapped.
- On or about December 2, 2018, on a phone call between Mr. Williams and AT&T, an AT&T representative told Mr. Williams that certain warnings that had been placed on his account were erased from his account but could not provide any explanation as to why. [3]
- On or about December 5, 2018, at AT&T store in Raleigh, AT&T employees told Mr. Williams that there was a note in his account regarding SIM swap procedures.

(App'x, Ex. 5 at 1-3; *see* Ex. 3 at 304:12-305:22.) These statements and their implication – that AT&T was taking action to protect Mr. Williams' account from being SIM swapped in the future – were false and their sole purpose was to induce Mr. Williams to remain an AT&T customer, and he justifiably relied on those statements[4]. In addition, the account notes produced by AT&T confirm that on multiple occasions during this time period, notations were put on Mr. Williams account with instructions that additional security steps should be undertaken for future SIM swap requests, including:

- A November 6, 2018, entry entitled "Special Instructions" that states: "Customer was previous victim of Account Takeover on 11/05/18. Please use caution when making account changes/placing order." (App'x, Ex. 1 at ATT-WIL-00676.)
- A December 3, 2018, entry entitled "Special Instructions" that states: "Customer has verified himself with ID and passcode with manager. Customer has given instructions that transactions can only be made in person with ID and passcode verification… Do not verify by last 4 of ssn….12/03/18 **FRAUD DEPT DO NOT REMOVE** Customer was previous victim of Account Takeover on xx/xx/xx. Please use caution when making account changes/placing order." (App'x, Ex. 1 at ATT-WIL-00663.)
- A December 5, 2018, entry entitled "Special Instructions" that states: "*FRAUD DEPT DO NOT REMOVE** Account holder lives in NC state and scammers went to OK state att cor store with ID to update sim card multiple times! AH is requesting to verify both the NC state issued driver license and passport before changing sim cards or make changes to the account!" (App'x, Ex. 1 at ATT-WIL-00656.)
- A February 4, 2019, entry entitled "Special Instructions" that states: "TO ACCESS THE ACCOUNT MUST IDENTIFY ACCOUNT HOLDER VIA 2 PASSPORTS AND I.D. Do not make any changes over the phone at the request Jason Williams verified in store with 2 passports and 1 drivers license." (App'x, Ex. 1 at ATTWIL- 00649.)

---

[3] In and of itself, this statement regarding the erasure of warnings from Mr. Williams' account notes raises a triable issue of fact regarding AT&T's willful and wanton conduct that exposed Mr. Williams to harm.

[4] AT&T's motion for summary judgment does not seek the dismissal of any elements of his fraud claim.

Robert Arno, an AT&T employee who investigates SIM swaps and other types of fraud, testified that these types of "Special Instructions" appear prominently in the system that AT&T employees used to access customer account notes. (App'x, Ex. 6 at 154:10-157:20.)

Notwithstanding representations, and notwithstanding the prominent, repeated, and specific additional security instructions on his account notes, Mr. Williams was SIM swapped (at least) five additional times in the approximately three months after the first SIM swap. AT&T's utter failure to protect Mr. Williams' account from these subsequent SIM swaps raises triable issues of fact regarding AT&T's willful and wanton corporate conduct with respect to Mr. Williams' rights and safety.

Under North Carolina law, a jury is entitled to determine if Mr. Williams is entitled to recover punitive damages for AT&T's pattern of corporate recklessness and indifference, and fraud, regarding SIM swaps on his account.

### III. AT&T Is Not Entitled to Summary Judgment on Mr. Williams' Emotional Distress Claim

As a result of AT&T's willful, wanton, and grossly negligent conduct, and its violations of statutory and common law, Mr. Williams suffered not only financial harm, but also severe emotional distress, as detailed in his complaint, as well as in his deposition testimony. Mr. Williams suffered severe emotional distress not only due to the upheaval in his own life, but also due to his distress at witnessing and copying with the threats to and the suffering of his spouse and children, including a kidnapping threat from the hackers directed at one of his children, which the police deemed so sufficiently serious and credible that they advised Mr. Williams to purchase a firearm in order to protect himself and his family members.

Rather than deal directly with the emotional havoc caused by its actions, AT&T seeks to hide behind various technicalities to prevent Mr. Williams' testimony of severe emotional distress from reaching a jury. However, none of AT&T's arguments pass muster under North Carolina law.

First, contrary to AT&T's arguments, under Fourth Circuit and North Carolina precedent, "a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Centers Inc.,* 333 F.3d 536, 546 (4th Cir. 2003), (citing *Price v. City*

*of Charlotte,* 9 F.3d 1241, 1251 (4th Cir. 1996)); *Lima v. MH & WH, LLC,* 2019 WL 2602142, at *19

(E.D.N.C. Mar. 8, 2019) (not reported); *Clark v. Clark,* 2021-NCCOA-652, ¶ 41, 867 S.E.2d 743, 753

(N.C. App. 2021) (damage verdict of emotional distress sufficiently supported by lay testimony from

plaintiff and a friend of plaintiff); *Everhart,* 200 N.C. App. at 156 (plaintiff's competent testimony was

sufficient to establish her own emotional distress and its source; medical or expert testimony is not a

necessary part of a claim for emotional distress); *Reis v. Hoots,* 131 N.C. App. 721, 731-32 (1998)

("Defendant testified as to the stress, both financial and emotional, caused by the numerous lawsuits and

mail tampering. She testified as to the mental anguish she had suffered either directly or indirectly (by

having to cope with the pain and turmoil plaintiff's actions caused the parties' children). Her testimony

constituted sufficient evidence of damages to submit the case to the jury."); *McKnight v. Simpsons Beauty*

*Supply, Inc.*, 86 N.C. App. 451, 454 (1987) ("Though expert medical testimony may be necessary to

establish that some types of emotional distress were suffered … plaintiff only had to present competent

evidence that he suffered emotional distress and that it resulted from defendant's conduct; and his

evidence that he was 'shocked' and 'upset' following the abrupt, unexplained termination of his

employment without cause met that requirement").[5]

      Unsurprisingly, the record contains ample testimony, and documentary evidence, regarding the

emotional distress Mr. Williams experienced as a result of the SIM swaps and their consequences,

including his constant state of fear. Mr. Williams testified:

- Specifically the night or the afternoon that I was threatened by text message, that if I didn't respond or do something, that my daughter would go missing. I called the police. I was terrified. (App'x, Ex. 3 at 61:16-21.)
- So it was highly disruptive to, you know, me being a fund manager and having to deal with this….And as you can imagine, me being a target of SIM swaps and this level of instability, you know, threatened my ability to be a good steward of my responsibilities with these people. It was highly -- it was highly disruptive. It was something that – it was just a very, very big deal. I wish I had the capacity and the words to explain to you how unnerving this is. This is my life. It's what I

---

[5] The cases cited by AT&T are not to the contrary. While those cases find various instances where the substance of a plaintiff's testimony did not meet the legal standard for severe emotional distress, they do not dictate that a plaintiff's testimony or evidence alone can never meet that standard. *See, e.g., Waddle v. Sparks,* 331 N.C. 73, 85 (1992) (finding plaintiff's testimony insufficient on the ground that it involved only one incident of distress that did not involve the defendant).

worked toward. I don't practice medicine anymore. This is what I do, and for me to have my personal information coopted for these folks to reach out to business clients and to solicit money and try to extract like business deals and doings that have nothing to do with me, it's just terrifying. (App'x, Ex. 3 at 66:8-67:9.)

- Throw on top of it you are worried about your safety and your family's safety. It's terrifying. I hate to keep using the same word, but it is very scary. (App'x, Ex. 3 at 70:15-18.)

- I had never experienced something like this. I have got ten plus businesses that I'm running, and this is my first experience with this kind of Dark Web hacker kind of thing affecting me so close to home. (App'x, Ex. 3 at 165:13-18.)

Here, unlike the cases AT&T seeks to rely on, Mr. Williams has more than sufficient evidence of emotional distress to allow the jury to decide the issue. The foreseeable consequences of AT&T providing Mr. Williams' SIM card to third parties were self-evidently distressing. Mr. Williams received threatening calls and text message from unknown individuals. (App'x, Ex. 15.) Mr. Williams received a text message threatening that his daughter would be kidnapped. (App'x, Ex. 3 at 67:17-68:18; 72:14-73:6; Ex. 16 ("Answer the phone or your daughter will go missing tonight.") When Mr. Williams contacted the local police about the kidnapping threat, they told him they could not protect him or his family. (App'x, Ex. 3 at 61:7-62:24.) The police told Mr. Williams to be "ready to use" a gun to protect himself and his family. (*Id*.) Mr. Williams purchased a gun, silencer, and other accessories in response to the threats that followed the SIM swaps. (App'x, Ex. 17.) Agents at the FBI told Mr. Williams that his and his family's personal information had been released onto the "Dark Web," where it was available to criminals and hackers. (App'x, Ex. 3 at 112:11-22; 173:18-22; 259:10-263:11.) Criminals used Mr. Williams' phone number to impersonate him and convince an acquaintance to transfer Bitcoin to them, harming his reputation in the process. (App'x, Ex. 18.) Mr. Williams' online accounts, including his personal Gmail account, and the information within those accounts, were compromised by hackers. (App'x, Ex. 19 at 5-7; Ex. 3 at 117:8-130:7; Ex. 20.) Mr. Williams has never been able to recover his personal Gmail account, which contained over a decade's worth of his personal and financial information, since the SIM swap attacks. (*Id*.; Williams Decl. ¶5.) After living with the consequences of the SIM swaps that he and his family have experienced so far, Mr. Williams remains in constant fear of the next consequence, and reasonably believes that AT&T is responsible for those consequences. (*See* Williams Decl. ¶¶5-7.)

Likewise, contrary to AT&T's argument, it is well-settled that a person may assert a claim for emotional distress based on the suffering of close family members, such as a spouse or children. *Johnson v. Ruark Obstetrics & Gynecology Associates, P.A.*, 327 N.C. 283, 300 (1990) ("Common sense and precedent tell us that a defendant's negligent act towards one person may proximately and foreseeably cause emotional distress to another person and justify his recovering damages, depending upon their relationship and other factors"); *see also id.* at 291 (North Carolina recognizes no "arbitrary requirements" for claims of emotional distress); *Reis,* 131 N.C. App. at 731-32 (mother could recover for emotional distress she suffered as a result of suffering defendant caused to her children). As set forth *supra*, Mr. Williams received a text message threatening that his daughter would be kidnapped. Mr. Williams testified about how that affect him, his family, and his relationship with his family:

> I think what I'm saying to you is a [sic] threatening a 15 year old to be kidnapped and having police with guns in your house and your father trying to project himself as some type of vigilante who can defend himself with weapons, who is tired, exhausted from this, and it's affected me. It's affected my relationships. It's affected my daughter. It's affected me and my wife. I am making that claim. How do I quantify that? I don't know. Do I think you are liable, yes. Yes, 100 percent. Do I think that these SIM swaps have taken a toll on me, and have affected my businesses negatively, yes. How do I quantify that? I don't know. I'm leaving that up to these attorneys. That's why I persisted. That's why I'm sitting here today and that's why I'm willing to go to trial with this.

(App'x, Ex. 3 at 248:22-249:20.) Under North Carolina, this evidence of Mr. Williams' family's suffering, and how it affected him, raises triable issues of fact regarding his claim for emotional distress. Additional witnesses can be called at trial to testify about the effects of the SIM swaps on Mr. Williams, including the emotional distress it caused him. (*See* App'x, Ex. 24 at ATT-WIL-02319) (transcript of podcast interview in which Mr. Williams describes the effects of the SIM swaps: "It's frightening.")

Finally, and again contrary to AT&T's arguments, for the reasons set forth in Section II.a., *supra*, nothing in the WCA can be read to prevent Mr. Williams for seeking damages for the severe emotional distress he suffered as a result of AT&T's conduct.

A jury – not AT&T – is entitled to determine if the SIM swaps reasonably caused Mr. Williams' emotional distress, and if his distress is severe enough to warrant damages under North Carolina law.

**IV.** **AT&T Is Not Entitled to Summary Judgment on Mr. Williams' Statutory Claims**

    **a.** **AT&T Violated 47 U.S.C. § 222 By Failing to Protect Mr. William's Proprietary Information, Accessing That Information Without His Authorization, and Opening the Door for Hackers to Access That Information**

Pursuant to 47 U.S.C. § 222(a), AT&T, as a telecommunications carrier, "has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers." AT&T must "only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service . . . ." (*Id.*) AT&T does not dispute that it has these duties, but claims that "Mr. Williams has not produced any evidence that any AT&T employee accessed or disclosed his CPNI." This argument is misleading to the point of absurdity, because AT&T itself produced incontrovertible evidence that its agent accessed Mr. Williams' confidential proprietary information without his authorization. AT&T produced two separate letters addressed to Mr. Williams, each from a member of AT&T's senior management, in which AT&T admitted that "an employee of one of our service providers accessed your Customer Proprietary Network Information (CPNI) without authorization." (*See* App'x, Exs. 25 and 26.) These letters alone raise a triable issue of fact regarding AT&T's failure to protect the confidentiality of Mr. Williams' proprietary information and foreclose summary judgment regarding Mr. Williams' 47 U.S.C.§ 222 claims.

In addition, AT&T misstates the nature and effect of the SIM swaps on Mr. Williams' account and his proprietary information. "Proprietary information" as used in this status "broadly encompasses all types of information that should not be exposed widely to the public, whether that information is sensitive for economic or personal privacy reasons," and "includes privileged information, trade secrets, and personally identifiable information." *In the Matter of Cox Commc'ns, Inc.*, 30 F.C.C. Rcd. 12302, 12307 (2015). AT&T acknowledges that the SIM swaps on Mr. Williams' account provided unauthorized third parties "with access to and use of his phone number for telephone calls and texts after the SIM swap." (AT&T Mov. Br. at 21.) AT&T omits that those third parties immediately used that unauthorized access to Mr. Williams's phone number to obtain a host of his confidential, personal and proprietary information

through the use of phone and/or text based two-factor authentication. AT&T cannot avoid the obvious: by providing unauthorized third parties "with access to and use of [Mr. Williams'] phone number for telephone calls and texts," AT&T provided those hackers with the means to access his other accounts and the information therein, including Gmail; Twitter; Instagram; DropBox; Google Drive; LinkedIn; Coinbase; Slush Pool; Gemini; and First Citizens Bank. (*See* App'x, Ex. 19 at 5-6.) Mr. Williams testified at length about how his accounts were breached as a result of the SIM swaps, and the information that was compromised as a result of those breaches. (*See* App'x, Ex. 3 at 117:8-130:7.) AT&T attempting to downplay the SIM swaps as temporary and limited losses of Mr. Williams ability to make phone calls and send texts is the equivalent of arguing that it is not responsible for a house robbery when it gave the keys to the house to the thief, and is contradicted by the facts in the record.

Moreover, the evidence in the record demonstrates that AT&T was and is fully aware that its customers use phone and text based two-factor authentication as "an extra security layer" for their online accounts. (*See* App'x, Ex. 27 at 1-2; Ex. 28.) In addition, AT&T was and is fully aware that criminals use unauthorized SIM swaps as a way to bypass their victims' phone and text based two-factor authentication security. (*See* App'x, Ex. 8; Ex. 9; Ex. 10; Ex. 28; Ex. 7 at 36-37.) AT&T gave unauthorized third parties access to and use of Mr. Williams' phone number and text services, and the resulting breaches of Mr. Williams' confidential information in his accounts that used phone and/or text based two factor authentication were direct and foreseeable results.

For these reasons, there is a triable issue of fact that AT&T violated 47 U.S.C. § 222 by failing to protect confidentiality of Mr. Williams' proprietary information. AT&T had an affirmative duty to protect that information, and utterly failed to do so.

**b. AT&T Violated the North Carolina Anti-Hacking Statute by Intentionally Disabling Mr. Williams' Phone Through the SIM Swaps**

North Carolina's anti-hacking statute, N.C. Gen. Stat. § 14-458, provides: "it shall be unlawful for any person to use a computer or computer network without authority and with the intent to do any of the following:

(1)     Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs, or computer software from a computer or computer network.

(2)     Cause a computer to malfunction, regardless of how long the malfunction persists.

(3)     Alter or erase any computer data, computer programs, or computer software…"

AT&T's unauthorized SIM swaps of Mr. Williams' phone violated these provisions of N.C. Gen. Stat. § 14-458. AT&T's own account notes for Mr. Williams' phone number demonstrate that AT&T swapped Mr. Williams' SIM card at least six times between November 5, 2018, and February 8, 2019. (App'x, Ex. 1 at ATT-WIL-00678, 668, 658, 649, 647, 641). There is no indication that any of these unauthorized SIM swaps that affected Mr. Williams phone were anything other than intentional. (*See, e.g.*, App'x, Ex. 12 (the AT&T agent that perform that November 5, 2018 on Mr. Williams' account "took full responsibility" for unauthorized SIM swaps.)) Indeed, there is no evidence in the record to suggest that AT&T, or its employees or its agents, could <u>unintentionally</u> swap Mr. Williams' SIM card.

Mr. Williams' account notes also include multiple contemporaneous notations from AT&T agents and employees indicating that those SIM swaps were "fraud," attempts to "hijack" or "takeover" Mr. Williams' SIM card and cellular account, or otherwise clearly done without Mr. Williams' authority. (*See, e.g.*, App'x, Ex. 1 at 676, 665, 657, 656, 655, 646, 640). AT&T does not argue, nor can it argue, that Mr. Williams authorized any of these SIM swaps. It does not matter if AT&T has the ability to perform certain SIM swaps for its customers with their authorization. (*See* AT&T Mov. Br. at 25.)  In this case, AT&T undisputedly accessed his phone to perform SIM swaps without Mr. Williams' authorization to do so, in violation of North Carolina's anti-hacking statute. *See* N.C. Gen. Stat. § 14-458.

As AT&T's own 30(b)(6) witness testified, each time AT&T changed Mr. Williams' SIM card, he necessarily lost access to his phone number and the ability to use his phone for calls and texts. (*See* App'x, Ex. 4 at 89:15-91:4.) When AT&T's agents and employees SIM swapped his phone, they intentionally disabled his ability to use that phone for calls and texts. Accordingly, AT&T's intentionally, and without Mr. Williams' authorization, "temporarily …disable[d]" phone, caused his phone to "malfunction," and "altered" the programs on his phone that permitted calls and texts.

For the reasons set forth above, there is a triable issue of fact that AT&T intentionally swapped

the SIM card on his cell phone without his authorization, and thereby violating N.C. Gen. Stat. § 14-458.[6]

**V.  Mr. Williams' Unfair Trade Practices and Negligence Claims Are Not Barred by the Economic Loss Doctrine**

    **a.  The Court's Previous Motion to Dismiss Order Regarding the Economic Loss Rule is Equally Applicable to This Motion for Summary Judgment**

AT&T moved to dismiss Mr. Williams' claims at the outset of this case, and the Court denied

AT&T's motion in its March 25, 2020, Order. (App'x, Ex. 29 at 10-11 (the "MTD Order.")) In its MTD

Order, the Court ruled that Mr. Williams' negligence claims were not barred by the economic loss rule,

because his claims fit within an exception to that rule: "the economic loss rule does not bar tort claims

where the promisor's conduct causes damage to 'property of the promisee **other than the property**

**which was the subject of the contract**, or was a personal injury to the promisee[.]'" (App'x, Ex. 29 at 10

(quoting *Ellis v. Louisiana-Pac. Corp.,* 699 F.3d 778, 783 (4th Cir. 2012)) (emphasis added).) The Court

held:

> Here, AT&T's alleged negligence led to the compromise of plaintiff's online accounts with other companies, the compromise of legal and financial information, money stolen from his bank account, as well as harm from personal threats and reputational damage. Plaintiff is not seeking to repackage a breach of contract claim for the deficient provision of wireless service. Rather, he is seeking to recover for tortious conduct where the harms proliferated to every aspect of his life, well beyond his contractual relationship with AT&T. The economic loss rule does not bar his negligence and negligent supervision claims.

*Id.* at 10-11.

In its motion for summary judgment, AT&T completely ignores the Court's economic loss rule

decision in its MTD Order, and instead rehashes the same argument it raised in its motion to dismiss: that

because Mr. Williams had a contract with AT&T as his wireless provider, his negligence claim (and now,

apparently, his unfair trade practices claim) cannot be pursued in tort. (*Compare* App'x, Ex. 30 at 16-17,

*with* AT&T's Mov. Br. at 17-19.) AT&T's summary judgment motion simply does not mention that the

---

[6] Since Mr. Williams filed his complaint in this action, the Supreme Court issued its decision in *Van Buren v. U.S.*, 141 S.Ct. 16 (2021), which limits the scope of liability under the CFAA. In light of the recent *Van Buren* decision, Mr. Williams does not contest the dismissal of his CFAA claim.

Court has previously ruled that Mr. Williams' claims fall within the "other property" exception to the economic loss rule. The motion also fails to point to any facts in the record that would affect the Court's previous analysis in its MTD Order[7].

In fact, discovery has substantiated Plaintiff's claims that AT&T's actions resulted in damages to aspects of his life and property beyond simply the cell phone services AT&T was obligated to provide. The records include triable issues facts related to the damage of Plaintiff's "other property" resulting from the SIM swaps, including:

- As a result of the AT&T's first SIM swap of Mr. Williams' account, hackers were able to his Bitcoin mining rewards from Mr. Williams' cryptocurrency accounts to an account (or accounts) controlled by the hackers. (*See* App'x, Ex. 2; Ex. 14 at 4-5.)
- After AT&T's repeated SIM swaps of Mr. Williams' account compromised the safety of this mining operation, Mr. Williams was forced to discontinue it, or risk attacks against his other (as yet un-hacked) operations. (*See* App'x, Ex. 14 at 11-14; Ex. 3 at 256:9-259:19.)
- As a direct result of the SIM swaps, hackers were immediately able to use to compromise his personal (e.g., bank and email) accounts. (App'x, Ex. 19 at 5-7.)
- Mr. Williams received threatening calls and text message from unknown individuals, including a threat that his daughter would be kidnapped (App'x, Ex. 15; Ex. 3 at 67:17-68:18; 72:14-73:6; Ex. 16.)
- After the SIM swaps, agents at the FBI told Mr. Williams that his and his family's personal information had been released onto the "Dark Web," where it was available to criminals and hackers. (App'x Ex. 3 at 112:11-22; 173:18-22; 259:10-263:11.)
- Criminals used the Mr. Williams' phone number to impersonate him and convince an acquaintance to transfer Bitcoin to them, harming his reputation in the process. (App'x Ex. 18.)

AT&T simply ignores these facts, and offers nothing to explain why the Court's MTD Order on this issue does not apply equally to the legal arguments in its motion for summary judgment. Absent any such facts, the law of the case doctrine applies, and the Court's MTD Order analysis regarding the economic loss rule forecloses AT&T's summary judgment on this issue. *See United States v. Aramony,* 166 F.3d 655, 661 (4th Cir. 1999).

---

[7] There is only one fact citation in the entire economic loss section of AT&T's Moving Brief (*see* pages 17-19). That solitary citation supports the proposition that Mr. Williams was an AT&T wireless customer and is completely irrelevant to the "other property" exception to the economic loss rule.

**b. In Addition to the "Other Property" Exception, Two Other Exceptions to the Economic Loss Rule Are Based on Triable Issues of Fact**

The Supreme Court of North Carolina has recognized four total exceptions to the economic loss rule (including the "other property" exception): (1) injury or damage is to a person or property of someone other than the promisee; (2) injury or damage is to property of the promisee other than that which was the subject of the contract; (3) the promisor was charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm; or (4) there was a willful injury to or conversion of the property of the promisee. *N. C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81 (1978), *rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J Hyatt Hammond Assocs., Inc.,* 313 N.C. 230 (1985). In addition to the "other property" exception to the economic loss rule upon which the Court's MTD Order was based, the third and fourth exceptions to the economic loss rule also apply to Mr. Williams' claims, and foreclose AT&T's ability to dismiss those claims at this stage.

As set forth above, there is a triable issue of fact regarding whether AT&T breached its responsibility as a telecommunications carrier to protect Mr. Williams' confidential and proprietary information. If proven at trial, these facts would establish that the third exception to the economic loss rule also applies to Mr. Williams' claims.

As also set forth above, there is a triable issue of fact regarding whether an AT&T agent, Stephen Defiore, intentionally and willfully gave Mr. Williams' SIM card to hackers, thereby causing harm to his AT&T account and other property. (*See supra* Section II.b.) If proven at trial, these facts would establish that the fourth exception to the economic loss rule also applies to Mr. Williams' claims.

**VI.    The Factual Record Demonstrates That AT&T's Conduct Is the Proximate Cause of Mr. Williams' Injuries**

In a final, vain effort to avoid liability, AT&T rehashes its argument about proximate cause which this Court has already rejected as a matter of law. As it did in its motion to dismiss, AT&T again argues that because Mr. Williams was harmed by criminal hackers, AT&T is not the proximate cause of Mr. Williams' damages. (*Compare* App'x, Ex. 30 at 5-6, *with* AT&T's Mov. Br. at 25-27.) However, as this Court has already held, this argument fails under North Carolina law because the criminal acts against Mr.

Williams were foreseeable results of the SIM swaps that AT&T performed on his account. (App'x, Ex. 29 at 7-8.)

The MTD Order held that "'[p]roximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." (App'x, Ex _ at 10 [Doc No. 20] (quoting *Williams v. Carolina Power & Light Co.,* 296 N.C. 400, 403 (1979)). A court should only decide proximate cause as a matter of law when reasonable minds cannot possibly differ as to foreseeability of an injury." *Williams*, 296 N.C. at 403 (App'x, Ex. 29 at 7.) Discovery has only served to substantiate the Court's previous holding that Mr. Williams' injuries were foreseeable to AT&T. AT&T swapped Mr. Williams' SIM card at least six times between November 5, 2018, and February 8, 2019, each time without his authorization and in disregard for its fraud department's warnings and instructions. (App'x, Ex. 1 at ATT-WIL-00678, 676, 668, 663, 658, 656, 649, 647, 641). AT&T tries to distance itself from the text threats he received, but Mr. Williams has put forward sufficient evidence connecting AT&T's misconduct to those text threats. Specifically, the threats were temporally connected, as they all happened immediately during or on the heels of the SIM swaps, and Mr. Williams had not received similar threats before. (Williams Decl. ¶¶5-7.) Indeed, AT&T acknowledges that the SIM swaps against Mr. Williams' account provided unauthorized third parties "…with access to and use of his phone number for telephone calls and texts after the SIM swap." (AT&T Mov. Br. at 21.) AT&T foresaw, or should have foreseen, that once it gave unauthorized third parties "access to and use of" Mr. Williams' phone number and texts, those third parties might employ that access and use to harm Mr. Williams, including by using two-factor authentication to access his online accounts and the information therein, including Gmail; Twitter; Instagram; DropBox; Google Drive; LinkedIn; Coinbase; Slush Pool; Gemini; and First Citizens Bank. (*See* App'x, Ex. 19 at 5-6.) A jury could reasonably infer that AT&T providing access to Mr. Williams' personal information to unknown third parties led to those third parties gaining the information they needed to threaten Mr. Williams and his family. Indeed, AT&T's own expert has opined that in November 2018, when Mr. Williams suffered the first SIM swaps, news media articles about the potential threat of SIM swaps, were so widely

available online that *even AT&T customers* should have known about them. (*See* App'x, Ex. 7; *see also* App'x, Ex. 8; Ex. 9; Ex. 10.) Moreover, as set forth above, there are facts from which a jury could infer that at least one of the SIM swaps, the November 5, 2018, SIM swap performed by AT&T agent Stephen Defiore, was performed for the intentional purpose of providing Mr. Williams' SIM card to a third-party, who could use it for whatever purpose they wanted. (*See supra* Section II.b.)

As this Court has also already held, proximate cause is established here because the intentional criminal acts of the hackers were:

> n*ot merely foreseeable by AT&T but were in fact foreseen.* . . . AT&T swapped plaintiff's SIM card not once, not twice, but seven times. After the first incident the company and plaintiff agreed to specific security protocols because it was aware that he was a high-risk target. On these factual allegations, to hold that proximate is not satisfied as a matter of law because the hacker's conduct is criminal would, in effect, write a new rule immunizing companies from all liability for data breaches. The Court declines to do this.

(App'x, Ex. 29 at 8.) (emphasis added). These allegations have been substantiated by discovery. As set forth above, after the first November 5, 2018, SIM swap on his account, Mr. Williams came to AT&T looking for help, and was told that AT&T would take specific measures to protect his account from further SIM swaps. (*See supra*, Section II.b.) AT&T's document production revealed that multiple instructions were placed on Mr. Williams' account notes warning AT&T agent about the threat of SIM swaps on Mr. Williams' account. (*Id*.) These facts reinforce the Court's previous holding that the criminal acts enabled by AT&T's SIM swaps were not "merely foreseeable by AT&T but were in fact foreseen . . . ." (App'x, Ex. 29 at 8.)

Accordingly, the hackers' criminal acts do not break the chain of proximate cause as a matter of North Carolina law, because AT&T's wrongful conduct facilitated them, and caused them to be more likely to occur. "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby." *Hutchens v. Hankins,* 63 N.C. App.1, 12 (1983) (quotation omitted). For this reason, *Hairston v. Alexander Tank & Equip Co,* 310 N.C. 227 (1984), which AT&T cites, actually supports Mr. Williams' position, because in

that case the court held that an intervening cause will not break the chain of proximate causation unless "the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it." (*id.* at 237). Here, it is clear that AT&T had every reason to anticipate what hackers would do if they gained access to Mr. Williams SIM card, both specifically in this case, because Mr. Williams told AT&T about it (and yet AT&T repeatedly allowed him to be SIM-swapped), and generally, because AT&T was aware of the threat from SIM swaps before and during the relevant time period.

Thus, as this Court has already held (in a portion of its prior decision which AT&T also ignores):

> [***T]he criminal conduct involved in a SIM swap is not "independent," but is facilitated by the wireless carrier***. Unlike a direct hack of data where the company may play a more passive role, ***SIM swaps are ultimately actualized by the wireless carrier***. It is the company that effectuates the SIM card change. This action "remains operative and in force" when the victim's phone activity is used to hack other online accounts, extort the victim, or cause other foreseeable injuries. *Hairston v. Alexander Tank & Equip. Co.,* 310 N.C. 227, 237 (1984) ("In order for the conduct of the intervening agent to break the sequence of events and stay the operative force ... of the original wrongdoer, the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it[.]").

(App'x, Ex. 29 at 8.) (emphasis added). *Accord Holt v. N. Carolina Dep't of Transp.*, 245 N.C. App. 167, 177 (2016), *aff'd*, 396 N.C. 57 (2016) ("It is immaterial how many new events or forces have been introduced if the original cause remains operative and in force.")

Simply put, the record contains substantial evidence that AT&T's conduct in allowing, facilitating, or aiding and abetting the SIM swaps against Mr. Williams' account was an essential link in the chain of causation leading the hackers to get access to Mr. Williams' online accounts, disrupt his Bitcoin mining operation, and wreak havoc on his personal and financial life.[8] Accordingly, AT&T's motion for summary judgment on causation grounds should be denied.

---

[8] In this regard, while AT&T cites *Holt* in its brief (*see* AT&T Brief at 20), it ironically misstates the holding in that case exactly the way the *Holt* Court found that the defendant in *Holt* had misstated the law. *See* 245 N.C. App. at 176 (explaining how defendant had selectively [mis]quoted *Tise v. Yates Constr. Co.,* 345 N.C. 456, 460 (1997) by arguing that "the intervening or superseding criminal acts of another preclude liability of the initial negligent actor when the injury is caused by the criminal acts"). The *Holt* court explained that criminal conduct does not break the chain of causation if it was foreseeable or if it was caused or facilitated by defendant's wrongdoing.

## CONCLUSION

For the reasons set forth above, Plaintiff requests that the Court deny Defendant's motion for

summary in full.

Dated:  May 2, 2022
        New York, New York

                                 **WITHERS BERGMAN LLP**

By:               _____
                        Christopher LaVigne
                        Joseph Gallo
                        430 Park Avenue
                        New York, New York 10022
                        (212) 848-9800
                        Christopher.LaVigne@withersworldwide.com
                        Joseph.Gallo@withersworldwide.com

                        *Attorneys for Plaintiff Jason Williams*

                        Terence S. Reynolds
                        Lucas Garber
                        **SHUMAKER LOOP & KENDRICK LLP**
                        101 South Tyron Street, Suite 2200
                        Charlotte, North Carolina 28280
                        Telephone: (704) 375-0057
                        Facsimile: (704) 332-1197
                        treynolds@shumaker.com
                        State Bar No. 49848

                        *Local Civil Rule 83.1(d) Counsel for Plaintiff*
                        *Jason Williams*

**CERTIFICATE OF SERVICE**

I hereby certify that on date set out below, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Nancy L. Stagg
KILPATRICK TOWNSEND & STOCKTON LLP
12255 El Camino Real, Suite 250
San Diego, CA 92130
Telephone: (858) 350-6156
Facsimile: (858) 350-6111
Email: nstagg@kilpatricktownsend.com

Joseph S. Dowdy
KILPATRICK TOWNSEND & STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: (919) 420-1700
Facsimile: (919) 510-6120
Email: jdowdy@kilpatricktownsend.com

Michael Breslin
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree St. NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile (404) 815-6555
Email: mbreslin@kilpatricktownsend.com

*Counsel for Defendant AT&T Mobility, LLC*

This the 2nd day of May, 2022

/s/ Christopher LaVigne
Christopher LaVigne